## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT HOSSFELD, individually and on behalf of others similarly situated, | ) | Case No. _____ |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EVERQUOTE, INC. and FARMERS GROUP, INC. | ) | **Jury Trial Demanded** |
| Defendant. | ) | |

## COMPLAINT
## <u>CLASS ACTION</u>

1.      Telemarketing calls are intrusive and disruptive. In response to widespread consumer complaints about abusive telemarketing practices, Congress enacted the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

2.      The TCPA provides tools that empower individuals to prevent unwanted calls. "Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 649-50 (4th Cir. 2019).

3.      Farmers authorizes its insurance agents to use third-party telemarketers, and endorses and facilitates use of defendant EverQuote to solicit consumers to purchase Farmers goods and services.

4.      Plaintiff's residential telephone number, 254-xxx-8888, has been on the Do Not Call Registry since 2015, and is also on Farmers' internal Do Not Call list.[1]

---

1.      Plaintiff Hossfeld has been litigating a Do Not Call Registry and Internal Do Not Call case against Farmers since 2023. *Hossfeld v. Farmers Ins. Co.*, 1:23-cv-16587 (N.D.Ill.). Plaintiff does not intend that the class in this action will overlap with the class in the Illinois action.

5. Nevertheless, EverQuote called Plaintiff March 4, 2026, in an effort to try to develop business for Farmers.

6. As part of EverQuote's warm-transfer process, it contemporaneously conveyed Plaintiff's personal information to the Holmes Farmers agency in Lubbock, Texas.

7. The Holmes Farmers agency used that information to call Plaintiff in another effort to try to develop business for Farmers.

8. Pursuant to Farmers' nationwide written policies and practices, neither Farmers, the Holmes Agency nor EverQuote scrubbed Plaintiff's telephone number to see whether it was on the National Do Not Call Registry or any internal Do Not Call list. Alternatively, Plaintiff's phone number was scrubbed and flagged as Do Not Call, but the flag was disregarded pursuant to Farmers' and EverQuote's nationwide policies and practices.

9. Upon information and belief, EverQuote resold or transmitted Plaintiff's lead after it had been informed that Plaintiff did not opt in, and after Plaintiff demanded that calls stop, resulting in additional nonconsensual telemarketing calls to Plaintiff.

10. Plaintiff did not agree or consent to receive telemarketing calls or text messages from or on behalf of either Defendant.

11. Plaintiff was harmed by these calls, and seeks damages and injunctive relief for himself and a class of others similarly situated.

**JURISDICTION AND VENUE**

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the TCPA, 47 U.S.C. § 227.

11. The Court has personal jurisdiction over EverQuote because its headquarters are in Cambridge, Massachusetts, and because the challenged telemarketing was based in this

District.

12.     The Court has personal jurisdiction over Farmers because it purposefully directed business activities toward the Commonwealth of Massachusetts through its partnership and coordinated marketing activities with EverQuote.

13.     Farmers knowingly participates in EverQuote's online insurance lead-generation marketplace and accepts consumer leads generated and transmitted from EverQuote's Massachusetts operations to Farmers agents nationwide.

14.     Through this relationship, Farmers has derived substantial commercial benefit from EverQuote's Massachusetts-based lead generation and consumer solicitation activities and has purposefully availed itself of the privilege of conducting business within Massachusetts.

15.     The claims in this action arise directly out of - and relate to - those Massachusetts-directed activities. The telemarketing calls at issue were initiated as part of the EverQuote lead-generation process and were made for the purpose of selling Farmers insurance products through Farmers' authorized agents.

16.     Farmers knowingly permits and facilitates its agents' use of EverQuote's Massachusetts-based platform to generate and distribute consumer leads that result in outbound telemarketing calls and transfers to Farmers agents.

17.     Because Farmers intentionally participates in this Massachusetts-centered lead-generation system and the claims arise from those activities, the exercise of personal jurisdiction over Farmers in this Court is proper and consistent with both the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, and the Due Process Clause of the Fourteenth Amendment.

18.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims occurred in this District and Defendants conduct business

throughout the United States.

**PARTIES**

12.    Plaintiff Robert Hossfeld is a natural person and resident of Texas.

13.    Plaintiff maintains cell phone number 254-xxx-8888, which he uses for personal matters.  254-xxx-8888 is not a business number.

14.    Prior to the calls at issue, Plaintiff had previously requested not to receive future telemarketing calls, during telemarketing calls promoting Farmers insurance to 254-xxx-8888.

14.    Defendant EverQuote, LLC is a Delaware limited liability company with its principal place of business in Cambridge, Massachusetts.

15.    EverQuote operates an online insurance lead-aggregation marketplace whereby it purchases marketing "leads" from third-party companies that operate websites that claim they are dedicated to finding people who are interested in purchasing insurance. EverQuote resells the leads to insurers, insurance agents and telemarketers.

16.    Often times EverQuote calls the lead itself, and then "warm-transfers" the already-connected call to its customer. When it does so, it contemporaneously emails the lead information to its customer.

17.    Defendant Farmers Group Inc. ("Farmers") offers and sells insurance products throughout the United States through a network of exchanges, subsidiaries and agents. Its headquarters are in California.

18.    Farmers is attorney-in-fact for the exchanges.

19.    Farmers operates and controls the marketing systems, lead programs and agent platforms, and has contractual authority to Manage the exchanges' business, handle underwriting, claims and perform and oversee marketing.

20.     Farmers operates a web-based service called the Agency Growth Store, through which its agents purchase marketing leads from vendors that Farmers pre-approves for TCPA compliance, such as EverQuote.

21.     Farmers specifically authorizes – and encourages – its agents to purchase EverQuote leads, especially through its Agency Growth Store.

**FACTUAL ALLEGATIONS**

24.     Call 1 – EverQuote Voice Call for Farmers. On March 4, 2026 at approximately 11:14 a.m., Plaintiff received a telephone solicitation to his residential telephone.

25.     This call came from Caller ID 254-253-8716, and the caller ID also stated "Farmers Agent."

26.     This call was placed by EverQuote for the purpose of trying to develop business for Farmers.

27.     During the call, the caller indicated that Plaintiff had requested an automobile insurance quote and stated that the call would be transferred to the Holmes agency.

28.     The Holmes agency referred to during this call was the Alexander Holmes Farmers agency located in Lubbock, Texas.

29.     Plaintiff informed EverQuote that he had not requested any insurance quote, and asked questions to learn more about the source of the lead and on whose behalf the call was made. The caller terminated the call.

30.     Call 2 – EverQuote Text Message. On March 4, 2026, shortly after the above-reverenced call, EverQuote sent Plaintiff a text message stating:

> Hi Robert, I recalculated your requested auto coverage application for your 2023 Toyota Camry in Bell County. Here are my recs: [link] – Dan at EverQuote.

32.     The link directed Plaintiff to an EverQuote webpage displaying an advertisement

for Progressive insurance. Upon information and belief, based upon knowledge of how the lead generation industry works, at the time EverQuote sent this text message the ultimate insurance company beneficiary had not yet been identified, and Farmers was one of the eligible beneficiaries.

34.     Calls 3 & 4 – Holmes Farmers agency voice call and Text Message. On March 4, 2026, at approximately 1:00pm Plaintiff received a second telephone solicitation, which came from telephone number (806) 300-8857.

35.     Caller ID (806) 300-8857 is a telephone number for Alexander Holmes Farmers agency.

36.     This call was placed by the Alexander Holmes Farmers agency in Lubbock, Texas, for the purpose of trying to develop business for Farmers, and to try to sell its goods and services.

37.     The Holmes agency call occurred because EverQuote transmitted Plaintiff's lead information to the Farmers agency as part of EverQuote's lead-generation process designed to connect consumers with Farmers agents.

38.     During the call, the caller identified himself as "JD with Farmers Insurance," and confirmed he was located in Lubbock, Texas.

39.     Plaintiff asked how the caller obtained his information, and the caller responded EverQuote.

40.     The caller sent Plaintiff a text message with the Holmes agency's URL on Farmers.com, to increase the likelihood of selling Farmers goods and services.

41.     Plaintiff informed the caller that he had never agreed to be contacted and demanded that the telemarketing calls stop. The caller ended the call.

42.     Farmers internal DNC policies and practices do not require that Farmers agents notify the companies from whom they purchase leads (such as EverQuote) of a Do Not Call request.

43.     Call 5 – EverQuote Text Message. EverQuote sent Plaintiff another follow up text on March 5, 2026.

44.     Upon information and belief, one purpose of this text was to try to develop business for Farmers. At the time EverQuote sent this text message, the ultimate insurance company beneficiary had not yet been identified, and Farmers was one of the eligible beneficiaries.

45.     Upon information and belief, EverQuote's March 4, 2026 call to Plaintiff that mentioned Farmers was part of a telemarketing strategy implemented by Farmers called its Agency Growth Store.

46.     Call 6 – Prerecorded Telemarketing Call Arising from EverQuote Resale. Plaintiff received a prerecorded message call on March 9, 2026, advertising auto insurance.

47.     Upon information and belief, EverQuote was the proximate cause of this call, because it again sold the marketing lead associated with Plaintiff as being an "opt in" and TCPA-compliant lead, even though EverQuote knew Plaintiff had not opted in to receive telemarketing. Alternatively, even if the lead was not represented to be TCPA-compliant, it was reasonably foreseeable that selling Plaintiff's lead after he asked not to receive calls would result in prerecorded calls being delivered to Plaintiff.

48.     Call 7 – Live Telemarketing Call Arising from EverQuote Resale. Plaintiff received another telemarketing call on March 10, 2026, at approximately 11:02am central, advertising auto insurance. The caller ID for this call was 254-796-1918.

49.     <u>Call 8 – Live Auto Insurance Telemarketing Call</u>. Plaintiff received yet another telemarketing call on March 11, 2026, at approximately 12:40pm central time, advertising auto and homeowner's insurance.

50.     The caller on the March 11, 2026, said his name was Daniel, made a sales pitch for lowering Plaintiff's auto insurance rates. The caller asked what insurance company Plaintiff had his auto insurance, asked Plaintiff several qualifying questions including whether Plaintiff owned his house. The caller became angry when Plaintiff asked what insurance company was being pitched, stopped speaking with Plaintiff but remained on the line. Plaintiff then requested not to receive any more calls, and to be placed on the internal DNC list.

51.     Upon information and belief, the March 9, 10 and 11 calls, calls were the result of EverQuote reselling the lead it sold to the Holmes Farmers agency, even though EverQuote was on actual notice that Plaintiff did not opt in.

52.     Upon information and belief, one purpose of the March 9, 10 and 11 calls was to try to develop business for Farmers. At the time these calls were made, the ultimate insurance company beneficiary had not yet been identified, and Farmers was one of the eligible beneficiaries. Farmers should thus be held liable for these calls.

53.     EverQuote should be held liable for the March 9, 10 and 11 calls, too, because EverQuote knew that there was no consent to call Plaintiff's number, but sold Plaintiff's lead as an opt-in lead, anyway, which resulted in those calls. It was reasonably foreseeable that selling Plaintiff's marketing lead after being notified that it was not valid would result in TCPA violations. In other words, EverQuote's actions and omissions were the proximate cause of these calls.

54.     <u>Farmers Agency Growth Store</u>. Farmers' Agency Growth Store is a web-based

service owned and operated by Farmers, whereby agents can select and purchase marketing leads from vendors that Farmers has pre-approved for TCPA compliance at a discount.

55.     Farmers engages a third-party compliance company to scrutinize the "form" consent language on websites from which EverQuote and other lead generators source their marketing leads, and Farmers knowingly and formally approved the consent language and disclosures for the marketing lead that led to the calls to Plaintiff.

56.     Upon information and belief, aside from the marketing and sales benefits Farmers gains from the Agency Growth Store, under certain circumstances Farmers also gains revenue when its agents purchase leads through this service.

57.     Both EverQuote and Farmers maintain the technological and practical ability to cease calling and remove the lead from its sales systems immediately after being notified that a lead is invalid or that there is a DNC request.

58.     EverQuote's calls to Plaintiff and the class were made as part of a campaign designed by Farmers to gain business for its exchanges which in turn benefits Farmers.

59.     Defendants' *En Masse* TCPA Consent Disclosure Approval. To facilitate systematic, efficient and automatic compliance oversight, lead data that EverQuote obtains in connection with Farmers originates from websites that have substantively identical disclosures with regard to consumer consent.

60.     The across-the-board substantively identical consent language, disclosures, websites and practices that EverQuote used – and which Farmers approved – did not effectively confer consent for telemarketing calls made for the purpose of trying to develop new customers for Farmers.

61.     Farmers and its agents keep track of leads its agents purchase from EverQuote, as

well as certain contacts and telemarketing calls to those leads, through an in-house CRM that is data-mapped with EverQuote.

62. EverQuote and Farmers also use a product called Guardian provided by a company called Jornaya to try to ensure that the leads it provides to its agents through the Agency Growth Store fall within certain consent parameters that EverQuote and/or Farmers set.

63. Jornaya allegedly keeps track of each and every consent event, so that EverQuote and Farmers can try to prove that they had consent if confronted with a TCPA lawsuit.

64. <u>There is a Principal-Agent Relationship between Farmers and Farmers Agents, as to Telemarketing and Telemarketing Compliance</u>. There is a principal-agent relationship in law between Farmers and its agents as to telemarketing and telemarketing compliance, such that Farmers should be held liable for its agents' actions and omissions within the scope of that agency.

65. Farmers has designed and implemented a business model that delegates responsibility for telemarketing and telemarketing compliance to its agents, while also maintaining strict control over such including the ability to discipline and terminate agents for failure to follow its policies and guidance.

66. Farmers insists upon controlling – and maintaining the ability to control – the day-to-day operations of agents, their telemarketing vendors, and others that engage in telephone solicitations on its behalf.

67. Farmers agents adhered to Farmers' telemarketing-related rules, policies and guidance, and in doing so violated the TCPA because certain of Farmers policies and guidance are inconsistent with the spirit and letter of the TCPA.

68. Farmers also explicitly approved of, facilitated and helped pay for its agents' use

of EverQuote leads, including approval of lead generation website disclosures that were insufficient to confer consent for them to call leads.

69.     Farmers, through exchange subsidiaries like Farmers New World Life, maintains a standardized contract called the Agent Appointment Agreement ("AAA") with each of its agents – including any agent that called or caused the calls to Plaintiff or the class such as the Holmes Farmers agency – that affords Farmers substantial rights to control the telemarketing at issue here.

70.     Farmers sets the telemarketing policies and guidance that its agents are required to follow, and as the managerial and implementation entity for the exchanges enjoys the power and benefits over agents afforded by the AAA and Farmers policies and guidance.

71.     Even though the exchanges are the nominal principal listed in the AAA, Farmers created systems, policies and rules that operate as centralized control, and dictate agent behavior as to telemarketing.

72.     The following is a non-exhaustive list of additional ways Farmers controls its agents:

a) Requires Farmers agents to solicit Farmers insurance to consumers;

b) Requires that Farmers agents and vendors attempt to sell Farmers products and services *first* in any sales situation, and only permits them to sell non-Farmers products and services if Farmers rejects the consumer's business.

c) Requires that agents permit Farmers to review and examine any agency records it wishes (including telemarketing-related records), compels agents to cooperate with such and requires them to agree to ship such requested records to Farmers upon request.

d) Requires that agents obtain pre-approval from Farmers for any marketing materials that mention Farmers name. Since the TCPA, 47 U.S.C. § 227(d)(5) requires that the name of the company whose products are being solicited be stated during telemarketing calls, this directive requires that Farmers review and approve any telemarketing script used by its agents or their telemarketers.

e) Provides Farmers the right to give or modify instructions concerning any aspect of telemarketing at any time, through unilateral issuance or alteration of guidelines, policies and rules.

f) Permits engagement of third-party telemarketers to help generate business, subject to Farmers' rules, policies and guidance.

g) Forbids agents and third-party telemarketers from calling telephone numbers that are on its internal Do Not Call list, subject to exceptions that Plaintiff alleges are inconsistent with the TCPA.

h) Empowers Farmers to - in its sole discretion - assist with and pay for advertising. For example, Farmers assists and assists agents with the costs of leads they purchase through its Agency Growth Store;

i) Dictates the geographical region(s) within which its agents can solicit Farmers insurance through telemarketing;

j) Mandates the manner and content of telemarketing scripting;

k) Allows Farmers to require its agents to engage in training designed by Farmers, including telemarketing training;

73. The principal-agent relationship between Farmers and its agents means that Farmers is *per se* liable for its agents' actions and omissions within the scope of delegation, such

as failures in DNC scrubbing and TCPA consent.

74. Farmers' Agent Authorization Agreement ("AAA") requires that its agents comply with its policies and guidelines concerning all aspects of their business, including telemarketing.

75. Farmers enjoys the right to modify the rules, policies and guidelines for agent and subvendor telemarketing at any time, and Farmers agents are required to adhere to whatever such modifications Farmers makes.

76. Discipline or terminate agents for conduct that Farmers – in its sole discretion – believes to be detrimental to its business.

77. Certain compliance directives in Farmers' Policy & Guidance for Contacting Consumers by Telephone are inconsistent with the TCPA, and therefore perpetuate TCPA violations by its agents.

78. For example, the Policy & Guidance for Contacting Consumers by Telephone instructs Farmers' agents to use an incorrect, watered-down, standard for consent with regard to Do Not Call Registry compliance.

79. As another example, the Policy & Guidance for Contacting Consumers by Telephone tells Farmers agents that they may call telephone numbers that are on Farmers' internal Do Not Call list, if they believe they have consent. While consent *used* to be an exception/affirmative defense to calling telephone numbers on a company's IDNC list, that exception was removed more than twenty years ago.[2] "There is no affirmative defense to be

---

[2]    Compare 47 C.F.R. § 64.1200(e) (2001) (restricting "telephone solicitations" to numbers on the IDNC list) with 47 U.S.C. § 64.1200(d) (2024) (restricting "telemarketing" calls to numbers on the IDNC list. "Telephone solicitation" is a term of art that contains a consent exception, see 47 C.F.R. § 64.1200(f)(3)(i) (2001). Changing the type of calls the IDNC regulations cover effectively removed the consent defense.

asserted." *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 131 (D. Conn. 2016), *aff'd*, 686 F. App'x 48 (2d Cir. 2017).

80.     Farmers knows that its agents routinely obtain marketing leads from third-party vendors such as EverQuote and then call those leads to sell Farmers insurance products. Farmers authorizes this practice, requires compliance with its telemarketing policies, and retains the authority to discipline or terminate agents who violate those policies.

81.     Moreover, Farmers may be held directly liable for tortious conduct committed by its insurance agents that occurs within the scope of actual delegated authority.

82.     Plaintiffs and other class members reasonably believed Farmers authorized EverQuote and the Holmes Agency's calls, based on Farmers' own actions, such as:

   a) Requiring use of Farmers' tradename during telemarketing calls,

   b) Allowing agents access to detailed and proprietary customer, product, and pricing information used during telemarketing calls;

   c) Authorizing agents to bind Defendants through sales derived through telemarketing calls, and

   d) Retaining revenue and marketing benefits arising from those calls that were successful.

83.     Farmers knew that its agents and their vendors were telemarketing on its behalf in the manner described herein, and received numerous complaints alleging that such conduct violated the TCPA. Farmers nevertheless continues to enjoy the benefits of its agents' telemarketing, such as new customers and marketing exposure.

84.     Farmers benefits directly from telemarketing calls made by its agents and their vendors because those calls generate opportunities to sell Farmers insurance products and expand

Farmers' customer base.

85.    In continuing the conduct complained of here in the face of consumer complaints that placed it on notice that its agents and their vendors were making telephone solicitations to persons who were on the national Do Not Call Registry or Farmers internal Do Not Call List, Farmers knowingly accepted the risk that the conduct complained of herein violated the TCPA. Farmers thus ratified the conduct complained of herein, and any violations that occurred were willful and knowing.

86.    Plaintiffs and the class have been damaged by these calls. Their privacy was improperly invaded, the calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. The calls were annoying and a nuisance, and wasted the time of Plaintiffs and the class. *See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

## CLASS ALLEGATIONS

46.    Plaintiff brings this action on behalf of a class defined as:

**DNC Registry Class: All persons in the United States received two or more telemarketing calls and/or text messages on their non-business number while such number was on the National Do Not Call Registry, within a 12-month period, where a purpose of such calls included trying to develop business for Farmers, where Farmers did not first obtain a signed, written agreement between the call recipient and Farmers, where the lead was obtained from EverQuote and Farmers did not first obtain a signed written agreement with the recipient authorizing telemarketing calls to that telephone number.**

**Internal DNC Class: All persons in the United States who received two or more telemarketing calls and/or text messages within a 12-month period, where a purpose of such calls included trying to develop business for Farmers, and where the recipient's non-business telephone number was on Farmers' or any of its agents or their vendors' internal Do Not Call List, and the lead called was obtained from EverQuote.**

**Robocall Class: All persons in the United States who received prerecorded or artificial voice calls on their cellular telephone, arising from a lead that EverQuote sold, where such call happened after EverQuote or any entity that purchased such lead received a Do Not Call request or was notified that the recipient did not opt in.**

47. Excluded from the DNC Registry class are call recipients Farmers can show made an inquiry or application with Farmers in the 3 months prior to the calls, or transacted business with Farmers in the 18 months prior to the calls.

48. Upon information and belief, based upon Farmers' calling policies and Farmers agents' calling practices, there are more than 1,000 persons who fall within each of the class definitions.

49. Common questions of law or fact exist as to all members of the classes, which predominate over any questions solely affecting any individual member. Such common questions include but are not limited to:

a) Whether Defendants obtained consent sufficient to call the class members whose telephone numbers were on the national Do Not Call Registry.

b) Whether Defendants internal do-not-call policies and practices are in compliance with the TCPA, 47 C.F.R. § 64.1200(d);

c) Whether Farmers should be held liable for call violations made by EverQuote and Farmers agents; and

d) Damages, including whether any violations were performed willfully or knowingly, such that Plaintiffs and the other class members are entitled to treble damages under 47 U.S.C. § 227(b)(3) or (c)(5).

50. Plaintiffs' claims are typical of the claims of the other class members. The factual and legal bases of liability are the same: Defendants violated the TCPA by causing multiple unsolicited telephone solicitations to be made to the telephone number of each member of the

classes above, despite such numbers' registration on the National Do Not Call Registry or a prior do-not-call request.

51.     Plaintiff will fairly and adequately protect the interests of the classes. Plaintiffs have no interests that might conflict with the interests of the classes. Plaintiff is interested in pursuing his claims vigorously, and has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

52.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

53.     No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

54.     Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the classes, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual class members, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

55.     The class members' identities are readily identifiable from Defendants' records.

**COUNT I**
(TCPA – Do Not Call Registry
47 C.F.R. § 64.1200(c))

51.     All prior paragraphs are incorporated.

52.     This Count is against both Defendants.

53.     The TCPA prohibits making telephone solicitations to residential numbers that have been placed on the national Do Not Call Registry.

54.     A private right of action accrues when a consumer receives two calls made by or on behalf of a seller within any 12-month period.

55.     EverQuote made two or more telephone solicitations within a 12-month period to Plaintiff's residential telephone.

56.     Plaintiff received two or more telephone solicitations within a 12-month period on his residential telephone, that were made by or on behalf of Farmers.

57.     The telephone solicitations Plaintiff experienced from Defendants were the result of EverQuote and Farmers' faulty TCPA policies and practices, and failure to adequately monitor and discipline those working on their behalf.

58.     Plaintiff and the class have been damaged by Defendants' national Do Not Call Registry violations. Plaintiff and the class have been damaged by Defendants' internal Do Not Call Registry violations. The calls were intrusions upon their seclusion temporarily seized their telephones preventing the phones' legitimate use. Moreover, the calls came despite legally-enforceable, *bona fide* efforts by Plaintiff and the Class to prevent such communications.

59.     The calls and violations alleged herein were willful and knowing.

WHEREFORE, Plaintiff seeks the following for himself and the proposed class:

        (a)     Certification of the class as alleged herein, and appointment of Plaintiff as class representatives and their attorneys as class counsel;

        (b)     Damages, pursuant to 47 U.S.C. § 227(c)(5), including treble damages if

the violative conduct if found to have been willful or knowing;

(c)    Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing

Defendants and their agents and (sub)vendors from violating the TCPA's Do Not Call

Registry regulations in the future;

(d)    Attorneys' fees and costs, as permitted by law, e.g. Fed.R.Civ.P.

23(g)(1)(C); and

(e)    Such other or further relief as the Court deems just and proper.

## COUNT II
TCPA – Internal Do Not Call
47 C.F.R. § 64.1200(d)

60.    All prior paragraphs are incorporated.

61.    This Count is against both Defendants.

62.    The TCPA prohibits making telephone solicitations to residential numbers of

persons who have asked not to receive such.

63.    A private right of action accrues when a consumer receives two calls made by or

on behalf of a seller within any 12-month period.

64.    Plaintiff has previously requested to be placed on the DNC list during

telemarketing calls which were placed for the purpose of trying to develop business for Farmers.

65.    Despite his prior DNC demand, Plaintiff received two or more telephone

solicitations within a 12-month period on his residential telephone, that were made by or on

behalf of Farmers.

66.    The telephone solicitations Plaintiff experienced from Defendants were the result

of Farmers' faulty TCPA policies and practices which its agents were obliged to follow, and its

failure to adequately monitor and discipline agents and third parties making calls on behalf of

Farmers.

67.     Plaintiff and the class have been damaged by Defendants' internal Do Not Call Registry violations. The calls were intrusions upon their seclusion temporarily seized their telephones preventing the phones' legitimate use. Moreover, the calls came despite legally-enforceable, *bona fide* efforts by Plaintiff and the Class to prevent such communications.

68.     The calls and violations alleged herein were willful and knowing.

WHEREFORE, Plaintiff seeks the following for himself and the proposed class:

(a)     Certification of the class as alleged herein, and appointment of Plaintiff as class representatives and their attorneys as class counsel;

(b)     Damages, pursuant to 47 U.S.C. § 227(c)(5), including treble damages if the violative conduct if found to have been willful or knowing;

(c)     Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at ensuring that Farmers' internal Do Not Call list is complete and that each DNC request is honored for five years;

(d)     Attorneys' fees and costs, as permitted by law, e.g. Fed.R.Civ.P. 23(g)(1)(C); and

(e)     Such other or further relief as the Court deems just and proper.

### COUNT III
TCPA – Prerecorded Telemarketing Calls to Cell Phone
47 U.S.C. § 227(b)(1)(A)(iii)

69.     All prior paragraphs are incorporated.

70.     This Count is against EverQuote.

71.     The TCPA prohibits making telephone solicitations to residential numbers of persons who have asked not to receive such.

72.    A private right of action for improper robocalls accrues when a consumer receives any call that uses a prerecorded or artificial voice.

73.    The caller for the March 9, 2026, prerecorded message call did not have consent for such call: Plaintiff had previously notified the source of the lead, EverQuote, that he did not opt in, and had requested to be placed on the DNC list during a telemarketing call with the Holmes Farmers agency which were placed for the purpose of trying to develop business for Farmers.

74.    Plaintiff and the class have been damaged by these prerecorded robocalls. The calls were intrusions upon their seclusion and temporarily seized their telephones preventing their legitimate use.

75.    The calls and violations alleged herein were willful and knowing.

WHEREFORE, Plaintiff seeks the following for himself and the proposed class:

(a)    Certification of the class as alleged herein, and appointment of Plaintiff as class representatives and their attorneys as class counsel;

(b)    Damages, pursuant to 47 U.S.C. § 227(b)(3), including treble damages if the violative conduct if found to have been willful or knowing;

(c)    Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at ensuring that EverQuote does not sell consumer information Farmers' internal Do Not Call list is complete and that each DNC request is honored; ;

(d)    Attorneys' fees and costs, as permitted by law, e.g. Fed.R.Civ.P. 23(g)(1)(C); and

(e)    Such other or further relief as the Court deems just and proper.

**COUNT IV**
**Violation of the Texas Telephone Solicitation Act**
**(Tex. Bus. & Com. Code § 305.001 et seq.)**

76.     All prior paragraphs are incorporated.

77.     This Count is against EverQuote.

73.     The Texas Act also independently prohibits a person from making a telephone solicitation using an automatic dialing announcing device unless the recipient has provided prior express consent. Tex. Bus. & Com. Code § 305.053.

74.     The Texas Act defines "telephone solicitation" as a telephone call or message that is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services. Tex. Bus. & Com. Code § 305.001.

75.     Text messages that promote goods or services constitute "telephone solicitations" under the Texas Act.

76.     At all relevant times, Plaintiff was a resident of Texas and received Defendant's telemarketing text messages in Texas.

77.     Defendant's text messages were sent using an automatic dialing system or similar automated technology that qualifies as an automatic dialing announcing device under the Texas Act.

78.     Defendant's conduct constitutes multiple violations of the Texas Act, which triggers a private right of action under Tex. Bus. & Com. Code § 305.053.

79.     As a result of Defendant's violations of the Texas Act, Plaintiff and the class is entitled to recover statutory damages of $500 per violation, plus attorneys fees and costs.

80.     If the Court finds that Defendant knowingly or intentionally violated the Texas Act, Plaintiff and the class are entitled to recover treble damages as permitted by statute.

81.    Defendants' violations were not accidental or isolated, but instead were the result of systematic joint business practices designed to generate and monetize consumer marketing leads without adequate regard for consent or legal compliance.

82.    As a direct and proximate result of Defendants' violations, Plaintiff and members of the Texas Subclass suffered harm, including invasion of privacy, nuisance, and disruption of their daily lives.

83.    Plaintiff and the Texas Subclass are also entitled to injunctive relief prohibiting Defendants from continuing to engage in the unlawful practices described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Subclass, prays for the following relief:

(a)    Injunctive relief prohibiting Defendant from sending calls soliciting the purchase of its goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

(b)    Injunctive relief prohibiting Defendant from sending calls soliciting the purchase of its goods or services, except for emergency purposes, to anyone who asked Defendant to stop;

(c)    Judgment in favor of Plaintiff and all Class members for statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

(d)    An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing Classes the Court deems appropriate, finding that

Plaintiff is a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes; and

(e)     Such other relief as the Court deems just and proper.

**COUNT V**
(Massachusetts Common Law Restitution and Disgorgement)

84.     All prior paragraphs are incorporated.

85.     This claim arises from Defendants' unfair, deceptive, and unlawful conduct that occurred primarily and substantially within the Commonwealth of Massachusetts, including conduct carried out from EverQuote's headquarters and operations in Cambridge, Massachusetts.

86.     EverQuote operates a Massachusetts-based lead-generation and marketing platform through which it acquires, processes, labels, and sells consumer leads to insurance carriers and agents, including Farmers and its authorized agents.

87.     From its Massachusetts operations, EverQuote systematically generated, labeled, marketed, and sold consumer leads—including Plaintiff's lead—as "opt-in" or otherwise compliant with telemarketing laws, when in fact such leads were not supported by valid consumer consent.

88.     EverQuote knew or should have known, from its Massachusetts-based operations and systems, that Plaintiff had not provided consent to receive telemarketing calls and had requested that such calls cease, yet nevertheless sold and/or resold Plaintiff's lead as a valid telemarketing lead.

89.     EverQuote's Massachusetts-based conduct—including the generation, mislabeling, marketing, and resale of non-consensual leads—directly caused telemarketing calls and text messages to be placed to Plaintiff and members of the Classes.

90.     Farmers knowingly participated in and benefited from this Massachusetts-

centered conduct through a coordinated and interdependent business relationship with EverQuote.

91. Specifically, Farmers:

(a) Authorized and encouraged its agents to purchase EverQuote leads, including through its Agency Growth Store;

(b) Approved and ratified the consent language, disclosures, and lead-generation practices used by EverQuote;

(c) Knowingly accepted and acted upon leads generated, processed, and transmitted from EverQuote's Massachusetts-based platform; and

(d) Derived revenue and other economic benefits from insurance policies and business opportunities generated through such leads.

92. At all relevant times, EverQuote and Farmers acted in concert and pursuant to a common business objective of generating and monetizing consumer leads for the sale of insurance products, and shared in the economic benefits of that conduct.

93. Through this coordinated enterprise, Defendants obtained and retained substantial revenues and other benefits derived from telemarketing activities that violated consumer protection laws and public policy, including calls made without valid consent and calls made after do-not-call requests.

94. Defendants collected, processed, monetized, and exploited Plaintiff and the class members' personal information through their Massachusetts-based lead-generation and telemarketing systems.

95. Defendants knowingly accepted and retained these benefits under circumstances that make it inequitable and unjust for them to retain the profits and revenues derived from such

conduct.

96.    Defendants' retention of these benefits violates principles of equity and good conscience under Massachusetts law, particularly where such benefits were obtained through conduct that was unfair, deceptive, and contrary to statutes designed to protect consumers from unwanted telemarketing.

97.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the Classes are entitled to restitution and disgorgement of Defendants' ill-gotten gains.

WHEREFORE, Plaintiff, on behalf of himself and the Classes, requests that the Court:

(a)    Order Defendants to disgorge all revenues, profits, and other benefits obtained as a result of the conduct alleged herein;

(b)    Impose a constructive trust over such ill-gotten gains;

(c)    Award restitution to Plaintiff and the Classes in an amount to be determined at trial; and

(d)    Grant such other and further equitable relief as the Court deems just and proper.


ROBERT HOSSFELD, individually and on behalf of others similarly situated,


By: _/s/ Anthony Paroncih_

Anthony Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(617) 485-0018
Anthony@ParonichLaw.com

Alexander H. Burke (*pro hac vice forthcoming*)

- 26 -

- 27 -

**BURKE LAW OFFICES, LLC**
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com

*Counsel for Plaintiffs*