**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERT HOSSFELD, individually and on behalf of others similarly situated,<br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>EVERQUOTE, LLC and FARMERS GROUP, INC.<br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:26-cv-11440-JCB

**Jury Trial Demanded**

**AMENDED COMPLAINT
<u>CLASS ACTION</u>**

1.　Telemarketing calls are intrusive and disruptive. In response to widespread consumer complaints about abusive telemarketing practices, Congress enacted the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

2.　The TCPA provides tools that empower individuals to prevent unwanted calls. "Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 649-50 (4th Cir. 2019).

3.　Farmers authorizes its insurance agents to use third-party telemarketers, and endorses and facilitates use of defendant EverQuote to solicit consumers to purchase Farmers goods and services.

4.　Plaintiff's residential telephone number, 254-xxx-8888, has been on the Do Not Call Registry since 2015, and is also on Farmers' internal Do Not Call list.[1]

---

[1]　Plaintiff Hossfeld has been litigating a Do Not Call Registry and Internal Do Not Call case against Farmers since 2023. *Hossfeld v. Farmers Ins. Co.*,

5.      Nevertheless, EverQuote called Plaintiff March 4, 2026, in an effort to try to develop business for Farmers.

6.      As part of EverQuote's warm-transfer process, it contemporaneously conveyed Plaintiff's personal information to the Holmes Farmers agency in Lubbock, Texas.

7.      The Holmes Farmers agency used that information to call Plaintiff in additional efforts to try to develop business for Farmers.

8.      Pursuant to Farmers' nationwide written policies and practices, neither Farmers, the Holmes Agency nor EverQuote scrubbed Plaintiff's telephone number to see whether it was on the National Do Not Call Registry or any internal Do Not Call list. Alternatively, Plaintiff's phone number was scrubbed and flagged as Do Not Call, but the flag was disregarded pursuant to Farmers' and EverQuote's nationwide policies and practices.

9.      Upon information and belief, EverQuote resold or transmitted Plaintiff's lead after it had been informed that Plaintiff did not opt in, and after Plaintiff demanded that calls stop, resulting in additional nonconsensual telemarketing calls to Plaintiff.

10.     Plaintiff did not agree or consent to receive telemarketing calls or text messages from or on behalf of either Defendant.

11.     Plaintiff was harmed by these calls, and seeks damages and injunctive

---

1:23-cv-16587 (N.D.Ill.). Plaintiff does not intend that the class in this action will overlap with the class in the Illinois action.

relief for himself and a class of others similarly situated.

## JURISDICTION AND VENUE

10.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the TCPA, 47 U.S.C. § 227.

11.     The Court has personal jurisdiction over EverQuote because its headquarters are in Cambridge, Massachusetts, and because the challenged telemarketing was based in this District.

12.     The Court has personal jurisdiction over Farmers because it purposefully directed business activities toward the Commonwealth of Massachusetts through its partnership and coordinated marketing activities with EverQuote.

13.     Farmers knowingly participates in EverQuote's online insurance lead-generation marketplace and accepts consumer leads generated and transmitted from EverQuote's Massachusetts operations to Farmers agents nationwide.

14.     Through this relationship, Farmers has derived substantial commercial benefit from EverQuote's Massachusetts-based lead generation and consumer solicitation activities and has purposefully availed itself of the privilege of conducting business within Massachusetts.

15.     The claims in this action arise directly out of - and relate to - those Massachusetts-directed activities. The telemarketing calls at issue were initiated as part of the EverQuote lead-generation process and were made for the purpose of selling Farmers insurance products through Farmers' authorized agents.

16. Farmers knowingly permits and facilitates its agents' use of EverQuote's Massachusetts-based platform to generate and distribute consumer leads that result in outbound telemarketing calls and transfers to Farmers agents.

17. Because Farmers intentionally participates in this Massachusetts-centered lead-generation system and the claims arise from those activities, the exercise of personal jurisdiction over Farmers in this Court is proper and consistent with both the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, and the Due Process Clause of the Fourteenth Amendment.

18. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims occurred in this District and Defendants conduct business throughout the United States.

## PARTIES

12. Plaintiff Robert Hossfeld is a natural person and resident of Texas.

13. Plaintiff maintains cell phone number 254-xxx-8888, which he uses for personal matters.  254-xxx-8888 is not a business number. Plaintiff placed 254-xxx-8888 onto the DNC Registry.

14. Prior to the calls at issue, Plaintiff had previously requested not to receive future telemarketing calls, during telemarketing calls promoting Farmers insurance to 254-xxx-8888.

15. Farmers and EverQuote had actual knowledge that Plaintiff's 254-xxx-8888 telephone number was on Farmers' do not call list at all relevant times.

16. Farmers agents, too, have access to DNC Registry and Farmers

internal DNC data.

14.     Defendant EverQuote, LLC is a Delaware limited liability company with its principal place of business in Cambridge, Massachusetts.

15.     EverQuote operates an online insurance lead-aggregation marketplace whereby it purchases marketing "leads" from third-party companies that operate websites that claim they are dedicated to finding people who are interested in purchasing insurance. EverQuote resells the leads to insurers, insurance agents and telemarketers.

16.     Often times EverQuote calls the lead itself, and then "warm-transfers" the already-connected call to its customer. When it does so, it contemporaneously emails the lead information to its customer.

17.     Defendant Farmers Group Inc. ("Farmers") offers and sells insurance products throughout the United States through a network of exchanges, subsidiaries and agents. Its headquarters are in California.

18.     Farmers is attorney-in-fact for the exchanges.

19.     Farmers operates and controls the marketing systems, lead programs and agent platforms, and has contractual authority to Manage the exchanges' business, handle underwriting, claims and perform and oversee marketing.

20.     Farmers operates a web-based service called the Agency Growth Store, through which its agents purchase marketing leads from vendors that Farmers pre-approves for TCPA compliance, such as EverQuote.

21.     Farmers negotiates and executes agreements with the entities that

make the Agency Growth Store possible, such as EverQuote, TCPA compliance company Verisk/Jornaya, LeadCloud and others.

22.    Farmers specifically authorizes – and encourages – its agents to engage third parties to assist with developing business for Farmers. In particular, Farmers encourages its agents to purchase EverQuote leads, especially through its Agency Growth Store.

**FACTUAL ALLEGATIONS**

24.    <u>Call 1 – EverQuote Voice Call for Farmers</u>. On March 4, 2026 at approximately 11:14 a.m., Plaintiff received a telephone solicitation to his residential telephone.

25.    This call came from Caller ID 254-253-8716. At Farmers' insistence, the caller ID also stated "Farmers Agent."

26.    EverQuote and Farmers knew 254-xxx-8888 was on the National Do Not Call Registry at the time of this call and also knew that Hossfeld had previously demanded not to receive Farmers calls.

27.    This call was placed by EverQuote for the purpose of trying to develop business for Farmers. During the call, the caller indicated that Plaintiff had requested an automobile insurance quote and stated that the call would be transferred to the Holmes agency.

28.    The Holmes agency referred to during this call was the Alexander Holmes Farmers agency located in Lubbock, Texas.

29.    Plaintiff informed EverQuote that he had not requested any insurance

quote, and asked questions to learn more about the source of the lead and on whose behalf the call was made. The caller terminated the call.

30.   Call 2 – EverQuote Text Message. On March 4, 2026, shortly after the above-reverenced call, EverQuote sent Plaintiff a text message stating:

> Hi Robert, I recalculated your requested auto coverage application for your 2023 Toyota Camry in Bell County. Here are my recs: [link] – Dan at EverQuote.

32.   The link directed Plaintiff to an EverQuote webpage displaying an advertisement for Progressive insurance.

33.   Upon information and belief, based upon knowledge of how the lead generation industry works, at the time EverQuote sent this text message the ultimate insurance company beneficiary had not yet been identified, and Farmers was one of the eligible beneficiaries.

34.   Calls 3 & 4 – Holmes Farmers agency voice call and Text Message. On March 4, 2026, at approximately 1:00pm Plaintiff received a second telephone solicitation, which came from telephone number (806) 300-8857.

35.   Caller ID (806) 300-8857 is a telephone number for Alexander Holmes Farmers agency.

36.   This call was placed by the Alexander Holmes Farmers agency in Lubbock, Texas, for the purpose of trying to develop business for Farmers, and to try to sell its goods and services.

37.   The Holmes agency call occurred because EverQuote transmitted Plaintiff's lead information to the Farmers agency as part of EverQuote's lead-

- 7 -

generation process designed to connect consumers with Farmers agents.

38.     During the call, the caller identified himself as "JD with Farmers Insurance," and confirmed he was located in Lubbock, Texas.

39.     Plaintiff asked how the caller obtained his information, and the caller responded EverQuote.

40.     The caller sent Plaintiff a text message with the Holmes agency's URL on Farmers.com, to increase the likelihood of selling Farmers goods and services.

41.     Plaintiff informed the caller that he had never agreed to be contacted and demanded that the telemarketing calls stop. The caller ended the call.

42.     Farmers internal DNC policies and practices do not require that Farmers agents notify the companies from whom they purchase leads (such as EverQuote) of a Do Not Call request.

43.     <u>Call 5 – EverQuote Text Message</u>. EverQuote sent Plaintiff another follow up text on March 5, 2026.

44.     Upon information and belief, one purpose of this text was to try to develop business for Farmers. At the time EverQuote sent this text message, the ultimate insurance company beneficiary had not yet been identified, and Farmers was one of the eligible beneficiaries.

45.     Upon information and belief, EverQuote's March 4, 2026 call to Plaintiff that mentioned Farmers was part of a telemarketing strategy implemented by Farmers called its Agency Growth Store.

46.    Call 6 – Prerecorded Telemarketing Call Arising from EverQuote Resale. Plaintiff received a prerecorded message call on March 9, 2026, advertising auto insurance.

47.    Upon information and belief, EverQuote was the proximate cause of this call, because it again sold the marketing lead associated with Plaintiff as being an "opt in" and TCPA-compliant lead, even though EverQuote knew Plaintiff had not opted in to receive telemarketing and had in fact demanded that calls cease.

48.    Alternatively, even if the lead was not represented to be TCPA-compliant, it was reasonably foreseeable that selling Plaintiff's lead after he asked not to receive calls would result in prerecorded calls being delivered to Plaintiff.

49.    Call 7 – Live Telemarketing Call Arising from EverQuote Resale. Plaintiff received another telemarketing call on March 10, 2026, at approximately 11:02am central, advertising auto insurance. The caller ID for this call was 254-796-1918.

50.    Upon information and belief, EverQuote was the proximate cause of this call, because it again sold the marketing lead associated with Plaintiff as being an "opt in" and TCPA-compliant lead, even though EverQuote knew Plaintiff had not opted in to receive telemarketing.

51.    Alternatively, even if the lead was not represented to be TCPA-compliant, it was reasonably foreseeable that selling Plaintiff's lead after he asked not to receive calls would result in prerecorded calls being delivered to Plaintiff.

52.    Call 8 – Live Auto Insurance Telemarketing Call. Plaintiff received yet

another telemarketing call on March 11, 2026, at approximately 12:40pm central time, advertising auto and homeowner's insurance.

53.    The caller on the March 11, 2026, said his name was Daniel, made a sales pitch for lowering Plaintiff's auto insurance rates. The caller asked what insurance company Plaintiff had his auto insurance, asked Plaintiff several qualifying questions including whether Plaintiff owned his house. The caller became angry when Plaintiff asked what insurance company was being pitched, stopped speaking with Plaintiff but remained on the line. Plaintiff then requested not to receive any more calls, and to be placed on the internal DNC list.

54.    Upon information and belief, the March 9, 10 and 11 calls, calls were the result of EverQuote reselling the lead it had previously sold to the Holmes Farmers agency, even though EverQuote was on actual notice that Plaintiff did not opt in and had requested not to receive telemarketing.

55.    EverQuote should be held liable for the March 9, 10 and 11 calls, because EverQuote knew that there was no consent to call Plaintiff's number, but sold Plaintiff's lead as an opt-in lead, anyway, which resulted in those calls.

56.    It was reasonably foreseeable that selling Plaintiff's marketing lead after being notified that it was not valid would result in TCPA violations. In other words, EverQuote's actions and omissions were the proximate cause of these calls.

57.    <u>Defendants' Internal Do Not Call Policies and Practices</u>

58.    Plaintiff was on Farmers do not call list at all times in March 2026. Moreover, EverQuote and Farmers have a nearly instantaneous Do Not Call

information sharing system.

59.    EverQuote and Farmers thus both *knew* that Plaintiff had requested not to receive communications from Farmers when they made telemarketing communications to him.

60.    The reason Defendants send marketing text messages and calls despite prior consumer requests to stop calling is that both Farmers and EverQuote have policies and procedures in place that permit telemarketing calls to telephone numbers that are on Farmers and/or EverQuote's DNC list, if Farmers or EverQuote believes there has been a opt-in to receive calls.

61.    <u>Farmers Agency Growth Store</u>. Farmers' Agency Growth Store is a web-based service owned and operated by Farmers, whereby agents can select and purchase marketing leads from vendors that Farmers has pre-approved for TCPA compliance at a discount.

62.    Farmers engages a third-party compliance company to scrutinize the "form" consent language on websites from which EverQuote and other lead generators source their marketing leads, and Farmers knowingly and formally approved the consent language and disclosures for the marketing lead that led to the calls to Plaintiff.

63.    Upon information and belief, aside from the marketing and sales benefits Farmers gains from the Agency Growth Store, under certain circumstances Farmers also gains revenue when its agents purchase leads through this service.

64.    Both EverQuote and Farmers maintain the technological and practical

ability to cease calling and remove the lead from its sales systems immediately after being notified that a lead is invalid or that there is a DNC request.

65.    EverQuote's calls to Plaintiff and the class were made as part of a campaign designed by EverQuote and Farmers to gain business Farmers and its exchanges, which in turn benefits Farmers.

66.    EverQuote's calls and text messages to Plaintiff and the classes were *not* designed to generate new business for EverQuote.

67.    <u>Google Tag Manager</u>. Google Tag Manager is a website tool that lets EverQuote place and control tracking code on its webpages from one central container, rather than hard-coding every tracker separately. In practical terms, it can cause other analytics, advertising, consent, fraud-detection, and conversion-tracking tools to fire when a visitor lands on a page, moves through a form, clicks a button, or submits information.

68.    EverQuote's website auto.everquote.com is instrumented with Google Tag Manager.

69.    The source code for `auto.everquote.com` contains a Google Tag Manager container identified as `GTM-P8QQMPK`, and includes code that loads Google Tag Manager and a noscript iframe associated with the same container.

70.    Through Google Tag Manager, EverQuote can deploy, modify, and trigger analytics, advertising, conversion, lead-submission, fraud-detection, and other tracking tags across its website without changing the visible webpage code.

71.    On information and belief, EverQuote engages such technology to

monitor, review and maintain Google Tag Manager data in the ordinary course of its lead generation, aggregation and sales business.

72.    On information and belief, EverQuote's Google Tag Manager implementation generated and/or routed event-level data concerning the alleged March 4, 2026 visit and form submission that EverQuote attributes to Plaintiff.

73.    Such event-level data would include, or allow EverQuote to determine, the pages and form steps visited, the timing of each step, the browser and device used, the IP address or network associated with the session, the referral source, the tags fired, and whether any click, submission, or consent-related event actually occurred during the session.

74.    On information and belief, those records contain indicia that the alleged lead was not submitted by Plaintiff, including session, device, network, geographic, referral, or event-pattern information inconsistent with Plaintiff's identity and conduct.

75.    <u>Google Analytics / GA4</u>. Google Analytics, including GA4, is a website analytics system that records information about visits to a website, such as when a session occurred, what pages or form steps were viewed, what device and browser were used, how the visitor reached the site, and what events occurred during the visit.

76.    EverQuote's website is instrumented with Google Analytics / GA4 tracking.

77.    The source code for `auto.everquote.com` loads a Google tag associated

with GA4 measurement ID `G-HV6LTMHKPY` and configures that tag to collect analytics data concerning website visits and user interactions.

78.     Google Analytics / GA4 can capture page views, sessions, user/device identifiers, timestamps, traffic source information, browser and device information, geographic information, and custom events such as form progression, lead creation, quote requests, and conversion events.

79.     On information and belief, EverQuote engages such technology to monitor, review and maintain Google Analytics data in the ordinary course of its lead generation, aggregation and sales business.

80.     On information and belief, Google Analytics / GA4 records exist for the alleged March 4, 2026 session that EverQuote attributes to Plaintiff. Those records would show whether the alleged visitor's session, device, browser, IP-derived location, referral source, timing, and event sequence were consistent with an actual visit and submission by Plaintiff.

81.     On information and belief, those analytics records contain indicia that the alleged visitor was not Plaintiff, including data reflecting a different device, network, location, acquisition source, session pattern, or user behavior than would be expected if Plaintiff had personally visited auto.everquote.com and submitted the form.

82.     <u>Server-Side Tagging / First-Party Data Collection</u>. EverQuote does not appear to rely only on ordinary browser-side Google tracking; it also implements server-side tagging and data collection.

83.     Server-side tagging is a tracking setup where website events are first sent to a company-controlled or company-associated server before being sent on to Google or other third parties.

84.     EverQuote's source code shows that its GA4 tracking is configured to use `https://gtm-sst-server.services.everquote.com` with first-party collection enabled, meaning EverQuote's own tagging server received and processed session-level event data.

85.     The source code for `auto.everquote.com` configures GA4 using a first-party/server-side collection endpoint at https://gtm-sst-server.services.everquote.com and sets "first_party_collection" to true.

86.     This means EverQuote's website is configured to route analytics or tag events through an EverQuote-controlled or EverQuote-associated server-side tagging endpoint before those events are processed or forwarded to Google or other recipients.

87.     On information and belief, EverQuote's server-side tagging system engaged such technology to generate and maintains records concerning the alleged March 4, 2026 session that EverQuote attributes to Plaintiff.

88.     Those records would include inbound browser events, timestamps, event parameters, user/session identifiers, IP address, user agent, page location, referral source, form-stage data, disclosure-related events, lead-submission events, and any outbound events transmitted to Google, Meta, fraud-detection vendors, consent-verification vendors, lead buyers, or other third parties.

- 15 -

89.     On information and belief, those records contain indicia that the alleged form submission did not originate from Plaintiff, including device, network, geographic, timing, source, or event-sequence inconsistencies.

90.     <u>Anura Fraud Detection Services</u>. EverQuote's website source code also indicates that EverQuote uses or loads Anura or similar internet traffic-quality technology. Anura is a traffic-quality and fraud-detection tool used to evaluate whether website traffic or lead submissions appear legitimate, suspicious, automated, proxied, or otherwise unreliable.

91.     EverQuote's source code includes a `loadAnura: true` configuration flag, supporting the inference that EverQuote's website was configured to load or use Anura-related traffic-quality technology.

92.     The source code for `auto.everquote.com` contains a configuration flag `loadAnura: true,` which indicates that EverQuote does, indeed, regularly and systematically use Anura traffic quality technology.

93.     Anura and similar systems are used in the online lead-generation industry to evaluate whether website traffic and lead submissions are legitimate, fraudulent, automated, bot-generated, proxied, VPN-associated, data-center-associated, corporate-network-associated, geographically inconsistent, or otherwise suspicious.

94.     On information and belief, EverQuote's Anura or traffic-quality systems evaluated the alleged March 4, 2026 session that EverQuote attributes to Plaintiff.

95.    Such systems would be expected to generate records, scores, flags, classifications, or logs concerning the alleged visitor's IP address, device, browser, network type, proxy/VPN status, traffic source, session behavior, and lead quality.

96.    On information and belief, those traffic-quality records contain indicia that the alleged lead was not submitted by Plaintiff, including a suspicious or non-residential network, proxy/VPN or corporate-network characteristics, bot-like or automated behavior, geographic mismatch, device mismatch, lead-quality warning, or other traffic-quality flag inconsistent with EverQuote's assertion that Plaintiff personally visited the website and assented to its terms

97.    Other Indicia Plaintiff did not visit auto.everquote.com. There are other indicia, too, that EverQuote had, which placed it on notice that the lead did not originate with Plaintiff.

98.    The email address EverQuote says is Plaintiff's email address robertho@gmail.com Dkt. 19-1 ¶ 10, is not and has never been an email address that Plaintiff has used. It has never been Plaintiff's email address.

99.    Additionally, on information and belief, the IP address on the lead does not match Plaintiff's geographic location or ISP.

100.    Defendants' *En Masse* TCPA Consent Disclosure Approval. To facilitate systematic, efficient and automatic compliance oversight, lead data that EverQuote obtains in connection with Farmers originates from websites that have substantively identical disclosures with regard to consumer consent.

101.    The across-the-board substantively identical consent language,

disclosures, websites and practices that EverQuote used – and which Farmers approved – did not effectively confer consent for telemarketing calls made for the purpose of trying to develop new customers for Farmers.

102. Farmers and its agents keep track of leads its agents purchase from EverQuote, as well as certain contacts and telemarketing calls to those leads, through an in-house CRM that is data-mapped with EverQuote.

103. EverQuote and Farmers also use a product called Guardian provided by a company called Jornaya to try to ensure that the leads it provides to its agents through the Agency Growth Store fall within certain consent parameters that EverQuote and/or Farmers set.

104. Jornaya allegedly keeps track of each and every consent event, so that EverQuote and Farmers can try to prove that they had consent if confronted with a TCPA lawsuit.

105. <u>There is a Principal-Agent Relationship between Farmers and Farmers Agents, and between Farmers and EverQuote, as to Telemarketing and Telemarketing Compliance</u>. There is a principal-agent relationship in law between Farmers and Farmers agents as to telemarketing and telemarketing compliance, such that Farmers should be held liable for its agents' actions and omissions within the scope of that agency.

106. Farmers has designed and implemented a business model that delegates responsibility for telemarketing and telemarketing compliance to its agents, while also maintaining strict control over such including the ability to

discipline and terminate agents for failure to follow its policies and guidance.

107.    Farmers insists upon controlling – and maintaining the ability to control – the day-to-day operations of agents, their telemarketing vendors, and others that engage in telemarketing and telephone solicitations on its behalf.

108.    Farmers agents and EverQuote adhered to Farmers' telemarketing-related rules, policies and guidance, and in doing so violated the TCPA because certain of Farmers policies and guidance are inconsistent with the spirit and letter of the TCPA.

109.    Farmers also explicitly approved of, facilitated and helped pay for its agents' use of EverQuote leads, including approval of lead generation website disclosures that were insufficient to confer consent for them to call leads.

110.    Farmers, through exchange subsidiaries like Farmers New World Life, maintains a standardized contract called the Agent Appointment Agreement ("AAA") with each of its agents – including any agent that called or caused the calls to Plaintiff or the class such as the Holmes Farmers agency – that affords Farmers substantial rights to control the telemarketing at issue here.

111.    Farmers sets the telemarketing policies and guidance that its agents are required to follow, and as the managerial and implementation entity for the exchanges enjoys the power and benefits over agents afforded by the AAA and Farmers policies and guidance.

112.    Even though the exchanges are the nominal principal listed in the AAA, Farmers created systems, policies and rules that operate as centralized

control, and dictate agent behavior as to telemarketing.

113. The following is a non-exhaustive list of additional ways Farmers controls its agents and EverQuote. Farmers:

a) Requires Farmers agents to solicit Farmers insurance to consumers;

b) Requires that EverQuote, Farmers agents and any third-party making or participating in telemarketing calls on its behalf, state that the call is being made on behalf of Farmers.

c) Requires that Farmers agents and vendors attempt to sell Farmers products and services *first* in any sales situation, and only permits them to sell non-Farmers products and services if Farmers rejects the consumer's business.

d) Requires that Farmers agents and EverQuote permit Farmers to review and examine any agency records it wishes (including telemarketing-related records), compels agents to cooperate with such and requires them to agree to ship such requested records to Farmers upon request.

e) Requires that Farmers agents and EverQuote obtain pre-approval from Farmers for any marketing materials that mention Farmers name. Since the TCPA, 47 U.S.C. § 227(d)(5) requires that the name of the company whose products are being solicited be stated during telemarketing calls, this directive requires that Farmers review and approve any telemarketing script used by its agents or their

telemarketers.

f) Provides Farmers the right to give or modify instructions concerning any aspect of telemarketing by Farmers agents, EverQuote or any third party assisting them at any time, through unilateral issuance or alteration of guidelines, policies and rules.

g) Permits engagement of third-party telemarketers to help generate business, subject to Farmers' rules, policies and guidance.

h) Forbids Farmers agents, EverQuote and third-party telemarketers from calling telephone numbers that are on its internal Do Not Call list, subject to exceptions that Plaintiff alleges are inconsistent with the TCPA.

i) Empowers Farmers to - in its sole discretion - assist with and pay for advertising. For example, Farmers assists and assists agents with the costs of leads they purchase through its Agency Growth Store, and facilitates such through EverQuote by sharing DNC data, and negotiating favorable pricing for Farmers Agents using EverQuote;

j) Dictates the geographical region(s) within which its agents can solicit Farmers insurance through telemarketing;

k) Mandates the manner and content of telemarketing scripting;

l) Allows Farmers to require its agents and EverQuote to engage in training designed by Farmers, including telemarketing training;

m) Allows Farmers to Discipline or terminate agents for conduct that

Farmers – in its sole discretion – believes to be detrimental to its business.

114. The principal-agent relationship between Farmers and its agents means that Farmers is *per se* liable for its agents' actions and omissions within the scope of delegation, such as failures in DNC scrubbing and TCPA consent.

115. The principal-agent relationship between Farmers and its agents also means that its agents' knowledge of their and their subagents' telemarketing activities and compliance failures is imputed to Farmers.

116. Farmers' Agent Authorization Agreement ("AAA") requires that its agents and their telemarketing vendors such as EverQuote comply with its policies and guidelines concerning all aspects of their business, including telemarketing.

117. Farmers enjoys the right to modify the rules, policies and guidelines for Farmers agent, EverQuote and other subvendor telemarketing at any time, and Farmers agents are required to adhere to whatever such modifications Farmers makes.

118. Certain compliance directives in Farmers' Policy & Guidance for Contacting Consumers by Telephone are inconsistent with the TCPA, and therefore perpetuate TCPA violations by its agents.

119. For example, the Policy & Guidance for Contacting Consumers by Telephone instructs Farmers' agents to use an incorrect, watered-down, standard for consent with regard to Do Not Call Registry compliance.

120. As another example, the Policy & Guidance for Contacting Consumers

by Telephone tells Farmers agents that they may call telephone numbers that are on Farmers' internal Do Not Call list, if they believe they have consent. While consent *used* to be an exception/affirmative defense to calling telephone numbers on a company's IDNC list, that exception was removed more than twenty years ago.[2] "There is no affirmative defense to be asserted." *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 131 (D. Conn. 2016), *aff'd*, 686 F. App'x 48 (2d Cir. 2017).

121. Farmers knows that its agents routinely obtain marketing leads from third-party vendors such as EverQuote and then call those leads to sell Farmers insurance products. Farmers authorizes this practice, requires compliance with its telemarketing policies, and retains the authority to discipline or terminate agents who violate those policies.

122. Moreover, Farmers may be held directly liable for tortious conduct committed by its insurance agents that occurs within the scope of actual delegated authority.

123. Plaintiff and other class members reasonably believed Farmers authorized EverQuote and the Holmes Agency's calls, based on Farmers' own actions, such as:

    a) Requiring use of Farmers' tradename during telemarketing calls,

    b) Allowing agents access to detailed and proprietary customer, product,

---

[2]    Compare 47 C.F.R. § 64.1200(e) (2001) (restricting "telephone solicitations" to numbers on the IDNC list) with 47 U.S.C. § 64.1200(d) (2024) (restricting "telemarketing" calls to numbers on the IDNC list. "Telephone solicitation" is a term of art that contains a consent exception, see 47 C.F.R. § 64.1200(f)(3)(i) (2001). Changing the type of calls the IDNC regulations cover effectively removed the consent defense.

and pricing information used during telemarketing calls;

c) Authorizing agents to bind Defendants through sales derived through telemarketing calls, and

d) Retaining revenue and marketing benefits arising from those calls that were successful.

124. Farmers knew that its agents and their vendors were telemarketing on its behalf in the manner described herein, and received numerous complaints alleging that such conduct violated the TCPA. Farmers nevertheless continues to enjoy the benefits of its agents' telemarketing, such as new customers and marketing exposure.

125. Farmers benefits directly from telemarketing calls made by its agents and their vendors because those calls generate opportunities to sell Farmers insurance products and expand Farmers' customer base

126. Farmers set up, authorized, and benefited from a telemarketing system whose purpose was to generate consumer leads and use those leads to market Farmers-branded insurance products and services.

127. The benefit Farmers received from that system was not limited to completed policy sales. Farmers obtained the marketing exposure, sales opportunities, lead information, and consumer contacts the system was designed to produce.

128. In Plaintiff's case, the system functioned exactly as intended: Plaintiff's information was generated or transmitted as an insurance lead, Plaintiff

was contacted by telephone and text message, and Farmers-branded insurance products and services were marketed to him. Farmers therefore received a concrete commercial benefit from the challenged conduct because the telemarketing system accomplished its intended purpose—marketing Farmers-branded insurance to Plaintiff and similarly situated consumers.

129.   In continuing the conduct complained of here in the face of consumer complaints that placed it on notice that its agents and their vendors were making telephone solicitations to persons who were on the national Do Not Call Registry or Farmers internal Do Not Call List, Farmers knowingly accepted the risk that the conduct complained of herein violated the TCPA. Farmers thus ratified the conduct complained of herein, and any violations that occurred were willful and knowing.

130.   Plaintiff and the class have been damaged by these calls. Their privacy was improperly invaded, the calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. The calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. *See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

## CLASS ALLEGATIONS

46.   Plaintiff brings this action on behalf of a class defined as:

**DNC Registry Class: All persons in the United States who, within any 12-month period, received two or more telemarketing calls or text**

**messages to a non-business telephone number registered on the National Do Not Call Registry, where a purpose of the calls or text messages was to encourage the purchase of Farmers goods or services, and where the lead associated with the called number was obtained from EverQuote.**

**Excluded from the DNC Registry Class are persons for whom Farmers' records show that, before each challenged call or text message necessary to establish membership in the class, the telephone number called or texted was associated with either: (a) a purchase, policy, renewal, or other transaction involving Farmers insurance products within the preceding 18 months; or (b) an inquiry or application directed to Farmers, a Farmers agent, or a Farmers-branded webpage concerning Farmers insurance products within the preceding 3 months. This exclusion does not apply to any call or text message made after the person requested not to receive further telemarketing calls or text messages made by or on behalf of Farmers.**

**Internal DNC Class: All persons in the United States who received two or more telemarketing calls and/or text messages within a 12-month period, where a purpose of such calls included trying to develop business for Farmers, and where the recipient's non-business telephone number was on Farmers' or any of its agents or their vendors' internal Do Not Call List, and the lead called was obtained from EverQuote.**

47. For avoidance of doubt, Plaintiff alleges that a visit to, inquiry through, application submitted to, transaction with, or relationship involving EverQuote or another lead generator does not, by itself, remove a person from the DNC Registry Class unless the records show that the person specifically inquired about, applied for, purchased, renewed, or transacted for Farmers insurance products within the applicable time period and had not thereafter requested that Farmers-related telemarketing stop.

48. Upon information and belief, based upon Farmers' calling policies and

Farmers agents' calling practices, there are more than 1,000 persons who fall within each of the class definitions.

49. Common questions of law or fact exist as to all members of the classes, which predominate over any questions solely affecting any individual member. Such common questions include but are not limited to:

a) Whether Defendants obtained consent sufficient to call the class members whose telephone numbers were on the national Do Not Call Registry;

b) Whether Defendants internal do-not-call policies and practices are in compliance with the TCPA, 47 C.F.R. § 64.1200(d);

c) Whether Farmers should be held liable for call violations made by EverQuote and Farmers agents; and

d) Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other class members are entitled to treble damages under 47 U.S.C. § 227(b)(3) or (c)(5).

50. Plaintiff's claims are typical of the claims of the other class members. The factual and legal bases of liability are the same: Defendants violated the TCPA by causing multiple unsolicited telephone solicitations to be made to the telephone number of each member of the classes above, despite such numbers' registration on the National Do Not Call Registry or a prior do-not-call request.

51. Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has no interests that might conflict with the interests of the classes.

Plaintiff is interested in pursuing his claims vigorously, and has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

52.   Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

53.   No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

54.   Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the classes, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual class members, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

55.   The class members' identities are readily identifiable from Defendants' records.

**COUNT I**
(TCPA – Do Not Call Registry
47 C.F.R. § 64.1200(c))

51.    All prior paragraphs are incorporated.

52.    This Count is against both Defendants.

53.    The TCPA prohibits making telephone solicitations to residential numbers that have been placed on the national Do Not Call Registry.

54.    A private right of action accrues when a consumer receives two calls made by or on behalf of a seller within any 12-month period.

55.    EverQuote made two or more telephone solicitations within a 12-month period to Plaintiff's residential telephone.

56.    Plaintiff received two or more telephone solicitations within a 12-month period on his residential telephone, that were made by or on behalf of Farmers.

57.    The telephone solicitations Plaintiff experienced from Defendants were the result of EverQuote and Farmers' faulty TCPA policies and practices, and failure to adequately monitor and discipline those working on their behalf.

58.    Plaintiff and the class have been damaged by Defendants' national Do Not Call Registry violations. Plaintiff and the class have been damaged by Defendants' internal Do Not Call Registry violations. The calls were intrusions upon their seclusion temporarily seized their telephones preventing the phones' legitimate use. Moreover, the calls came despite legally-enforceable, *bona fide* efforts by Plaintiff and the Class to prevent such communications.

59.    The calls and violations alleged herein were willful and knowing.

WHEREFORE, Plaintiff seeks the following for himself and the proposed

class:

> (a)    Certification of the class as alleged herein, and appointment of Plaintiff as class representatives and their attorneys as class counsel;

> (b)    Damages, pursuant to 47 U.S.C. § 227(c)(5), including treble damages if the violative conduct if found to have been willful or knowing;

> (c)    Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Defendants and their agents and (sub)vendors from violating the TCPA's Do Not Call Registry regulations in the future;

> (d)    Attorneys' fees and costs, as permitted by law, e.g. Fed.R.Civ.P. 23(g)(1)(C); and

> (e)    Such other or further relief as the Court deems just and proper.

## COUNT II
### TCPA – Internal Do Not Call
### 47 C.F.R. § 64.1200(d)

60.    All prior paragraphs are incorporated.

61.    This Count is against both Defendants.

62.    The TCPA prohibits making telephone solicitations to residential numbers of persons who have asked not to receive such.

63.    A private right of action accrues when a consumer receives two calls made by or on behalf of a seller within any 12-month period.

64.    Plaintiff has previously requested to be placed on the DNC list during telemarketing calls which were placed for the purpose of trying to develop business for Farmers.

65.     Despite his prior DNC demand, Plaintiff received two or more telephone solicitations within a 12-month period on his residential telephone, that were made by or on behalf of Farmers.

66.     The telephone solicitations Plaintiff experienced from Defendants were the result of Farmers' faulty TCPA policies and practices which its agents were obliged to follow, and its failure to adequately monitor and discipline agents and third parties making calls on behalf of Farmers.

131.     Farmers may also be held directly liable for the internal do not call violations alleged herein even though it did not "press the button" to initiate the calls to Plaintiff and the class because: (1) Farmers created and facilitates the system within which such telemarketing calls are made, (2) Farmers' formal policies and procedures are contrary to the TCPA such that agents and subvendors that follow those policies and procedures are certain to violate, and (3) the TCPA states that persons on whose behalf calls are made shall be held liable for IDNC violations.

67.     Plaintiff and the class have been damaged by Defendants' internal Do Not Call Registry violations. The calls were intrusions upon their seclusion temporarily seized their telephones preventing the phones' legitimate use. Moreover, the calls came despite legally-enforceable, *bona fide* efforts by Plaintiff and the Class to prevent such communications.

68.     The calls and violations alleged herein were willful and knowing.

WHEREFORE, Plaintiff seeks the following for himself and the proposed class:

(a)    Certification of the class as alleged herein, and appointment of Plaintiff as class representatives and their attorneys as class counsel;

(b)    Damages, pursuant to 47 U.S.C. § 227(c)(5), including treble damages if the violative conduct if found to have been willful or knowing;

(c)    Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at ensuring that Farmers' internal Do Not Call list is complete and that each DNC request is honored for five years;

(d)    Attorneys' fees and costs, as permitted by law, e.g. Fed.R.Civ.P. 23(g)(1)(C); and

(e)    Such other or further relief as the Court deems just and proper.

### COUNT III
### Violation of the Texas Telephone Solicitation Act
### (Tex. Bus. & Com. Code § 305.001 et seq.)

69.    All prior paragraphs are incorporated.

70.    This Count is against EverQuote and Farmers.

73.    The Texas Business & Commerce Code § 305.053(a), provides that a violation of the TCPA constitutes a violation of the Texas Act.

74.    Defendants' conduct constitutes multiple violations of the TCPA, , which violations trigger a private right of action under Tex. Bus. & Com. Code § 305.053.

75.    As a result of Defendants' violations of the Texas Act, Plaintiff and the class is entitled to recover statutory damages of $500 per violation, plus attorneys fees and costs.

76.     If the Court finds that Defendants knowingly or intentionally violated the Texas Act, Plaintiff and the class are entitled to recover treble damages as permitted by statute.

77.     Defendants' violations were not accidental or isolated, but instead were the result of systematic joint business practices designed to generate and monetize consumer marketing leads without adequate regard for consent or legal compliance.

78.     As a direct and proximate result of Defendants' violations, Plaintiff and members of the Texas Subclass suffered harm, including invasion of privacy, nuisance, and disruption of their daily lives.

79.     Plaintiff and the Texas Subclass are also entitled to injunctive relief prohibiting Defendants from continuing to engage in the unlawful practices described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Subclass, prays for the following relief:

(a)     Injunctive relief prohibiting Defendant from sending calls soliciting the purchase of its goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

(b)     Injunctive relief prohibiting Defendant from sending calls soliciting the purchase of its goods or services, except for emergency purposes, to anyone who asked Defendant to stop;

(c)     Judgment in favor of Plaintiff and all Class members for statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

(d)     An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing Classes the Court deems appropriate, finding that Plaintiff is a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes; and

(e)     Such other relief as the Court deems just and proper.

### COUNT IV

(Massachusetts Common Law Restitution and Disgorgement)

80.    This Count is against EverQuote, only.

81.    All prior paragraphs are incorporated.

82.    This claim arises from Defendants' unfair, deceptive, and unlawful conduct that occurred primarily and substantially within the Commonwealth of Massachusetts, including conduct carried out from EverQuote's headquarters and operations in Cambridge, Massachusetts.

83.    EverQuote operates a Massachusetts-based lead-generation and marketing platform through which it acquires, processes, labels, and sells consumer leads to insurance carriers and agents, including Farmers and its authorized agents.

84.    EverQuote knowingly monetized dubious or fabricated lead traffic because its business model incentivized volume over legitimacy.

85.    EverQuote built a highly sophisticated surveillance and lead-routing system capable of detecting consumer behavior in enormous detail, yet failed—or refused—to stop obviously invalid leads from being sold and used for telemarketing.

86.    From its Massachusetts operations, EverQuote systematically generated, labeled, marketed, and sold consumer leads—including Plaintiff's lead— as "opt-in" or otherwise compliant with telemarketing laws, when in fact EverQuote knew such leads were not opt-in.

87.    EverQuote knew or should have known, from its Massachusetts-based operations and systems, that Plaintiff had not provided consent to receive telemarketing calls and had requested that such calls cease, yet nevertheless sold and/or resold Plaintiff's lead as a valid opt-in telemarketing lead.

88.    Indeed, EverQuote sold Plaintiff's lead after Plaintiff had notified EverQuote that he had not opted in.

89.    EverQuote's Massachusetts-based conduct—including the generation, mislabeling, marketing, and resale of non-consensual leads—directly invaded Plaintiff's privacy by disseminating Plaintiff's personal information.

90.    What is more, it was a natural and foreseeable result of EverQuote selling Plaintiff's personal information as an "opt-in" when it was not, that Plaintiff would receive telemarketing calls and text messages from purchasers or re-purchasers of the lead, and that the lead would be repeatedly resold thus

perpetuating additional unwanted telemarketing calls.

91.    EverQuote obtained and retained substantial revenues and other benefits derived from telemarketing activities that violated consumer protection laws and public policy, including calls made without valid consent and calls made after do-not-call requests

92.    Defendants collected, processed, monetized, and exploited Plaintiff and the class members' personal information through their Massachusetts-based lead-generation and telemarketing systems.

93.    Defendants knowingly accepted and retained these benefits under circumstances that make it inequitable and unjust for them to retain the profits and revenues derived from such conduct.

94.    Defendants' retention of these benefits violates principles of equity and good conscience under Massachusetts law, particularly where such benefits were obtained through conduct that was unfair, deceptive, and contrary to statutes designed to protect consumers from unwanted telemarketing.

95.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the Classes are entitled to restitution and disgorgement of Defendants' ill-gotten gains.

96.    This Count does not seek relief arising from telemarketing calls.

97.    Instead, this Count seeks restitution and disgorgement arising from EverQuote's sale of Plaintiff and class members' personal information when EverQuote knew or had reason to know that the consumer had not opted in.

- 36 -

WHEREFORE, Plaintiff, on behalf of himself and the Classes, requests that the Court:

(a)     Order EverQuote to disgorge all revenues, profits, and other benefits obtained as a result of the conduct alleged herein;

(b)     Impose a constructive trust over such ill-gotten gains;

(c)     Award restitution to Plaintiff and the Classes in an amount to be determined at trial;

(d)     Enjoin EverQuote from selling, reselling, transferring, licensing, marketing, representing as compliant, or otherwise monetizing consumer lead data after EverQuote knows or has reason to know the consumer did not submit the lead, did not opt in, or made a do-not-call request; and

(e)     Grant such other and further equitable relief as the Court deems just and proper.

> ROBERT HOSSFELD, individually and on behalf of others similarly situated,
>
> By: */s/ Alexander H. Burke*

Anthony Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(617) 485-0018
Anthony@ParonichLaw.com

Alexander H. Burke, *pro hac vice*
**BURKE LAW OFFICES, LLC**

909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com

*Counsel for Plaintiff*

## Document Preservation Demand

Defendants are directed to immediately gather data pertaining to Plaintiff and the allegations in this action.

Plaintiff demands that Defendants preserve all records, and direct that all customers, (sub)vendors, agents, and other third parties with relevant documents or data do so, too. Pursuant to their contractual and extracontractual rights and privileges, including for example paragraph B.3 of the Farmers Agency Appointment Agreement, Defendants are directed to obtain all call data, lead or opt-in data, and other relevant documents from all agents and applicable (sub)vendors or third parties – particularly if they are located overseas – ***before*** any relationship is modified or terminated, and before otherwise taking any steps that might cause relevant lead and call records to be altered, lost or destroyed.

Lead generators and aggregators frequently remove access to call records when relationships sour or terminate. Defendants should therefore collect and preserve all EverQuote and lead originator/producer records before taking any action that might eliminate access.

Defendants should gather all records first, before taking any steps that might remove access to these types of records. Plaintiff will assist with reasonable costs of preservation; please contact the attorneys listed here to discuss.

*/s/ Alexander H. Burke*

## Do Not Call Request

Plaintiff reiterates his request not to receive telephone calls at 254-743-8888 for any marketing purpose from or on behalf of: (a) Farmers, Farmers agents or any of their affiliates or subvendors; and (b) EverQuote and any of its affiliates, subvendors or customers.

## Certificate of Service

I certify that the forgoing document was served upon each party through counsel using the ECF System for the District of Massachusetts.

*/s/ Alexander H. Burke*