**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ROBERT HOSSFELD,** individually and on behalf of all others similarly situated, | Case No. 1:26-cv-11440-RGS |
| *Plaintiff,* | |
| *v.* | |
| **EVERQUOTE, INC. and FARMERS GROUP, INC.** | |
| *Defendants.* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
EVERQUOTE, INC.'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT**

### I. INTRODUCTION

EverQuote's motion asks this Court to resolve a series of factual disputes and unsettled legal questions on the pleadings, and to do so by reading the First Amended Complaint selectively and drawing every inference in EverQuote's own favor. Rule 12(b)(6) permits none of that.

On Count II, EverQuote portrays the internal do-not-call claim as resting on a single text message sent one day after a single request made to a stranger. The FAC alleges far more. Mr. Hossfeld's number was on *Farmers' own internal do-not-call list at all relevant times*, both Defendants had *actual knowledge* of that listing through their "nearly instantaneous" DNC information sharing system, and EverQuote and Farmers maintain defective policies that permit telemarketing to numbers on their internal DNC lists whenever they believe there has been an "opt-in," including, as here, an "opt-in" EverQuote knew to be false. FAC ¶¶ 14-15, 26, 58-60, 64. Calling a number already on the internal list is itself a violation, and no "reasonable time" grace period applies to a request made and recorded long before the calls began. As for the requests Mr.

Hossfeld made during the March 4 calls themselves, the ten business days allowed by the regulation is a ceiling, not a floor. On these allegations, reasonableness is fact-intensive and cannot be resolved in EverQuote's favor on the pleadings. Whether a caller with an alleged near-instantaneous DNC system, in light of the same lead generation system, acted within a "reasonable time" is a question of fact for the jury.

On Count III, EverQuote concedes that its argument is entirely derivative. In its words, the Texas claim fails only "to the same extent" the TCPA claims fail. Because the TCPA claims survive, the Texas claim survives with them. EverQuote's fallback request to bar "duplicative statutory damages" is a damages argument, unsettled on the merits, and one the Texas Legislature has now resolved against EverQuote by statute for conduct occurring after September 1, 2025, as all of the calls here did. Tex. Bus. & Com. Code § 305.055.

On Count IV, the telephone calls are not the benefit EverQuote unjustly retained, the referral revenue is. The TCPA compensates consumers for unlawful communications, while Count IV strips EverQuote of the profit from an unauthorized *sale* of Plaintiff's *personal information*, a sale complete before any communication occurred and one EverQuote repeated *after* Plaintiff told EverQuote directly that he had never opted in. FAC ¶¶ 86-88, 96-97. No statutory count remedies that wrong or reaches that benefit, so the adequate remedy at law doctrine has no application. This Court recently sustained a similar claim in *Lionetta v. InMarket Media, LLC*, 798 F. Supp. 3d 139, 151-53 (D. Mass. 2025) (Kobick, J.).

Finally, on Calls 6-8, EverQuote's "initiation" framework addresses the wrong statute. Plaintiff's claims arise under 47 U.S.C. § 227(c)(5), which reaches calls made "by or on behalf of" the same entity. The FAC alleges that the March 9, 10, and 11 calls resulted from EverQuote reselling the very lead at issue as a TCPA compliant "opt in" with actual knowledge that no consent

2

existed. Those allegations state a claim, and whether calls made by Farmers based on leads sold by EverQuote can be said to be "on behalf of" EverQuote is a matter for discovery, not dismissal.

The motion should be denied in its entirety.

## II. FACTUAL BACKGROUND

Mr. Hossfeld's residential cellular number has been on the National Do Not Call Registry since 2015 and on Farmers' internal Do Not Call list. FAC ¶¶ 4, 13, 15, 58. Before the calls at issue, he had demanded during telemarketing calls promoting Farmers insurance that the calls stop. FAC ¶¶ 14, 64. EverQuote and Farmers operate a "nearly instantaneous Do Not Call information sharing system," and both "knew that Plaintiff had requested not to receive communications from Farmers when they made telemarketing communications to him." FAC ¶¶ 58-59.

Despite this, at approximately 11:14 a.m. on March 4, 2026, EverQuote called Mr. Hossfeld, with a caller ID reading "Farmers Agent," claiming he had requested an automobile insurance quote. FAC ¶¶ 24-27. Mr. Hossfeld told the caller he had not requested any quote. FAC ¶ 29. EverQuote texted him minutes later anyway and transferred his information to the Alexander Holmes Farmers agency, which called and texted him that afternoon. FAC ¶¶ 30-40. On the Holmes call, which occurred only because EverQuote sold Plaintiff's lead to the agency, Mr. Hossfeld "informed the caller that he had never agreed to be contacted and demanded that the telemarketing calls stop." FAC ¶¶ 37, 41. EverQuote texted him again on March 5. FAC ¶ 43.

Then, with actual knowledge that Plaintiff had not opted in and had demanded that the calls stop, EverQuote resold his lead as a TCPA compliant "opt in," proximately causing at least three more solicitations, a prerecorded call on March 9 and live calls on March 10 and 11, during the last of which he again demanded placement on an internal do-not-call list. FAC ¶¶ 9, 46-56. The FAC alleges that these calls occurred because "both Farmers and EverQuote have policies and

3

procedures in place that *permit* telemarketing calls to telephone numbers that are on Farmers and/or EverQuote's DNC list, if Farmers or EverQuote believes there has been a[n] opt-in to receive calls," FAC ¶ 60 (emphasis added), and because Farmers' internal DNC policies "do not require that Farmers agents notify the companies from whom they purchase leads (such as EverQuote) of a Do Not Call request." FAC ¶ 42.

### III. LEGAL STANDARD

To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in his favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A party may also plead claims "alternatively or hypothetically" and "regardless of consistency." Fed. R. Civ. P. 8(d)(2), (3).

### IV. ARGUMENT

**A. Count II States an Internal Do-Not-Call Claim Against EverQuote.**

*1. The claim does not rest on a single text message sent one day after a single request.*

EverQuote's argument proceeds from a false premise, namely that Count II rests on "a single follow-up text message sent the very next day" after a request "made to an independent third party." Mot., ECF No. 46, at 2-3. But the face of the FAC pleads several independent do-not-call predicates, most of which long predate March 5, 2026.

*First*, Mr. Hossfeld's number was already on Farmers' internal do-not-call list "at all relevant times," pursuant to demands he made before the calls at issue, and both EverQuote and Farmers "had actual knowledge" of that fact. FAC ¶¶ 14-15, 58-59, 64. The regulation is violated not only when a caller fails to record a do-not-call request but also when it calls a number already on an internal do-not-call list. *Robison v. 7PN, LLC*, 569 F. Supp. 3d 1175, 1184 (D. Utah 2021).

4

Where the request was made, recorded, and known long before the challenged calls, there is no "reasonable time" left to run. The processing window in 47 C.F.R. § 64.1200(d)(3) governs how quickly a *new* request must be honored. It is not a license to call numbers already on the list. Every one of the eight communications alleged in the FAC, starting with EverQuote's 11:14 a.m. call on March 4 to sell Farmers' Insurance, was placed to a number on Farmers' internal DNC list. FAC ¶¶ 24-26, 58-59. That states a claim without any reference to the March 5 text at all.

EverQuote dismisses these allegations as generalized because the FAC does not plead when any prior request was made or to whom. Mot. at 6. But the FAC pleads that the requests were made to Farmers "during telemarketing calls promoting Farmers insurance," FAC ¶ 14, that the number was on Farmers' internal DNC list throughout March 2026, FAC ¶ 58, and that EverQuote had actual knowledge of that listing through the shared system. FAC ¶¶ 15, 58-59. Rule 8 does not require Plaintiff to plead the calendar date and the name of the telemarketer who took each prior demand. That information resides in Defendants' own DNC records and is "peculiarly within the possession and control of the defendant[s]." *Guadian v. DebtBlue LLC*, No. EP-23-CV-329-KC, 2024 WL 5184488, at *3 (W.D. Tex. Apr. 16, 2024).

*Second*, even taking the March 4-5 sequence on its own, the "independent third party" framing fails on the regulation's text. The Holmes call occurred because EverQuote itself *transmitted Plaintiff's information to the Farmers agency minutes after EverQuote's own call*, as part of a single Farmers-branded campaign whose caller ID read "Farmers Agent." FAC ¶¶ 25, 27, 34-37. It is thus reasonable to infer that Do Not Call requests should be processed similarly, and equally as expeditiously across the entire calling chain. The regulation expressly contemplates this structure. If do-not-call requests "are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will

be liable for any failures to honor the do-not-call request," and a request reaches affiliated entities where "the consumer reasonably would expect them to be included given the identification of the caller and . . . the product being advertised." 47 C.F.R. § 64.1200(d)(3). A consumer who demands mid-transaction that the calls stop, on a call EverQuote transferred to him, promoting the same Farmers insurance EverQuote had called about two hours earlier, has made a request that every participant in that campaign must honor.

EverQuote's reliance on FAC ¶ 42, alleging that Farmers' policies "do not require that Farmers agents notify the companies from whom they purchase leads (such as EverQuote) of a Do Not Call request," is remarkable. That allegation is not EverQuote's defense. It is the pleaded violation. A DNC procedure under which stop requests made during a campaign's own calls are, by policy, never routed to the entity generating and reselling the leads that drive the campaign is precisely the procedural deficiency § 64.1200(d) condemns.

Third, the post-request conduct is not limited to the March 5 text. After Plaintiff's March 4 demands, EverQuote resold his lead as an "opt in," with actual knowledge that he had not opted in and did not want the calls, proximately causing the March 9, 10, and 11 solicitations. FAC ¶¶ 9, 46-56. A caller does not honor a do-not-call request by continuing to merchandise the consumer's number to new telemarketers as a valid, consented lead with purported interest.

### 2. Ten business days is a ceiling, not a floor, and it is not a safe harbor at the pleading stage.

EverQuote's centerpiece argument, that any communication within ten business days of a request "does not plausibly violate Section 64.1200(d)(3)," Mot. at 5, inverts the regulation. The rule commands that callers "must honor a residential subscriber's do-not-call request *within a reasonable time* from the date such request is made," and then provides that "[t]his period may not exceed [10] business days." 47 C.F.R. § 64.1200(d)(3) (emphasis added). The operative obligation

is *reasonableness*. The ten-day figure is an outer limit on what can ever be reasonable, not a grant of ten free days of violations. Indeed, the FCC amended a previous version of this rule, effective April 2025, to shorten that outer limit from thirty days to ten business days, reflecting its judgment that modern systems process such requests far faster.

Courts accordingly treat the reasonableness of the time taken to honor a request as a factual question, with the regulatory maximum serving only as an outer bound. "[W]hether a defendant honored a do-not-call request within a reasonable period is a question of fact best left to the jury in most circumstances where the period is less than 30 days." *Hulett v. EyeBuyDirect, Inc.*, No. 1:24-CV-996 (AMN/MJK), 2025 WL 1677071, at *6 (N.D.N.Y. June 13, 2025) (construing the prior thirty-day cap); *accord Menin v. Star Markets Co.*, No. 23-CV-11918-DJC, 2024 WL 4123522, at *3 (D. Mass. Sept. 9, 2024) (denying motion to dismiss because the reasonableness of DNC procedures is a question for the jury). Courts have found messages sent within days, and even within one hour, of a request sufficient to state a claim. *Lourie v. Papa John's Int'l, Inc.*, No. 1:23-CV-4320-MHC, 2024 WL 5497082, at *4 (N.D. Ga. June 25, 2024) ("[T]he Court must infer that Defendant could have immediately complied with the request prior to the transmittal of the two telemarketing text messages in the week following Lourie's request."); *Gill v. Align Tech. Inc.*, No. 21-CV-631-JPS-JPS, 2022 WL 1540016, at *3-*4 (E.D. Wis. May 16, 2022) (calls one hour after a confirmed opt-out).

The circumstances pleaded here make EverQuote's "one-day turnaround" defense a jury argument several times over. By EverQuote's own reading of the FAC, which is entitled to a presumption of truthfulness at the pleadings stage, EverQuote and Farmers operate a "nearly instantaneous Do Not Call information sharing system." FAC ¶ 58. An entity whose own DNC infrastructure operates in near real time cannot plausibly claim, at the pleading stage, that it needed

7

even a single day to stop texting a consumer who was already on the internal list, who told EverQuote's own caller that morning that he never requested a quote, and who demanded that afternoon, on a call EverQuote itself transferred, that the calls stop. As in *Lourie*, the Court can, and must, infer that EverQuote could have complied immediately. 2024 WL 5497082, at *4.

EverQuote's authorities do not help it. *Orsatti*, *Wagner*, and *Ott* all construed the prior thirty-day version of the rule, and none announces any presumption that any call within the regulatory maximum is *per se* reasonable at the pleading stage. EverQuote itself concedes that "some courts have found a 'reasonable time' to mean less than the provided time period." Mot. at 5. Its proposed "presumptive limit at the pleadings stage," *id.* at 6, appears nowhere in the regulation, and it would read the words "within a reasonable time" out of the rule entirely.

### 3. The FAC plausibly alleges deficient procedures.

EverQuote's final argument, that Plaintiff must plead the absence of internal DNC procedures and that the FAC instead shows "robust" ones, Mot. at 6-8, fails for two reasons.

First, Defendant's premise inverts the pleading burden. Neither § 64.1200(d) nor § 227(c)(5) requires a plaintiff to plead a separate pattern or practice of noncompliance. At this stage, the continued receipt of solicitations after do-not-call requests itself supports the reasonable inference that the caller lacks, or does not honor, the required procedures. *Eagle v. GVG Cap., LLC*, No. 22-CV-00638-SRB, 2023 WL 1415615, at *4 (W.D. Mo. Jan. 31, 2023) ("At the motion to dismiss stage, it is reasonable to infer that Defendant did not have internal procedures regarding do not call request[s]."); *Menin*, 2024 WL 4123522, at *5. Plaintiff alleges existing internal DNC listings, multiple express demands, and eight communications that followed anyway, including three generated by EverQuote's knowing resale of the lead, where he again reiterated his demands. The inference of noncompliant, deficient procedures is compelling.

Second, Plaintiff does not rely on inference alone. The FAC pleads two deficiencies affirmatively. EverQuote and Farmers "have policies and procedures in place that *permit* telemarketing calls to telephone numbers that are on Farmers and/or EverQuote's DNC list, if Farmers or EverQuote believes there has been a[n] opt-in to receive calls," FAC ¶ 60, and Farmers' policies do not require that stop requests received by its agents be conveyed to lead vendors like EverQuote, FAC ¶ 42. That is why, per the FAC, the requests here were never honored and why EverQuote felt at liberty to resell a lead it knew was invalid. FAC ¶¶ 9, 54-56. EverQuote's response, that the existence of a policy "is itself evidence of a procedure, not evidence of a lack thereof," Mot. at 7, turns Rule 12(b)(6) on its head. The regulation does not reward the existence of just any procedures. It requires procedures meeting the "minimum standards" the rule enumerates, including recording and honoring do-not-call requests. 47 C.F.R. § 64.1200(d), (d)(3), (d)(6); *see Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir. 2011) (§ 64.1200(d) "impose[s] minimum procedures for maintaining a do-not-call list that apply to all calls—live or automated— initiated for telemarketing purposes to residential telephone subscribers"). A written policy whose function is to override standing internal DNC listings on the strength of a purported, and here known false, "opt-in" is not compliance with § 64.1200(d). Whether EverQuote's procedures meet the regulatory minimum is, at most, a factual dispute that cannot be resolved by crediting EverQuote's own characterization of its systems over the FAC's allegations. *Menin*, 2024 WL 4123522, at *5.

*Simmons*, *Nece*, and *Buja* do not compel a different result. Each involved records showing that the defendant had actually instituted compliant written procedures, and *Nece* and *Buja* were decided on summary judgment records. None involved a pleaded policy of calling numbers on the

9

internal list, actual knowledge of the listing and of the falsity of the claimed opt-in, or the resale of the consumer's number as consented after being told directly that no consent existed.

### B. Count III States a Claim, and the "Duplicative Damages" Argument Is Premature, Wrong, and Superseded by Statute.

EverQuote concedes that its attack on Count III is wholly derivative. In its words, the Texas claim "fails to the same extent as the corresponding TCPA claims fail." Mot. at 2, 8-9. That concession resolves this portion of the motion, because EverQuote identifies no independent defect in the Texas claim and the TCPA claims survive for the reasons set forth in Sections IV.A and IV.D. *See Guadian v. Progressive Debt Relief, LLC*, No. EP-23-CV-00235-FM, 2023 WL 7393129, at *4 (W.D. Tex. Nov. 8, 2023).

EverQuote's fallback, that Plaintiff "may not recover duplicative statutory damages under both the federal TCPA and § 305.053(a)," Mot. at 9, fails for three independent reasons.

*First*, it is not a Rule 12(b)(6) argument at all. On a motion to dismiss, a court "looks to whether the plaintiff has stated a claim upon which relief can be granted, not whether those claims may lead to double recovery at the end of the litigation." *Guadian*, 2023 WL 7393129, at *4. "A potential double recovery problem down the road is simply not an appropriate ground on which to dismiss claims under Rule 12(b)(6)." *Bergeron v. Ochsner Health Sys.*, No. CV 17-519, 2017 WL 3648451, at *10 (E.D. La. Aug. 24, 2017). Plaintiffs "can plead multiple claims in the alternative and that any potential recovery should only be limited at the time of trial." *Jubb v. CHW Grp., Inc.*, No. 23CV23382, 2025 WL 942961, at *7 (D.N.J. Mar. 28, 2025); Fed. R. Civ. P. 8(d)(2)-(3).

*Second*, the merits question is far from settled, and the more recent authority rejects EverQuote's position. As the Eastern District of Texas explained months ago, "nothing in either the TCPA or the Business and Commerce Code precludes a plaintiff from suing under both statutes

and receiving the penalties that each statute provides," and courts "routinely award statutory damages under both the TCPA and TBCC based on the same unwanted telephone calls or texts." *Tatum v. RFG USA Inc.*, No. 6:25-cv-403-JDK-JDL, 2026 WL 541474, at *1-*2 (E.D. Tex. Feb. 26, 2026) (citing *Tatum v. New York Tribeca Grp. LLC*, No. 6:25-CV-103-JDK, 2025 WL 1864961, at *1-*3 (E.D. Tex. July 7, 2025), and collecting cases). In *RFG*, the court rejected a recommendation to reduce the Texas award to nominal damages to avoid "double recovery," and instead awarded full statutory damages on a judgment under both statutes, because the two statutes prohibit different conduct and vindicate distinct legislative judgments. *Id.* Even *Busbee*, EverQuote's lead case, awarded the plaintiff full damages under both the TCPA *and* Chapter 302.101, although not 305.053, for the same calls. *Busbee v. ServiceToday!*, No. 4:24-CV-00364-P, 2024 WL 4428989, at *4-*5 (N.D. Tex. Oct. 4, 2024).

*Third*, whatever force the one-satisfaction reasoning in *Busbee* ever had, the Texas Legislature has abrogated it for the conduct at issue here. Effective September 1, 2025, well before the March 2026 calls, Senate Bill 140 added the following provision to Chapter 305:

> The fact that a claimant has recovered under a private action arising from a violation of this chapter more than once may not limit recovery in a future legal proceeding in any manner.

Tex. Bus. & Com. Code § 305.055. The Legislature enacted parallel provisions in Chapters 302 and 304. That enactment repudiates the premise on which *Busbee* rested, namely the observation in *Masters* that "[t]here is no indication in either the TCPA or Texas's analogue that either legislative body intended to allow double recovery under both state and federal law for the same TCPA violations." *Progressive Debt*, 2023 WL 7393129, at *4 (quoting *Masters v. Wells Fargo Bank S. Cent., N.A.*, No. A-12-CA-376-SS, 2013 WL 3713492, at *3 (W.D. Tex. July 11, 2013)). There is now an explicit indication in statutory text. Whatever role a one-satisfaction election may

11

play in cases governed by prior law, it supplies no basis to dismiss, or to cap at the pleadings, a Chapter 305 claim arising from 2026 conduct.

### C. Count IV States a Claim for Restitution and Disgorgement Under Massachusetts Law.

#### 1. No legal claim in this case redresses the wrong, or reaches the benefit, that Count IV targets.

EverQuote correctly recites the abstract rule. "[A] party with an adequate remedy at law cannot claim unjust enrichment," and it is "the availability of a remedy at law, not the viability of that remedy," that matters. *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017). But that rule has a scope. In every case EverQuote cites, the equitable claim was dismissed because a legal claim in the *same case* was directed at the *same wrong* and the *same loss*. In the First Circuit's most recent statement of the doctrine, the court affirmed dismissal of an unjust enrichment claim because it "s[ought] to redress the same injury" as the plaintiff's Chapter 93A claim. *Schuster v. Wynn Ma, LLC*, 118 F.4th 30, 38 (1st Cir. 2024). The doctrine prevents plaintiffs from using equity as "a catchall which could apply to otherwise failed claims." *Patenaude v. Orgain, LLC*, 594 F. Supp. 3d 108, 116 (D. Mass. 2022).

Count IV does not do that, because no statutory count in this case addresses the wrong it targets. The FAC is explicit. "This Count does not seek relief arising from telemarketing calls. Instead, this Count seeks restitution and disgorgement arising from EverQuote's sale of Plaintiff and class members' personal information when EverQuote knew or had reason to know that the consumer had not opted in." FAC ¶¶ 96-97. The TCPA counts compensate the recipient of unlawful communications, at $500 per call or text. 47 U.S.C. § 227(c)(5). They do nothing to reach, measure, or strip EverQuote's referral revenue from generating, mislabeling, marketing, and repeatedly reselling Plaintiff's personal information as a compliant "opt-in" lead. FAC ¶¶ 83-93. The sale of the lead was a completed transaction, and a completed wrong, an unauthorized

dissemination of Plaintiff's personal information for profit, FAC ¶ 89, before any given call occurred, and EverQuote profited from it whether or not any purchaser ever placed a compensable call. The telephone calls are not the benefit EverQuote unjustly retained. The *referral revenue* is. Because no statutory count provides a remedy for that distinct wrong or that distinct benefit, the adequate remedy bar is not triggered.

EverQuote's only response is to declare that "[t]he allegedly wrongful sale of personal information is the same conduct underlying the TCPA claims." Mot. at 11. EverQuote should tell that to its own Section D, which argues that "merely selling a lead does not establish liability under the TCPA." Mot. at 12-14. EverQuote cannot have it both ways. If the TCPA supplies a comprehensive remedy for "the exact conduct alleged" in Count IV, Mot. at 11, its Calls 6-8 argument is wrong. And if its argument in Section D were right, then by EverQuote's own account, there is no legal remedy for the conduct Count IV targets, and the equitable claim must proceed. At a minimum, Plaintiff may plead the theories in the alternative. Fed. R. Civ. P. 8(d)(2)-(3).

This Court's decision in *Lionetta* confirms the analysis. There, the defendant monetized consumers' personal data without their informed consent, and the plaintiffs sought disgorgement of the profits from the sale of that data. Judge Kobick sustained the unjust enrichment claim, holding that the complaint "plausibly states a claim of unjust enrichment by alleging that InMarket knowingly profited from the plaintiffs' geolocation data without their permission." 798 F. Supp. 3d at 153. The claim here is stronger. EverQuote did not merely fail to obtain informed consent. It sold, and then resold, Plaintiff's personal information as an affirmatively consented lead after Plaintiff notified EverQuote that he had not opted in and did not want the calls. FAC ¶¶ 86-88.

### 2. The FAC pleads every element under the governing Massachusetts standard.

EverQuote's elements argument rests on an over-read formulation. Citing *Massachusetts Eye & Ear*, it contends that Plaintiff must plead a benefit "directly conferred," a payment of money,

or an economic detriment corresponding dollar for dollar to EverQuote's gain. Mot. at 3, 11. That is not the law. Under the Supreme Judicial Court's *current* formulation, the plaintiff must allege that "(1) [he] conferred a measurable benefit on the defendant, (2) [he] reasonably expected compensation from the defendant, and (3) the defendant accepted the benefit with knowledge of [his] reasonable expectation." *Columbia Plaza Assocs. v. Ne. Univ.*, 227 N.E.3d 999, 1018 (Mass. 2024). *Columbia Plaza* does not contain the same rigid direct payment formulation in *Eye & Ear*. And "[u]njust enrichment does not require that a defendant receive direct payments from a plaintiff." *Massachusetts v. Mylan Lab'ys*, 357 F. Supp. 2d 314, 323 (D. Mass. 2005).

*Lionetta* applied these exact elements to unauthorized data monetization and rejected every argument EverQuote advances. On the benefit element, the court held that consumers plausibly conferred a measurable benefit through the defendant's collection and sale of their data even though the data reached the defendant indirectly through third parties, because "the relevant question is whether [the defendant] received a benefit from the plaintiffs at all, not whether that benefit was directly received." 798 F. Supp. 3d at 151-52. Indeed, "liability for unjust enrichment . . . may extend to recipients who were not responsible for wrongful conduct," where they "have benefited directly due to the harm one person has tortiously perpetrated against another." *Id.* at 152 (quoting *Sacks v. Dissinger*, 488 Mass. 780, 790 (2021)). The profit from selling the data is the relevant benefit. *Id.* at 152-53. The FAC alleges exactly that. EverQuote "collected, processed, monetized, and exploited Plaintiff and the class members' personal information," "obtained and retained substantial revenues" from its sale, and "knowingly accepted and retained these benefits under circumstances that make it inequitable and unjust" to retain them. FAC ¶¶ 91-93.

EverQuote's final argument, that Plaintiff cannot claim unjust enrichment because he "never reasonably expected or intended to be compensated" for information a third party

submitted, Mot. at 11-12, gets the doctrine backwards, and *Lionetta* rejected it too. *Karp* involved a consumer voluntarily handing over a zip code in a routine retail transaction, where "a reasonable person would not expect compensation." *Karp v. Gap, Inc.*, 2014 WL 4924229, at *2 (D. Mass. Sept. 29, 2014). But the Supreme Judicial Court's decision in *Tyler*, which the *Karp* Court distinguished, recognizes that where a merchant improperly obtains and then sells a consumer's "private information on the open market," unlike a zip code, the invasion of privacy is a cognizable injury, and "[d]isgorgement of the merchant's profits may provide an appropriate means of calculating damages." *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 504 n.20 (2013). *Lionetta* applied that principle to sustain an unjust enrichment claim where consumers alleged their data was collected and sold without informed consent, finding the expectation element satisfied by allegations that their "privacy has been invaded," that they "unwittingly conferred a benefit" of "valuable personal . . . information," and that they "received nothing" while the defendant sold the data for profit. 798 F. Supp. 3d at 152.

EverQuote's contrary rule would also produce a perverse result, because the more clearly unauthorized the taking and sale of a consumer's private information, the less available restitution would become. Under Massachusetts law, it is the *unauthorized character* of the acquisition and sale that makes EverQuote's retention of the resulting revenue "against the fundamental principles of justice or equity and good conscience," *Columbia Plaza*, 227 N.E.3d at 1018, particularly where EverQuote kept selling the information as a consented lead after the consumer himself said no consent existed. FAC ¶¶ 86-88. Count IV states a claim.

### D. The FAC States TCPA Claims Predicated on Calls 6-8.

EverQuote's final argument, that "merely selling a lead" cannot support TCPA liability for the March 9, 10, and 11 calls, rests on the wrong statutory framework and on inferences drawn in EverQuote's favor.

At the threshold, EverQuote's "initiation" analysis addresses the wrong provision. Plaintiff's claims arise under 47 U.S.C. § 227(c), whose private right of action extends to any "person who has received more than one telephone call within any 12-month period *by or on behalf of* the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). Congress did not condition liability on which entity physically placed the call, and courts have affirmed classwide judgments against sellers under § 227(c)(5) for calls their marketing partners dialed. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50, 659-61 (4th Cir. 2019). Even the FCC guidance EverQuote invokes recognizes that a person may be directly liable, without pressing a button, where it "take[s] the steps necessary to physically place a telephone call" or is "so involved in the placing of a specific telephone call as to be directly liable for initiating it." *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6583 (2013). The question is whether the FAC plausibly alleges that the March 9-11 calls were made by or "on behalf of" EverQuote, or through EverQuote's knowing and purposeful involvement. It does.

*First*, the Complaint alleges a single, continuous telemarketing campaign centered on one asset, Plaintiff's lead, that EverQuote created, labeled, transferred, and resold to Farmers. EverQuote placed the first call on March 4 and transferred the transaction to the Holmes agency while conveying Plaintiff's personal information, then texted Plaintiff that day and the next. FAC ¶¶ 5-6, 24-30, 37, 43. And when Plaintiff told EverQuote's own caller that he had never requested a quote, and demanded on the transferred call that the calls stop, EverQuote resold the very same lead, representing it as a TCPA compliant "opt in," to additional telemarketers, who called Plaintiff

on March 9, 10, and 11 to sell the same product to the same number. FAC ¶¶ 9, 29, 41, 46-56. Courts recognize that a "smooth transfer" from one caller to another "shows a cooperative relationship from which one may infer authority or apparent authority." *Doyle v. GoHealth, LLC*, No. CV 22-04291, 2023 WL 11900257, at *3 (D.N.J. Dec. 7, 2023) (quoting *Landy v. Nat. Power Sources, LLC*, 2022 WL 797967, at *3 (D.N.J. Mar. 16, 2022)). The same logic controls here with added force. EverQuote's systems generated the lead, EverQuote's own call and transfer launched the campaign, and EverQuote's resale supplied both the consumer data and the false legal predicate on which the March 9-11 callers acted. A call placed by a purchaser dialing a lead that EverQuote sold for the purpose of that call being made, on the strength of EverQuote's representation that the consumer consented, is not plausibly a new and independent solicitation untethered to EverQuote. At the pleading stage, it is the continuation of the campaign EverQuote set in motion, and a call made "on behalf of" EverQuote within the meaning of the statute.

The FAC's knowledge allegations reinforce that inference. EverQuote resold the lead "after it had been informed that Plaintiff did not opt in, and after Plaintiff demanded that calls stop," FAC ¶ 9, it "knew that there was no consent to call Plaintiff's number, but sold Plaintiff's lead as an opt-in lead, anyway, which resulted in those calls," FAC ¶ 55, and it was "reasonably foreseeable that selling Plaintiff's marketing lead after being notified that it was not valid would result in TCPA violations," FAC ¶ 56. These are specific allegations of a specific transaction, a specific misrepresentation, specific knowledge, and a specific, foreseeable result. They also plead ratification and authorization under the common law framework EverQuote invokes. *See In re DISH Network*, 28 FCC Rcd. at 6584 (agency principles include "not only formal agency, but also principles of apparent authority and ratification"); *Doane v. Python Leads, LLC*, No. 1:24-CV-12947-JEK, 2025 WL 3485569, at *8-*9 (D. Mass. Dec. 4, 2025).

*Second*, courts routinely credit closely timed calls sharing a common subject and purpose as part of a single telemarketing effort, even where the responsible entity emerges only later. *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) ("the content and timing of the fourth call allows the court to draw a reasonable inference that [the defendant] made the first three calls"); *Bird v. Pro Star Builders, Inc.*, No. 2:22-cv-03610-JLS-JEM, 2022 U.S. Dist. LEXIS 215155, at *7-*8 (C.D. Cal. Nov. 28, 2022) (collecting cases). The FAC here pleads more than timing and subject matter. It pleads the mechanism connecting the calls, EverQuote's resale of the specific lead at issue. FAC ¶¶ 46-56. EverQuote's position requires the Court to infer that the March 9-11 calls were entirely unrelated to the lead it had just resold, despite the temporal proximity, the common subject matter, and the pleaded resale. The Court must draw the reasonable inferences in Plaintiff's favor instead.

EverQuote's authorities do not hold otherwise. *Aaronson* involved a complaint "devoid of facts such as how the caller identified itself, the substance of the calls, or any other details," 2019 WL 8953349, at *2, the opposite of this FAC. *Hot Leads* and *Bank v. Vivint* hold that the TCPA contains no freestanding aiding and abetting theory, and Plaintiff pleads none. And *Doane v. Benefytt* dismissed vicarious claims where the plaintiff did not "allege facts to plausibly suggest that defendant exercised control over any of the callers," 2023 WL 2465628, at *9, whereas the FAC here pleads EverQuote's ownership of the lead, its labeling of the lead as consented, its actual knowledge that the label was false, its purpose that the buyers call Plaintiff, and the foreseeable result. FAC ¶¶ 46-56, 86-90.

*Third*, at a minimum, whether EverQuote is responsible for Calls 6-8 is a question for discovery. Who bought the lead, on what terms, under what consent warranties, and with what ongoing relationship to EverQuote is information "peculiarly within the possession and control of

the defendant[s]." *DebtBlue*, 2024 WL 5184488, at *3. EverQuote's motion asks the Court to resolve, before any discovery, a factual dispute about the mechanics and scope of its own resale arrangements. That cannot be done on a Rule 12(b)(6) motion. To the extent the Court finds any aspect of these allegations inadequate, the proper remedy is leave to amend.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant EverQuote, Inc.'s Motion to Dismiss in its entirety. In the alternative, to the extent the Court identifies any pleading deficiency, Plaintiff respectfully requests leave to amend.

Dated: July 16, 2026

/s/ *Anthony I. Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com
*Counsel for the Plaintiff*

19