**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ROBERT HOSSFELD,** individually and on behalf of all others similarly situated, | Case No. 1:26-cv-11440-RGS |
| *Plaintiff,* | |
| *v.* | |
| **EVERQUOTE, INC. and FARMERS GROUP, INC.** | |
| *Defendants.* | |

**PLAINTIFF'S OPPOSITION TO THE
<u>DEFENDANT'S MOTION TO COMPEL ARBITRATION</u>**

**I. INTRODUCTION**

This is the second time in approximately three months that EverQuote, Inc. ("EverQuote") has asked this Court to compel arbitration of TCPA claims based on the same website, the same orange "Get My Quotes" button, the same below-the-button disclosure, and a materially identical declaration from the same declarant, Madeline Contois. The first time, this Court denied the motion, holding that EverQuote's declaration, which offered no name, no timestamp, no IP address, no device data, and no metadata of any kind, failed even to make a threshold showing that the plaintiff was the person who clicked the button. *Weingrad v. EverQuote, Inc.*, No. 26-cv-10197-MJJ, ECF No. 48, at 5-7 (D. Mass. June 26, 2026) (Levenson, M.J.), attached as Exhibit 2. The same result follows here.

EverQuote says that, on March 4, 2026, Plaintiff Robert Hossfeld ("Mr. Hossfeld") visited its website, entered his telephone number and an email address ("robertho@gmail.com") into a web form, read a dense block of disclosure text, and clicked an orange "Get My Quotes" button above that text. There is only one major problem with that story. It is false, and EverQuote's own conduct on March 4, 2026 shows that EverQuote knew it. Mr. Hossfeld has never visited auto.everquote.com in his life. (Hossfeld Dec.) His number has been on the National DNC Registry since 2015 and on Farmers' own internal DNC list, and he has been actively litigating a TCPA case *against Farmers* since 2023. FAC ¶¶ 4 n.1, 4, 13-15. The suggestion that this Plaintiff logged on to EverQuote's website to request telemarketing calls is implausible on its face, a suggestion that Mr. Hossfeld repudiated when he told the caller, that he never requested a quote. FAC ¶¶ 24, 27, 29.

Despite unequivocally and categorically contending that the Plaintiff visited its website, as in *Weingrad*, nowhere in its moving papers does EverQuote disclose any of the "evidence" it supposedly captured to prove that the Plaintiff himself visited the website. It omits the name

1

associated with the submission, the *time* of the submission, the IP address of the alleged visitor, the geolocation, the device type, the operating system, or any other purported information about the "submission" it allegedly captured but does not even plead.

That silence is louder here than it was in *Weingrad*, because the operative complaint identifies, with specificity, the very tracking systems, Google Tag Manager, Google Analytics/GA4, and Anura fraud detection technology, through which EverQuote captured event-level data about the March 4 session, data that, on information and belief, contains indicia that the lead was not submitted by Plaintiff at all, but which it fails to plead. FAC ¶¶ 67-99. A defendant with records actually linking Mr. Hossfeld to a March 4 website visit would lead with them. EverQuote leads with silence, again.

Against EverQuote's bare recitation, Mr. Hossfeld offers his sworn Declaration unequivocally denying, with specific supporting facts, that he ever visited the website, entered any information, or agreed to anything. Courts routinely deny motions to compel arbitration on such records, without any trial. That is what this Court did in *Weingrad*, and what other courts have done on weaker factual showings. The Court should do the same here.

Besides this evidentiary infirmity, EverQuote's motion independently fails as a legal matter. Even resolving every disputed fact in EverQuote's favor, and even assuming that Mr. Hossfeld sat at a keyboard on March 4, 2026 and clicked "Get My Quotes," the purported agreement is unenforceable on its face under binding First Circuit and Massachusetts law. The Court should follow the same course here and deny the motion in its entirety, with no trial required. In the alternative, and only if the Court concludes that a genuine dispute of fact remains, Plaintiff demands a jury trial on the formation issue as provided by 9 U.S.C. § 4.

## II. BACKGROUND

This case arises from telemarketing calls promoting Farmers insurance that Plaintiff alleges violated the Telephone Consumer Protection Act. Plaintiff's residential cellular telephone number has been registered on the National Do Not Call Registry since 2015 and was also on Farmers' internal Do Not Call list. FAC ¶¶ 4 n.1, 4, 13-15. Nevertheless, on March 4, 2026, EverQuote called Plaintiff with a caller ID reading "Farmers Agent" to solicit Farmers insurance. FAC ¶¶ 24-27. Plaintiff immediately advised the caller that he had never requested an insurance quote. FAC ¶ 29. EverQuote nevertheless texted Plaintiff, transferred his information to a Farmers agency, and, after Plaintiff demanded that the calls stop, continued to distribute Plaintiff's purported "lead," resulting in additional telemarketing calls and texts. FAC ¶¶ 30-56. EverQuote seeks to compel arbitration based on an alleged online transaction that it contends occurred earlier that same day. Relying on the declaration of Madeline Contois, EverQuote asserts that Plaintiff visited its website, entered his telephone number and the email address "robertho@gmail.com," and clicked the orange "Get My Quotes" button. Contois Dec. ¶¶ 9-17.

Plaintiff unequivocally denies those assertions. As set forth in the accompanying Declaration, Plaintiff never visited auto.everquote.com, never entered any information on the website, never clicked "Get My Quotes," never saw or agreed to any Terms of Use or arbitration provision, never owned or used the email address "robertho@gmail.com," and never authorized anyone else to submit information on his behalf. Hossfeld Dec. Plaintiff further declares that, given his longstanding placement on the National Do Not Call Registry and his ongoing litigation against Farmers over telemarketing calls, he would never have requested Farmers insurance quotes or consented to receive the telemarketing communications at issue.

3

The screenshot attached to the Contois Declaration further shows that the purported disclosure appeared below the large orange "Get My Quotes" button, with no checkbox or other separate manifestation of assent. The alleged arbitration provision itself appears only through a hyperlink to separate Terms of Use.

### III. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, commands that, *before* compelling arbitration, the Court must first be satisfied that the parties agreed to arbitrate. 9 U.S.C. § 4 (directing courts to compel arbitration only "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). Because arbitration is fundamentally "a matter of consent, not coercion," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010), consent remains a "first principle that underscores" arbitration. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019).

In evaluating the existence of an arbitration agreement, the First Circuit applies the summary judgment standard. *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 174 (1st Cir. 2021). "[T]he court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* at 175. Burden allocation under this standard is settled. The *moving party*, here, EverQuote, bears the initial burden of production and must affirmatively demonstrate "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Id.* Only *after* the moving party makes this threshold showing does the burden shift to the nonmoving party to "identify specific evidence in

4

the record demonstrating a material factual dispute." *Id.* at 175 n.8. An "unequivocal denial" that the parties agreed to arbitrate, accompanied by supporting affidavits and evidence, is sufficient to require a jury determination on the formation issue, if not denial outright. *Dixon v. Michael Kors Retail, Inc.*, 468 F. Supp. 3d 409, 413 (D. Mass. 2020); *Santa Cruz v. Banco Santander Puerto Rico*, No. CIV. 08-1225 (JAF), 2008 WL 5192347, at *2 (D.P.R. Dec. 10, 2008); *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013).

The question of whether an agreement to arbitrate was ever formed in the first place is always for the Court, never an arbitrator, to decide, regardless of any delegation clause. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024); *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 80 (1st Cir. 2018). If, after considering the record under the *Air-Con* standard, the Court concludes that a genuine factual dispute exists as to whether an agreement was formed, Section 4 of the FAA requires the Court to "proceed summarily" to trial of that question, with a right to a jury if demanded. 9 U.S.C. § 4; *Air-Con*, 21 F.4th at 175.

## IV. ARGUMENT

**A. This Court Already Denied This Same Motion, on This Same Record, in *Weingrad*, and EverQuote Again Fails to Carry Its Threshold Burden. Plaintiff's Declaration Forecloses Any Finding That a Contract Was Formed, and EverQuote's Motion Should Therefore Be Denied Outright.**

As the party seeking to invoke arbitration, EverQuote bears the *initial* burden of demonstrating that Mr. Hossfeld ever agreed to arbitrate. *Air-Con*, 21 F.4th at 175. It cannot come close to carrying that burden here, as this Court has already held, on this precise showing, in *Weingrad*. There, EverQuote moved to compel arbitration of materially identical TCPA claims based on the same website, the same "Get My Quotes" button, the same below-the-button disclosure, and a declaration from the same declarant asserting that EverQuote's internal business records "definitively establish" that the plaintiff visited the Website and submitted his

information. This Court denied the motion. It observed that EverQuote's papers "begin[] by describing an anonymous user . . . but switch[], without explanation, to 'Plaintiff,'" and that "[w]hat's missing is an explanation of how the Court should deduce that the user was indeed Plaintiff." *Weingrad*, ECF No. 48, at 5-6. It noted that the Contois declaration "does not elaborate on this assertion or provide any information to link EverQuote's business record to [the plaintiff]; there is no indication that the person (or bot) that purportedly clicked the button was identified by a name, IP address, or other meta data." *Id.* at 6. And it held that the declaration "fails to acknowledge the obvious possibility that another individual could have entered Plaintiff's phone number, either as a typo or by purposely entering an incorrect phone number," or "that a bot or other program could have been tasked with entering phone numbers to the website," concluding that "absent some persuasive factual showing that it was indeed Plaintiff who provided his telephone number and clicked the button in question, no binding contract would result." *Id.* EverQuote "fail[ed] to carry its burden and the motion to compel arbitration [was] denied." *Id.* at 7.

Nothing has changed. The Contois Declaration filed here suffers from every defect this Court identified in *Weingrad*. It again withholds the name, IP address, device, and metadata. FAC ¶¶ 24, 29. Other than the bare fact that EverQuote somehow obtained Mr. Hossfeld's phone number, resulting in the phone calls that he complains of, there is a dearth of information tying Mr. Hossfeld to the business record that EverQuote relies on. Because EverQuote has not made its threshold showing, the burden never shifts to Plaintiff at all, and the motion fails at the starting gate. *Air-Con*, 21 F.4th at 174 n.8, 175.

But Plaintiff has not stopped there. Mr. Hossfeld's Declaration does far more than deny that he agreed to arbitrate. It establishes that EverQuote has identified the wrong person. He

swears that he never visited auto.everquote.com, never entered his information, never clicked "Get My Quotes," never saw the Terms of Use, never used the email address "robertho@gmail.com," and never authorized anyone else to submit information on his behalf. Hossfeld Dec. The dispute therefore is not whether Plaintiff subjectively remembers clicking a button or later changed his mind about arbitration. It is whether EverQuote's electronic records relate to Plaintiff at all. And the surrounding, undisputed circumstances corroborate him at every turn, since Mr. Hossfeld's number has been on the DNC Registry for over a decade, has been on Farmers' own internal Do Not Call list, and he has been suing Farmers over these very practices since 2023. FAC ¶¶ 4 n.1, 4, 13-15. EverQuote's theory requires the Court to believe that this Plaintiff voluntarily logged on to EverQuote's website to solicit the very Farmers telemarketing he was actively litigating against, using an email address that is not his. The more plausible explanation is the one the FAC pleads and EverQuote's withheld records would confirm: the "lead" was not submitted by Plaintiff at all. FAC ¶¶ 74, 81, 89, 96-99. That is a classic contract-formation dispute, not a credibility dispute, and it cannot be resolved by simply accepting EverQuote's unsupported business records over Plaintiff's sworn testimony.

Anticipating this, EverQuote's motion leans on *Bourque* and *Katzeff* for the proposition that a plaintiff cannot defeat arbitration by professing not to remember. Mot. at 14. Those cases have no application here, for two independent reasons. *First*, both involved a plaintiff's *failure of memory*, as opposed to an unequivocal denial, as here. *Second*, and more fundamentally, *Bourque* and *Katzeff* address the *responsive* burden, what a plaintiff must do once the movant has carried its threshold burden with competent evidence linking the plaintiff to the agreement. Here, as in *Weingrad*, EverQuote never carried that threshold burden in the first place, so there is nothing for Plaintiff to rebut.

7

This case is materially indistinguishable from *Hobbs v. Apollo Interactive, Inc.*, where the plaintiff submitted a declaration denying that he visited the website or submitted his information, and the defendant relied on electronic records purporting to show otherwise. The Court held that the plaintiff's declaration created, at minimum, a genuine dispute regarding contract formation and denied the motion to compel arbitration. *Hobbs v. Apollo Interactive, Inc.*, No. 1:19-cv-03653, 2019 WL 6878863, at *2 (M.D. Ga. Dec. 17, 2019). Here, EverQuote offers even less than the defendant in *Hobbs*, having withheld the IP address, geolocation, device information, operating system, timestamp, and even the alleged name associated with the submission. Courts routinely deny motions to compel arbitration on far weaker factual records. *See, e.g.*, *Conrad v. Camping World Holdings Inc.*, No. 4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025); *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545, at *3 (M.D. Tenn. Apr. 16, 2025) *Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at *3 (N.D. Ill. Sept. 20, 2024).

In each of those cases, the defendant offered more than what EverQuote offers here, which is, again, only the plaintiff's telephone number and an email address the plaintiff has never used, and the respective courts either denied arbitration outright or ordered a summary arbitration trial. *A fortiori*, the record here warrants the same outcome. What's more, EverQuote's own theory of its evidence defeats its motion. The FAC pleads that the very information EverQuote has omitted lies in EverQuote's own source code. EverQuote does not deny possessing that data and has declined to show it to the Court. Under the summary judgment standard, the Court must draw all reasonable inferences in Plaintiff's favor, *Air-Con*, 21 F.4th at 175, and the reasonable inference from a movant's decision to withhold the only records that could tether its "submission" to a specific human being is that those records do not say what the

movant needs them to say. FAC ¶¶ 74, 81, 89, 96, 98-99.

In the alternative, and only to the extent the Court concludes that a genuine factual dispute remains, Section 4 of the FAA requires that the formation question be submitted to a jury. 9 U.S.C. § 4; *Air-Con*, 21 F.4th at 175. Plaintiff has demanded a jury trial to the extent one is required. However, the more economical course, and the one the weight of authority, including this Court's own decision in *Weingrad*, supports, is to deny the motion outright on the papers, given the complete lack of evidence under the summary judgment standard for the Defendant to be able to compel arbitration.

### B. Even Had Plaintiff Submitted Information to the Website, EverQuote's Agreement Is Unenforceable as a Matter of Law on Multiple Independent Grounds.

Even assuming, *arguendo*, that Mr. Hossfeld somehow clicked "Get My Quotes" on March 4, 2026 (he did not), EverQuote's motion still fails for at least four independent legal reasons. And because each is a facial defect appearing on EverQuote's own exhibits, each can and should be resolved now, as a matter of law, without any trial, just as the court did in *Carter v. Health Choice Now, LLC*, No. 3:25-cv-00005-SHL-WPK, ECF No. 70 (S.D. Iowa July 1, 2026), where it *assumed* every disputed fact in the movant's favor and still denied the motion to compel arbitration outright because the agreement did not enforceably reach the dispute. *See* Exhibit 1, *Carter*, ECF No. 70, at 8, 17.

### 1.    The Delegation Clause Does Not Foreclose Judicial Review, Because Plaintiff Challenges Contract Formation Itself.

Relying on the delegation clause embedded in its terms of use and the incorporation of the AAA Rules, EverQuote first argues that all issues, including these, are for the arbitrator to decide. That argument is foreclosed by binding First Circuit and Supreme Court authority. In *Toth v. Everly Well, Inc.*, 118 F.4th 403 (1st Cir. 2024), the First Circuit held that when a party

contests the formation of the contract, that is, whether any agreement between the parties was ever concluded, the Court retains authority to resolve that threshold question, even in the presence of a delegation clause. *Id.* at 409-13. As the court explained, if an "agreement between the parties was not concluded," then neither was any arbitration or delegation agreement within that contract. *Id.* at 409 (cleaned up).

The First Circuit's decision in *Toth* is not an outlier. In *Coinbase*, the Supreme Court reaffirmed that where, as here, "a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." 602 U.S. at 151 (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)). The Court reaffirmed *Rent-A-Ctr.*'s central holding and went on to explain that "basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute." *Id.*; *accord Toth*, 118 F.4th at 409-10 ("a party may still challenge the contract's formation," which take the form of "formation and validity challenges."). That being the case here, with the Plaintiff challenging *both* the factual circumstances surrounding formation and the validity of the contract language as binding him, the Court retains, and must, decide these threshold questions in the first instance.

Moreover, a delegation of arbitrability is enforceable only upon "clear and unmistakable evidence" that the parties agreed to it. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). A delegation clause buried in a hyperlinked document that was never reasonably communicated to the user that denies visiting cannot possibly constitute "clear and unmistakable" evidence. The *Carter* court confronted this structure. It held that the court, not the arbitrator, must decide arbitrability, because no reasonable consumer reading the materials

10

actually presented would understand that he was "clearly and unmistakably" agreeing to arbitrate arbitrability with the movant. *Carter*, ECF No. 70, at 14-17.

2.   **The Purported Agreement Is Unenforceable Browsewrap (or, At Best, a Hybrid Sign-In-Wrap), Because the Acceptance Language Sits Below the Action Button, with No Affirmative Manifestation of Assent.**

EverQuote repeatedly describes its online agreement as a "clickwrap." It is not. The label matters, because, under Massachusetts law, which applies when the issue here is one of formation, clickwraps, browsewraps, and the various in-between sign-in wraps and hybrids are treated very differently. *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1054 n.26 (Mass. 2021). "A 'browsewrap' agreement is an agreement where 'website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen.' . . . These agreements are often unenforceable because there is no assurance that the user was ever put on notice of the existence of the terms or the link to those terms. . . . [E]ven close proximity of the hyperlink to relevant buttons users must click on -- without more -- is insufficient to give rise to constructive notice." *Id.* Clickwraps, which require a separate affirmative act, such as "checking a box," *id.* at 1050, are "regularly enforced" and are one of the "clearest manifestations of assent." *Id.* Browsewraps, on the other hand, are regularly refused enforcement because they typically involve no affirmative act of assent. *Id.* at 1054 n.26.

What EverQuote actually deployed on its website has none of the hallmarks of clickwrap. There is no separate "I Agree" button. There is no checkbox. There is no scrollwrap presentation of the Terms of Use. What there is, as the Contois Declaration's own screenshot shows, is a single large orange "Get My Quotes" button and under it a dense, unformatted, and grammatically inept grey disclosure paragraph sitting *beneath* that button. It also shows a lone, small blue hyperlink to "Terms of Use" tucked near the end of that paragraph, and nothing else.

11

That is a browsewrap, or at best a modified sign-in wrap hybrid, not a clickwrap. *See Gaker v. Citizens Disability, LLC*, 654 F. Supp. 3d 66, 73 (D. Mass. 2023) (treating a similar below-the-button architecture as unenforceable and noting that clickwrap "requires that a user take an affirmative step to agree to the proposed terms . . . *separately* from merely clicking a "continue" or "submit" button"). On this point, this Court's decision in *Gaker* is particularly instructive:

> [T]he Court concludes that Citizens has not met its burden to establish that "a clear and conspicuous disclosure was provided and unambiguous consent was obtained." The terms indicating that users who submitted their information on the Super-Sweepstakes website consented to be contacted by the site's marketing partners were printed in small font at the very bottom of the page. The Court accorded significant weight to the fact that the terms appeared below the "CONFIRM YOUR ENTRY" button, such that a user could—and in all likelihood, would—click on the button without ever reaching the portion of the page disclosing the terms. Further, the terms were printed in smaller font than other language on the page, and appeared in blue font against a blue background, with only slight variation in color between the language and the background. Although the terms were legible to an ordinary reader, no other language on the Super-Sweepstakes site was presented so inconspicuously, and all promotional language appeared in colors that distinctly contrasted from the background.

*Id.* at 75-76 (cleaned up). An online agreement is enforceable only if (1) the terms were reasonably communicated to the user, and (2) the user manifested assent to them. *See Kauders*, 159 N.E.3d at 1048-49. EverQuote's design fails both prongs.

*First*, it fails on notice. The disclosure sits *below* the "Get My Quotes" button, the very action that EverQuote claims manifests assent. As in *Gaker*, a user who clicks the button to move on with the quote request has every reason to do so without ever scrolling to, or reading, the grey run-on paragraph of legalese positioned beneath it, let alone its links to the terms that appear at the bottom of a grammatically suspect paragraph. That is precisely the defect that First Circuit and Massachusetts courts have repeatedly held fatal to notice.

*Gaker's* reasoning is directly applicable to this case. EverQuote's disclosure is located below the action button. Its opening words, "*By clicking* Get My Quotes and submitting this

12

form . . .," expressly contemplate that the user will not read the disclosure at all. The button is positioned *above* the relevant text, which makes it possible for a user to click "Get My Quotes" without even seeing any of the text at all. In such a way, the agreement thus tries to have it both ways, with the button being a purported point of assent, which is itself insufficient as a matter of binding Massachusetts law, and the language that would give the user notice of what he is assenting to is also positioned where he is unlikely to see it until after he has already clicked. That is not reasonable notice.

The Massachusetts Supreme Judicial Court reached the same conclusion in *Kauders*. There, the link to Uber's Terms and Conditions appeared "at the very bottom" of a screen, such that "the user could fully register for the service and click 'done' without ever clicking the link to the terms and conditions." 159 N.E.3d at 1052. Our very own State Supreme Court held the agreement unenforceable because there was no reasonable notice of the terms. *Id.* at 1054. The EverQuote design does the same. A user can enter a phone number, email address, and any other information (which EverQuote does not even identify), click "Get My Quotes," and submit the form, without ever reading the disclosure paragraph, without ever clicking the hyperlinked "Terms of Use," and without ever seeing that it contains an arbitration provision.

The Eleventh Circuit's recent decision in *Tejon v. Zeus Networks, LLC*, 174 F.4th 1322 (11th Cir. 2026), confirms that this below-the-button architecture is fatal even on facts far more favorable to the movant than these. In *Tejon*, the arbitration clause sat in hyperlinked terms beneath large action buttons, in small grey text accompanying a disclaimer stating that, by submitting, the user agreed to the Terms of Service, materially indistinguishable from EverQuote's design. *Id.* at 1324 (11th Cir. 2026). The Eleventh Circuit held the hyperlink "was not conspicuous," reasoning that "when important terms are placed below a highly conspicuous

13

action button, it is not reasonable to assume that users will continue scrolling past the action button." *Id.* at 1327. Critically, the plaintiff in *Tejon* had visited the site and clicked the button, and the agreement was still unenforceable. *A fortiori* here, where Plaintiff never visited at all.

EverQuote leans heavily on *Toth*, *Schwartz*, and *Good*, but each cuts the other way, because each, by Defendant's own concession, involved the very design feature EverQuote's interface lacks, a check box affirmatively evidencing an agreement, as opposed to a mere button. EverQuote offers no such separate act. The button is the submit button, the disclosure sits below it, and no checkbox exists anywhere on the page, just as in *Gaker* and *Tejon*.

Nor are these cases outliers. District courts in TCPA actions across the country have almost uniformly rejected the sufficiency of such language, as has the Ninth Circuit. *See, e.g.*, *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 857-58 (9th Cir. 2022) (denying motion to compel when large colored "continue" button was followed by a wall of text); *Rojas v. GoSmith, Inc.*, No. 2:17-CV-281-JVB-JEM, 2020 WL 831585, at *3 (N.D. Ind. Feb. 20, 2020 ("'See Job Matches' does not indicate assent or connect clicking the button to a contract's terms. Plaintiff, by clicking, only indicated that he wished to 'See Job Matches.' No text informed him that, by clicking the button, he was agreeing to a contract.").

*Second*, the agreement fails on assent. Even if this Court were to hold that EverQuote's placement of disclosure below the button satisfied the notice prong (and, as shown, it does not), the agreement still fails because EverQuote never secured any unambiguous manifestation of assent. The user clicks one button labeled "Get My Quotes." That language refers to the user's request for insurance quotes, not to an acceptance of legal terms. This is no different then *Berman*, *Rojas*, or *Tejon*. And, unlike the cases EverQuote cites, the design here does not inform the user that clicking is an act of agreement except beneath the button itself, where the user must

arrive to read it, and by which time he has likely already clicked. *See Machado v. System4 LLC*, 28 N.E.3d 401, 414 (Mass. 2015) (procedural unconscionability turns on the "circumstances surrounding the formation of the contract," including surprising or obscured terms).

Because EverQuote's design fails both prongs of the *Kauders* test, and given its striking similarity to terms this Court has already rejected in *Gaker* and identical terms in *Weingrad*, no enforceable agreement to arbitrate was formed even if the Court credits (and it should not) EverQuote's claim that Mr. Hossfeld was the person who filled out the form.

**3.      The Scope of the Purported Arbitration Provision Does Not Extend to Plaintiff's TCPA Claims, Even Assuming, Arguendo, Plaintiff Visited the Website.**

Even if a valid contract were formed (it was not) and even if its terms were sufficiently conspicuous (they are not), Plaintiff's TCPA claims fall outside the clause's plain scope. By its own terms, the arbitration clause reaches only disputes "aris[ing] out of or relat[ing] in any way to these Terms or your use of the Site or the Content." A TCPA claim for telemarketing calls placed in violation of federal law is not a claim about the Website, the Terms, or the "Content." It is an independent statutory claim for harms Congress defined long before EverQuote existed, even assuming, *arguendo*, Hossfeld visited (which he did not).

Judge Kobick's decision in *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501, at *6 (D. Mass. Mar. 25, 2024), is squarely on point. In *Starling*, a defendant tried to use an arbitration clause in an internet services agreement to compel arbitration of a TCPA claim. This Court rejected that sweeping view, reasoning that a "TCPA claim is not a benefit of a contract for internet service; it is an independent cause of action created by Congress in response to 'a torrent of vociferous consumer complaints about intrusive robocalls' that could 'automatically dial a telephone number and deliver an artificial or prerecorded voice message.'" *Id.* The Court there rejected an attempt to take expansive boilerplate about the alleged

15

"beneficiaries of the service" and transform it into a way to shoehorn an independent statutory claim into a contractual one about arbitration.

The same analysis applies here. Mr. Hossfeld's allegations are not about his "use" of EverQuote's website. Even assuming, *arguendo*, that he did use it (which is wrong), the arbitration contract on its face applies to a limited set of disputes: those relating to the use of the website or its contents, not to TCPA claims. Next, EverQuote's own theory of the case cannot reach at least the March 9, 10, and 11 calls. Those calls, as pleaded, resulted from EverQuote's decision to *resell* Plaintiff's lead as a TCPA compliant "opt in" *after* Plaintiff had told EverQuote's own caller, on March 4, that he never requested a quote, and after he had demanded that the calls stop. FAC ¶¶ 46-56. Whatever else may be said of them, calls proximately caused by a defendant's post-notice resale of a lead it knew to be invalid do not "arise out of" anyone's "use of the Site." They arise out of EverQuote's independent, knowing misconduct after the purported "use" had been repudiated to EverQuote's face.

The interpretive method the *Carter* court applied supports this result. There, as here, the movant invoked broad "related to" boilerplate and the court refused to stretch it, holding that an obligation to arbitrate "must not depend upon implication or subtlety," *Carter*, ECF No. 70, at 11, that limiting language in an arbitration provision must be given effect, and that no reasonable consumer would understand a website form to sweep every conceivable dispute with every conceivable entity into arbitration, *id.* at 12. So too here, as no reasonable consumer requesting an auto insurance quote would understand that act to surrender, to an entity the page never even grammatically identifies (*see* Section IV.B.4, *infra*), his independent federal statutory right to be free of Do Not Call violations, including violations committed by strangers to the page, like Farmers Group, Inc., which is not a signatory to anything, is not named anywhere in the

16

disclosure, and notably does not join this motion.

**4.      The Purported Consent Is Grammatically Incoherent, Because the Pronoun "You" Has No Identifiable Antecedent.**

There is one additional, independent defect with the disclosure text on which EverQuote's motion rests. As a matter of ordinary English grammar, it does not say what EverQuote now says it says. The disclosure reads, in relevant part:

> By clicking Get My Quotes and submitting this form, I am providing express written consent to being contacted by *you*, *EverQuote Marketing Partners*, or by one or more agents or brokers of *your* partners which companies I agree may reach me to discuss my interest, including offers of insurance . . . .

The sentence is written in the first person. "I" am giving my consent to be contacted by "you." The question is: *who is "you"*? The pronoun has no identifiable antecedent. Nothing in the disclosure or page precedes the word "you" with a proper noun identifying the addressee of the purported consent and agreement. The page never says "EverQuote, Inc." and never says "this website." The only candidate for an antecedent within the sentence itself is "EverQuote Marketing Partners," the phrase that appears immediately after the pronoun, set off by a comma. But "EverQuote Marketing Partners" is a link on EverQuote's website that lists only "EverQuote," not EverQuote's full legal name, alongside a list of hundreds of "marketing partners," including many nonsensical acronyms, which is doubly problematic.

The legal consequence of that ambiguity is that EverQuote cannot use it to compel arbitration. Ambiguous contractual language is construed against the drafter, here, EverQuote. And a drafter who asks a court to compel arbitration based on a document that cannot identify, in plain English, the party to whom the consumer is purportedly giving consent has not "clear[ly] and unmistakab[ly]" established an agreement to arbitrate. *First Options*, 514 U.S. at 939. This is the same defect that the *Carter* court held independently fatal, even after assuming that the consumer visited the site and clicked the button. *Carter*, ECF No. 70, at 11-12. What's more, as

17

this Court has noted, any TCPA consent must identify the specific seller that consent is being provided to. *Mantha v. Quotewizard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919, at *8 (D. Mass. Dec. 13, 2021). A consent form that cannot grammatically identify its addressee cannot identify a specific "seller" either. *See Id.* (holding disclosure deficient where it did not name the defendant as the seller). An arbitration clause tethered to a defective consent cannot reach a TCPA dispute about that very consent, to say nothing of the grammatical freight train that the rest of the disclosure consists of.

**5.    The Purported Agreement Fails the E-SIGN Act.**

EverQuote also has not demonstrated compliance with the E-SIGN Act's requirements for obtaining a legally effective electronic signature. Although its disclosure references an "E-SIGN Consent," EverQuote has not produced that document or any evidence that it provided the disclosures required by 15 U.S.C. § 7001(c). Because EverQuote bears the burden of proving the existence of a valid arbitration agreement, this omission provides an additional reason why it has failed to carry its burden. See *Air-Con*, 21 F.4th at 175.

**C. The Class Waiver Does Not Warrant Striking or Dismissing the Class Claims.**

EverQuote asks, in the alternative, that the Court strike Plaintiff's class claims based on the class action waiver nested inside Section 2 of the Terms of Use. That request rises or falls with the Motion to Compel Arbitration.

*First*, as Plaintiff has shown, no valid arbitration agreement was formed. If there was no contract, there was no class action waiver either. There is nothing to strike. Like an agreement to arbitrate, an agreement to forego the right to bring claims as a class action is contractually waivable, but if there is no contract in the first instance, there is nothing to agree to waive. *Second*, even if the Court were to consider the class action waiver independently, EverQuote's own Terms of Use dictate the result. The terms themselves provide that if the class action waiver

18

is deemed invalid or unenforceable (including if the entire contract is unenforceable, as it must be, for the reasons outlined above), then the entirety of this Section 2 shall be null and void. The severability consequence is therefore not the striking of Plaintiff's class allegations, but the complete unenforceability of Section 2, arbitration provision and all.

*Third*, and independently, the legal defects Plaintiff identifies here are *uniform* defects that apply equally to every class member EverQuote might attempt to bind to arbitration or the putative class waiver. Whether EverQuote's below-the-button disclosure language provides reasonable notice under *Kauders*, whether the "Get My Quotes" button constitutes unambiguous manifestation of assent, and whether the grammatically incoherent "you" pronoun identifies any specific consenting counterparty, in addition to all of the other maladies identified here, are all common legal questions susceptible to uniform resolution on a classwide basis. Courts are virtually unanimous that when TCPA defenses rest on uniform defects, individualized determinations are not required and class treatment is appropriate. *See, e.g.*, *Mantha*, 347 F.R.D. at 396. Indeed, this Court rejected EverQuote's parallel attempt to strike class allegations at the pleading stage in *Weingrad*, observing that "the glaring gaps in EverQuote's initial showing with respect to [the plaintiff's] purported entry into a clickwrap arbitration agreement . . . may signal that EverQuote's anticipated defense may be easier to plead than to prove." *Weingrad*, ECF No. 48, at 9. To the extent EverQuote takes issue with the class definition as pled, that complaint is premature and better suited to class certification. If any definitional issues remain at certification, the proper course is to permit amendment, not to strike the class allegations outright at the motion to compel stage.

**D. No Jury Trial Is Needed Because the Motion Fails as a Matter of Law.**

EverQuote closes by demanding a jury trial under 9 U.S.C. § 4. But the Court need not convene any trial, for two reasons, in the alternative. *First*, as in *Weingrad*, *Hobbs*, and *Carter*,

19

EverQuote has failed to carry even its initial burden of production. A trial under Section 4 is required only when the making of the agreement is genuinely "in issue," which presupposes that the movant has first come forward with competent evidence that an agreement was made with *this* plaintiff. 9 U.S.C. § 4; *Air-Con*, 21 F.4th at 174-75. A declaration that cannot say who clicked the button, when, from where, or on what device does not put anything "in issue." The motion should simply be denied, as it was in *Weingrad*.

*Second*, the facial legal defects addressed in Section IV.B are pure questions of law on EverQuote's own exhibits. They would remain dispositive no matter what a jury found about who clicked the button on March 4, 2026. *See Carter*, ECF No. 70, at 8 (assuming the visits and denying the motion outright as a matter of law). Resolving them now disposes of the motion in its entirety and avoids any trial at all. In the alternative, and only to the extent the Court concludes that a genuine factual dispute remains as to formation, Plaintiff joins issue and demands a jury trial on that narrow formation question pursuant to 9 U.S.C. § 4.

### V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant EverQuote, Inc.'s motion to compel arbitration in its entirety. In the alternative, and only to the extent the Court concludes that a genuine factual dispute remains as to contract formation, Plaintiff demands a jury trial on that narrow formation issue pursuant to 9 U.S.C. § 4.

Dated: July 16, 2026

/s/ Anthony I. Paronich
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com
*Counsel for the Plaintiff*

20