IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| MONTWAIN CARTER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HEALTH INSURANCE KING AGENCY, LLC; ALVARADO MARKETING GROUP, INC.; and HEALTH CHOICE NOW, LLC,<br><br>Defendants. | No. 3:25-cv-00005-SHL-WPK<br><br><br><br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION** |

Defendant Health Choice Now, LLC ("Health Choice Now") moves to compel arbitration based on two different online contracts allegedly entered into by Plaintiff Montwain Carter. One of those contracts post-dated the dispute between Carter and Health Choice Now, did not purport to apply retroactively, and never mentions by name Health Choice Now, any of its affiliates, or any other legal entity. It therefore does not cover this dispute. The other contract, on its face, is only between Carter and an entity other than Health Choice Now. Thus, it, too, does not cover this dispute. For these reasons, and as explained in full below, the Court DENIES Health Choice Now's Motion to Compel Arbitration. (ECF 52.)

## I. BACKGROUND.

### A. Allegations in the Amended Complaint.

Carter brings claims under the Telephone Consumer Protection Act of 1991 ("TCPA") against Defendants Health Insurance King Agency, LLC ("HIK"), Alvarado Marketing Group, Inc. ("Alvarado"), and Health Choice Now in his individual capacity and on behalf of a putative nationwide class of similarly situated individuals. (ECF 45, ¶¶ 79–80, 95.) Carter has a cellular telephone number with the area code "563," which is associated with the Southern District of Iowa. (Id., ¶¶ 6, 21.) This is a residential telephone line that is not associated with a business. (Id., ¶¶ 22–24.) Carter's phone number has been registered on the National Do Not Call Registry since October 2024. (Id., ¶ 28.) "Despite this, [Carter] received at least 3 calls from either Defendants Health Choice Now or Alvarado" in late November and early December 2024 that solicited him to sign up for health insurance. (Id., ¶ 29.)

All three calls came from "563" area codes, but Carter rejected the first two. (Id., ¶¶ 30–31.) He answered the third call, which was eventually transferred to HIK. (Id., ¶ 32.) During the call, a person named Timothy Reese collected information about Carter's age, insurance, and ZIP code while trying to solicit him for health insurance. (Id., ¶¶ 32–33.) According to public records, Reese is an employee and licensed insurance producer for HIK. (Id., ¶ 34.) The third call was auto-dialed because there was a brief pause and delay before Carter answered, and there was no human being on the other end of the line. (Id., ¶ 38.) Carter asserts that the first two calls were auto-dialed, too, because no one left messages after Carter failed to answer. (Id., ¶ 39.) Carter never did business with or consented to receive calls from any Defendant. (Id., ¶¶ 41–42.)

Carter alleges that HIK has a contractual relationship with Alvarado to help generate leads for insurance business. (E.g., id., ¶¶ 55, 59.) In turn, Alvarado uses Health Choice Now to make calls to help generate those leads. (Id., ¶¶ 56, 70.) Discovery has revealed that HIK paid Alvarado approximately $20,000 to $70,000 per week for billable leads at a rate of approximately $50 per lead. (Id., ¶ 44.) HIK received approximately 400 to 1,400 call transfers per week from Alvarado. (Id.) Carter therefore alleges that "Defendants mass-dialed calls indiscriminately and incessantly, including to numbers on the Do Not Call registry." (Id., ¶ 45.) Carter alleges that HIK is responsible for the calls placed by Alvarado and Health Choice Now that were routed back to HIK to generate insurance business. (Id., ¶ 50.) Carter further alleges that HIK had "full knowledge" that Alvarado and Health Choice Now were placing calls in violation of the TCPA but failed to take corrective action. (Id., ¶¶ 51–54.)

HIK's relationship with Alvarado is governed by an Advertiser Agreement that called on Alvarado to "acquir[e], generat[e], and licens[e] certain consumer information" and "transfer[] inbound calls from consumers expressing an interest in insurance products." (Id., ¶ 59.) The Advertiser Agreement obligates Alvarado to use "lawful methods" and "compl[y] with applicable laws," including the TCPA. (Id., ¶ 60.) Alvarado is obligated to indemnify HIK "for violations of TCPA or misrepresentations in lead generation." (Id., ¶ 62.) HIK, too, is required under the Advertiser Agreement to "comply with all applicable laws." (Id., ¶ 61.) HIK provides an "Insertion Order" to Alvarado specifying "campaign details including pricing, vertical, filters, state/geography, volume caps, exclusivity, and return policies." (Id., ¶ 63.) HIK also has the authority to set "return policies" and reject leads that do not meet HIK's criteria. (Id.) HIK has the

right to terminate Alvarado on thirty days' notice, or immediately upon material breach. (Id., ¶ 64.) HIK has never terminated Alvarado. (Id., ¶ 65.)

       *B.  Additional Factual Allegations Relating to the Motion to Compel Arbitration.*

Health Choice Now has an affiliate called C4R Media Corp. ("C4R"), which is a marketing company that provides advertising and customer acquisition services through, among other things, the operation of user-facing websites. (ECF 52-1, ¶¶ 3–4.) C4R and Health Choice Now are under common control of What If Media Group, LLC. (Id., ¶ 4.) Ben Zitter, the Chief Compliance Officer for C4R, asserts that Carter visited C4R's websites at least thirty-eight times between February 9, 2022, and May 29, 2025. (Id., ¶ 8.) This includes visits to the following websites:

- win.click2win4life.com on various dates between February 9, 2022, and May 27, 2023;

- claim.theclassactionguide.com on March 28, 2022, and January 25, 2023;

- help.unemploymentbenefitsguide.com in late May 2022 and October 7, 2023;

- win.bestdayeversweeps.com on May 26, 2022, and March 19, 2023;

- claim.foundmoneyguide.com on various dates between May 28, 2022, and April 29, 2023;

- go.thepersonalfinancialguide.com in early June 2022 and October 2, 2024;

- go.thefreedailyraffle.com on June 7, 2022;

- deals.thefreesampleshelper.com on October 30, 2022, and March 19, 2023;

- go.topcreditcardfinder.com on various dates between November 5, 2022, and May 29, 2025;

- win.omgsweeps.info on December 6, 2022, and March 12, 2023;

- find.usaassistanceguide.com on April 29, 2023; and

- go.creditguideusa.com on September 19, 2023.

(ECF 52-1, ¶ 8; ECF 52-2.)

Zitter asserts that during these visits, Carter agreed to Terms and Conditions of C4R's websites, including a mandatory arbitration provision. (ECF 52-1, ¶¶ 8, 21.) One of the times this occurred was May 29, 2025, when Carter visited a website bearing the name "Top Credit Card Finder," located at go.topcreditcardfinder.com. (ECF 52-1, ¶ 9, ECF 52-2, p. 2.) According to

Zitter, this website is owned and operated by C4R and is an aggregator of information from third parties about credit offers. (ECF 52-1, ¶¶ 4, 9–10.) C4R offers the website free to users because it has third-party advertisers and marketing partners. (Id., ¶ 10.) To enter the "Top Credit Card Finder" site, a user must confirm the user's email address and click a button labeled "Submit," as shown here:

(Id., ¶ 13.) If clicked, the "Terms and Conditions" link takes the user to a separate document entitled "Terms and Conditions," the first paragraph of which states: "Welcome to our website, located at topcreditcardfinder.com (the 'Website')." (ECF 52-3, p. 2.) These terms and conditions will be referred to in this Order as the "May 2025 Terms and Conditions."

    1.   The May 2025 Terms and Conditions.

The May 2025 Terms and Conditions identify the "Website" as "an Internet property of topcreditcardfinder ('Company,' 'we,' 'our' or 'us')." (Id.) They further state: "By registering on or continuing your use of the Website, you enter into a binding legal agreement, as set forth below, that includes, among other things, a requirement to arbitrate any disputes as described in the section titled 'Dispute Resolution Provisions.'" (Id.) The May 2025 Terms and Conditions state that it "constitutes the entire and only agreement between you and the Company with respect to your use of the website Offerings…." (Id., p. 3.) The "Offerings" are described as follows:

Subject to the terms and conditions of the Agreement, by registering on the Website, and receiving approval from Company, you can obtain, or attempt to obtain, access to the Links and Content. The Links and Content will enable you to access various web venues operated by governmental entities, as well as third party advertisers, which may enable you to apply for governmental benefits and/or third party products and/or services.

(Id., p. 4.)

The May 2025 Terms and Conditions contain lengthy arbitration provisions stating, in part:

**Disputes that Must Be Arbitrated.**

This agreement applies to any "Dispute" between (a) you, and (b) us and/or our advertisers marketing partners, or clients, which you agree are third-party beneficiaries of these Dispute Resolution Provisions (Company, its parent, subsidiaries, affiliates, and their advertisers, marketing partners, and clients, and each of their respective officers, directors, employees, agents, shareholders, licensors, suppliers and/or attorneys) are all included within the term "Company" for purposes of these Dispute Resolution Provisions) related to the Website or Offerings including, without limitation, or any calls, texts or emails you may receive in conjunction with your interactions with the Website or any Offerings or other interactions with us. "Dispute" means any dispute, claim, or controversy (excluding those exceptions listed below) between you and Company, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, for which either of us seeks legal recourse, including the validity, enforceability, or scope of this agreement to arbitrate or any portion of it. Questions of arbitrability—for example, whether a Dispute falls within the scope of this arbitration agreement and whether this arbitration agreement is enforceable—shall be decided by the arbitrator.

**For the avoidance of doubt and without limiting the foregoing, you agree to arbitrate any dispute related to any emails, text messages or calls you may receive from us or from any third party in conjunction with your interactions with our Website or with us, regardless of whether such dispute is with us or with the third party.**

(Id., p. 8.) The May 2025 Terms and Conditions include exceptions to the arbitration requirement, none of which appear to be relevant here. (Id.)

Later, the May 2025 Terms and Conditions include additional arbitration provisions that, among other things, prohibit class action arbitrations, establish governing rules and procedures for individual arbitrations, and define the scope of the arbitrator's authority. (Id., pp. 9–11.) These provisions also state, in the case of consumer arbitrations, that the consumer must pay the filing fee but "[i]n some situations, Company will help you with the fees related to an arbitration you initiate against Company to (hopefully) move us to a resolution quickly and fairly." (Id., p. 11.) In particular, the "Company" agrees to pay all arbitration costs in disputes seeking damages of $5,000

5

or less and "may still help you with your fees" if the dispute involves a claim of damages in excess of $5,000 and "you demonstrate that arbitration costs will be prohibitive compared to litigation costs." (Id.) The "Company" will not, however, pay arbitration costs "if the claimant is represented by the same common or coordinated counsel as other claimants with similar claims unless the total aggregated claim of damages is USD $5,000 or less for all claimants." (Id., pp. 11–12.) Zitter asserts that Carter would have confirmed his email address and clicked "submit" while visiting the site on May 29, 2025, thus assenting to these terms. (ECF 52-1, ¶¶ 9–15.)

   2.   The Class Action Guide Terms and Conditions.

Zitter asserts that Carter also visited other websites owned or operated by C4R, including, on January 25, 2023, a website entitled "Class Action Guide." (Id., ¶ 17.) As part of that visit, Zitter says Carter would have confirmed his email address and clicked on a link entitled "Search For Your Cash" as shown here:



(Id., ¶¶ 17–23.) If clicked, the "Terms and Conditions" link takes the user to a document entitled "THECLASSACTIONGUIDE.COM™ TERMS & CONDITIONS" that is similar in some respects to the May 2025 Terms and Conditions summarized above. (ECF 52-4.) This time, however, the "Company" is identified as "C4R Media Corp." (Id., p. 2.) This version of the Terms and Conditions will be referred to as the "Class Action Guide Terms and Conditions."

As it relates to arbitration, the Class Action Guide Terms and Conditions state that the parties "agree to submit their dispute for resolution by arbitration before a reputable organization as mutually agreed upon by the parties in New York, New York in accordance with then-current

Commercial Arbitration rules of the American Arbitration Association." (Id., p. 11.) Unlike the May 2025 Terms and Conditions from the Top Credit Card Finder website, the arbitration provision in the Class Action Guide Terms and Conditions does not identify (by category or otherwise) any third-party beneficiaries to the arbitration agreement, nor does it define the word "party" or "Company" broadly enough to include C4R's subsidiaries and affiliates like Health Choice Now (id., pp. 11–12) even though "subsidiaries and affiliates" are mentioned elsewhere, such as the provision entitled "Indemnification" (id., p. 8).

The Class Action Guide Terms and Conditions include a link to a document entitled "Demand for Arbitration" and give the user the option of in-person, telephone, or via written submissions in cases involving demands of $10,000 or less. (Id., p. 12.) If the user prevails in the claim and recovers more than was offered in settlement, the Company agrees to pay the user's attorney's fees. (Id.) Users are also informed: "**If you do not consent to the Agreement in its entirety, you are not authorized to use the TheClassActionGuide™ Offerings in any manner or form.**" (Id., p. 3.)

3.   <u>Other Alleged Interactions Between Carter and C4R Websites.</u>

In addition to agreeing to arbitration provisions, Zitter asserts that Carter consented to receive solicitations via telephone and otherwise when he visited websites affiliated with C4R, including the "USA Assistance Guide" and "Class Action Guide" websites. (ECF 52-1, ¶¶ 27–28.) Carter denies that he ever visited the websites identified in Zitter's Declaration, much less that he ever provided information, filled out forms, agreed to arbitrate disputes, or consented to receive telemarketing or sales calls. (ECF 66-1, ¶¶ 5–12.) To that end, Carter disputes details in Zitter's Declaration regarding the type of mobile device, type of network, and internet service provider that Carter allegedly used to access the websites. (Id., ¶¶ 15–19.) Carter suggests that the data reflected in Zitter's Declaration, if accurate at all, stems from automated form submissions on the websites, not information submitted by Carter or any other person. (ECF 66, p. 6.)

Health Choice Now moves to compel arbitration. (ECF 52.) Carter resists, arguing that: (i) the arbitration provisions are unenforceable because his putative agreement to them came via "browsewrap," not "clickwrap"; (ii) there are disputed issues of fact regarding whether Carter personally visited the websites where the arbitration agreement was presented; and (iii) any consent he might have provided would not result in mandatory arbitration anyway due to legal

7

defects like Health Choice Now not being mentioned in the relevant agreements and the arbitration provisions not being broad enough to cover his TCPA claims. (ECF 66.)

## II. LEGAL ANALYSIS.

### A. Legal Background.

The Federal Arbitration Act ("FAA") "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), *superseded by statute on other grounds*. It provides that arbitration agreements are generally "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Therefore, "a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

"When reviewing an arbitration clause, we ask only [1] whether a valid arbitration agreement exists and, if so, [2] whether the particular dispute falls within the terms of that agreement." *Dickson v. Gospel for ASIA, Inc.*, 902 F.3d 831, 834 (8th Cir. 2018). The first question requires the Court to determine if the agreement was valid under state law. *See Faber v. Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004). The second question asks whether the dispute falls within the agreement's scope. *Id.* The Court must "resolv[e] any doubts in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Unison Co., Ltd. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015) (cleaned up, citation omitted).

### B. Even When Disputed Facts Are Resolved in its Favor, Health Choice Now Has Failed to Show That Carter Agreed to Arbitrate This Dispute.

Although there are factual disputes regarding whether Carter visited C4R's websites at all, those disputes only matter if one or more of the arbitration provisions is enforceable in the first instance and covers the parties' dispute. Carter argues that Health Choice Now has failed as a matter of law to prove these elements. The Court therefore will start by assuming Carter visited the websites in question and deciding whether the putative arbitration agreements are applicable and enforceable. For reasons stated below, the Court concludes that Health Choice Now has not shown that Carter has an enforceable obligation to arbitrate this dispute even if he visited the C4R websites and agreed to the Terms and Conditions on the dates alleged by Health Choice Now.

8

1. <u>Legal Background.</u>

The parties' arguments revolve, in part, on whether the Terms and Conditions on the C4R websites are "browsewrap" or "clickwrap." The difference between the two is explained in *Foster v. Walmart, Inc.*, 15 F.4th 860, 863–64 (8th Cir. 2021). "[A] 'clickwrap' arrangement[] requires the user to explicitly assent by clicking 'I agree' (or something similar) before using the website or purchasing a product." *Id.* at 863. "In these types of agreements, mutual assent is rarely an issue because the user sees the list of the terms and conditions before accepting them. For that reason, courts rarely find problems with clickwrap agreements." *Id.* (internal citation omitted).

"A 'browsewrap' arrangement, on the other hand, imputes assent through the user's performance of some specific act" such as using or accessing the website. *Id.* "In this scenario, 'no [other] affirmative action is required,' meaning that users are never asked if they agree to the terms and conditions." *Id.* (internal citation omitted) (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)). "The terms themselves are also usually provided through a hyperlink rather than directly to the user." *Id.* "So the validity of a browsewrap agreement often depends on whether there is adequate notice to create 'actual or constructive knowledge of [the] website's terms and conditions.'" *Id.* (quoting *Nguyen*, 763 F.3d at 1176). In a case involving browsewrap, "the key … is the adequacy of the notice." *Id.*

Notice can come in two forms: actual notice and inquiry notice. *Id.* at 863–64. Actual notice exists "when the user is actually aware of the terms of use, most commonly after clicking on a hyperlink and reviewing them." *Id.* at 863. The browsewrap agreement is enforceable in such circumstances. *Id.* "The other, inquiry notice, depends on 'whether the website puts a reasonably prudent user on inquiry notice of the terms.'" *Id.* at 864 (quoting *Nguyen*, 763 F.3d at 1177). The critical question is whether the website is designed in such a way to make the existence of the relevant terms "reasonably conspicuous" to the user. *Id.* (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016)).

The Eighth Circuit and other courts have recognized that the distinction between "clickwrap" and "browsewrap" is not always clear. *See id.* at 863 (recognizing "numerous 'variations in between [clickwrap and browsewrap]'" (quoting 1 Corbin on Contracts § 2.12[2])). With that in mind, some courts have recognized a third category of agreements, which they call "hybridwrap" agreements, that "incorporate[] elements of clickwrap and browsewrap agreements; generally, these types of agreements provide greater notice of the terms and conditions—and of

9

the website's intent to bind the user to them—than a browsewrap agreement, but do not require the affirmative manifestation of intent that a clickwrap agreement does." *Gaker v. Citizens Disability, LLC*, 654 F. Supp. 3d 66, 73 (D. Mass. 2023); *see also, e.g.*, *Barclay v. ICON Health & Fitness, Inc.*, No. 19-CV-2970, 2020 WL 6083704, at *10 (D. Minn. Oct. 15, 2020) (discussing "hybridwrap" agreements); *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019) (same).

       2.   <u>Even if Carter Interacted with the "Top Credit Card Finder" Website on May 29, 2025, He Is Not Required to Arbitrate This Dispute.</u>

In moving to compel arbitration, Health Choice Now relies heavily on Carter's alleged visit to the Top Credit Card Finder website on May 29, 2025. As a threshold matter, the Court agrees with Health Choice Now that the agreement on this website is either clickwrap or hybridwrap falling on the clickwrap side of the spectrum. Which is to say, the "Submit" button that Carter ostensibly clicked contains reasonably clear language placing him on notice that, by clicking, he was agreeing to Terms and Conditions that included an arbitration provision:



As shown, the "Submit" button is directly below language alerting the user to the fact that clicking it constitutes assent to the Terms and Conditions *and* that those Terms and Conditions include an arbitration provision. Thus, the Court likely would compel arbitration if the facts showed that (a) Carter actually visited the website and clicked the "Submit" button, and (b) the arbitration provision in the May 2025 Terms and Conditions covers the dispute arising out of the November and December 2024 phone calls. *See Barclay*, 2020 WL 6083704, at *10 ("Federal courts generally give effect to such agreements 'where the button required to perform the action manifesting assent (*e.g.*, signing up for an account or executing a purchase) is located directly next to a hyperlink to

10

the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms.'" (quoting *Nicosia*, 384 F. Supp. 3d at 266)).

The problem for Health Choice Now is that there is no basis to conclude that the arbitration provision in the May 2025 Terms and Conditions covers this dispute. Instead, for at least two reasons, the record establishes the opposite even when disputed facts are resolved in Health Choice Now's favor. <u>First</u>, the May 2025 Terms and Conditions state that Carter was agreeing to arbitrate disputes "related to the Website or Offerings including, without limitation, or [sic] any calls, texts or emails **you may receive** in conjunction with your interactions with the Website or any Offerings or other interactions with us." (ECF 52-3, p. 8 (emphasis added).) It later reiterated his agreement to "arbitrate any dispute related to any emails, text messages, or calls **you may receive** from us or from any third party in conjunction with your interactions with our Website or with us, regardless of whether such dispute is with us or with the third party." (Id. (emphasis added).) Temporally, there is no way to interpret the words "you may receive" (future tense) in an agreement from May 2025 to mean that Carter was agreeing retroactively to arbitrate disputes arising out of prior interactions with the "Company" in November and December 2024. *See Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 727 (4th Cir. 2025) (refusing to apply version of agreement that post-dated parties' dispute and did not purport to apply retroactively); *see also, e.g.*, *Anderson v. Hansen*, 47 F.4th 711, 718–19 (8th Cir. 2022) (affirming denial of motion to compel arbitration and recognizing that limiting language in the arbitration agreement must be given effect).

<u>Second</u>, and relatedly, the May 2025 Terms and Conditions fail to reasonably identify the party or parties with whom Carter ostensibly reached such an agreement. The document opaquely defines "Company" to mean "an Internet property of topcreditcardfinder." (ECF 52-3, p. 2.) Zitter's later Declaration suggests there is no standalone legal entity called "topcreditcardfinder." (ECF 52-1, ¶ 9.) Instead, it is simply a website owned by C4R. (Id.) But neither C4R nor any of its subsidiaries or affiliates is ever identified by name as a party or third-party beneficiary in the May 2025 Terms and Conditions. Thus, the Court cannot conclude that a reasonable person in Carter's position would have understood that he was agreeing to arbitrate preexisting disputes with Health Choice Now simply by virtue of having agreed to arbitrate disputes on a forward-looking basis with "an Internet property of topcreditcardfinder" (whatever that means). *See, e.g.*, *Waldron v. Goddess*, 461 N.E.2d 273, 274 (N.Y. 1984) (holding that arbitration agreements "must not depend upon implication or subtlety"); *First Nw. Nat. Bank, Denison v. Crouch*, 287 N.W.2d 151,

11

153 (Iowa 1980) ("The intention expressed in the instrument prevails over the secret intention of the drafter.").[1]

Granted, other documents in the record identify C4R by name, including the Class Action Guide Terms and Conditions (ECF 52-4, p. 2) and Privacy Policy (ECF 52-5, p. 2). Health Choice Now does not allege, however, that Carter agreed to these documents as part of his visit to the Top Credit Card Finder site on May 29, 2025. Instead, Health Choice Now says he would have had access to these documents during "other visits" to C4R's websites. (ECF 52, p. 9.) The fact that these documents do a better job of identifying C4R by name therefore is immaterial to the significance of Carter's visit to the Top Credit Card Finder site on May 29, 2025. Based on the language of the May 2025 Terms and Conditions, Carter would not have known on that date that he was entering an agreement to arbitrate disputes with Health Choice Now at all, much less that he was doing so on a retroactive basis. Thus, the May 2025 Terms and Conditions do not obligate Carter to arbitrate this dispute. *See Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717–18 (9th Cir. 2020) (holding that arbitration agreement was not enforceable by entity who later became an affiliate of company with whom consumer originally agreed to arbitrate where "neither the entity nor the dispute has anything to do with [services]" the consumer received pursuant to the agreement); *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) ("[N]o reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under [a related entity]'s corporate umbrella—including those who provide services unrelated to cell phone coverage.").

3. The Arbitration Provision in the January 2023 Class Action Guide Terms and Conditions Does Not Cover This Dispute.

With the May 2025 Terms and Conditions off the table, the issue turns to whether Carter's alleged earlier interactions with C4R websites are enough to establish his binding assent to arbitration. The analysis of this issue revolves around his alleged visit to the "Class Action Guide" website on January 25, 2023. (ECF 52-1, ¶ 17; ECF 52-2, p. 2.) As part of that visit, Zitter says

---

[1] Neither party addressed choice of law in their briefs, but both the May 2025 Terms and Conditions and Class Action Guide Terms and Conditions contain a New York choice-of-law provision. (ECF 52-3, p. 7; ECF 52-4, p. 11.) There does not appear to be a material difference between New York and Iowa law on the relevant issues of contract formation and interpretation.

Carter would have confirmed his email address and clicked on a link entitled "Search For Your Cash," as shown here:



(ECF 52-1, ¶¶ 17–23.) This interface is not as close to clickwrap as the May 2025 Terms and Conditions because, among other things, it does not mention (or even imply) that the consumer is agreeing to arbitrate disputes by clicking the "Search For Your Cash" button. Nonetheless, the Court will assume without deciding that this interface would result in mandatory arbitration if the underlying arbitration provision is broad enough to cover this dispute.

Once again, however, Health Choice Now has failed to show that the arbitration provision applies to this dispute. The Class Action Guide Terms and Conditions define "Company" to include only one entity, C4R. (ECF 52-4, p. 2.) The "parties" to the Class Action Guide Terms and Conditions are therefore limited to the user (as alleged here, Carter) and C4R. The same is true for the arbitration provision: it applies to disputes with the "Company" (id., pp. 11–12) but does not identify (by category or otherwise) any third-party beneficiaries such as C4R's subsidiaries and affiliates. Thus, when the arbitration provision states that the "parties" are agreeing to submit disputes to arbitration, this applies only to disputes between Carter and C4R, not the latter's subsidiaries or affiliates. *See Burnett v. Nat'l Ass'n of Realtors*, 75 F.4th 975, 984 (8th Cir. 2023) (holding that arbitration agreement could not be enforced by an entity that was "neither a party nor a third-party beneficiary" to the relevant contracts); *White v. Sunoco, Inc.*, 870 F.3d 257, 267–68 (3d Cir. 2017) ("Nowhere does the agreement provide for a third party … the ability to elect arbitration or to move to compel arbitration."); *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014,

13

1025 (7th Cir. 2014) ("This language indicates that the signatories intended to bind themselves, but not others, to arbitration.").

In this regard, the failure of the arbitration provision to identify any third-party beneficiaries or modify the definition of "Company" to include C4R's subsidiaries and affiliates is especially significant because it stands in contrast to the Indemnification provision of the Class Action Guide Terms and Conditions, which broadly applies to include "subsidiaries and affiliates." (ECF 52-4, p. 8). In other words, C4R knew how to include additional entities within the scope of a contract provision when it wanted to do so. C4R's failure to include the same "subsidiaries and affiliates" language in the arbitration provision therefore must be interpreted as reflecting an intentional decision not to require arbitration of disputes with entities like Health Choice Now. *See Greenfield v. Cincinnati Ins. Co.*, 737 N.W.2d 112, 120 (Iowa 2007) ("A cardinal rule of contract interpretation is that the use of substantially different language in provisions of a contract must have been intentional and must be recognized by a reviewing court."); *Lucas v. Coastal Advantage Mktg. LLC*, No. 25-60450-CIV, 2025 WL 3759231, at *2 (S.D. Fla. Dec. 30, 2025) (holding that arbitration provision did not apply to disputes between a consumer and any company or entity other than the one expressly identified). The Court must give effect to that intent by rejecting Health Choice Now's attempt to use the Class Action Guide Terms and Conditions to compel arbitration here.

4. <u>The Court Will Not Compel Arbitration on the Threshold Question of Arbitrability.</u>

One final issue requires attention. Health Choice Now argues that even if the Court is not comfortable affirmatively ruling as a matter of law that arbitration is required for the entire dispute, it must order arbitration anyway on the "gateway question" of whether the dispute falls within the scope of the arbitration agreement. *See Burnett*, 75 F.4th at 984. Under New York law (and consistent with Eighth Circuit precedent), the governing standard is whether the parties "evinced a 'clear and unmistakable' agreement to arbitrate arbitrability as part of their alternative dispute resolution choice." *Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884, 887 (N.Y. 1997); *accord Burnett*, 75 F.4th at 982.

Health Choice Now's position rests, first, on language in the May 2025 Terms and Conditions stating: "Question of arbitrability—for example, whether a Dispute falls within the scope of this arbitration agreement and whether this arbitration agreement is enforceable—shall be decided by the arbitrator." (ECF 52-3, p. 8.) In addition, although the Class Action Guide Terms

14

and Conditions does not contain such explicit language, they do incorporate the Rules of the American Arbitration Association ("AAA"). (ECF 52-4, p. 11.) Because those Rules contemplate arbitrators deciding arbitrability, "the incorporation of the AAA Rules into a contract requiring arbitration [is] a clear and unmistakable indication the parties intended for the arbitrator to decide threshold questions of arbitrability." *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014). Thus, the Court must consider whether it has the authority to consider arbitrability as to the arbitration provisions in both the May 2025 Terms and Conditions and Class Action Guide Terms and Conditions.

The Court must apply state law in evaluating the "gateway question" of arbitrability. *See Burnett*, 75 F.4th at 982–83. New York law recognizes that non-parties may not compel arbitration of a dispute unless the arbitration provision identifies them as third-party beneficiaries or otherwise gives them the right to do so. *See Waldron*, 461 N.E.2d at 275 (holding that lower courts erred in ordering arbitration where arbitration provision did not extend the benefits of that provision to non-parties); *see also Rent-A-Center, Inc. v. Iowa Civ. Rights Comm'n*, 843 N.W.2d 727, 736 (Iowa 2014) ("Nonparties don't have to arbitrate."). In this regard, New York law is identical to the Missouri law the Eighth Circuit applied in *Burnett* when it held that the district court properly addressed the threshold question of arbitrability. 75 F.4th at 983–84.

*Burnett* squarely defeats any attempt by Health Choice Now to rely on the Class Action Guide Terms and Conditions to argue that questions of arbitrability must be decided by the arbitrator. The arbitration provision in the Class Action Guide Terms and Conditions states that "the parties" agree to submit "their" disputes to arbitration. (ECF 52-4, p. 11.) As explained above, the only parties to the arbitration provision in the Class Action Guide Terms and Conditions are Carter and C4R. Thus, under *Burnett*, the arbitration provision contains "narrow, party-specific language [that] does not clearly and unmistakably delegate to an arbitrator threshold issues of arbitrability between nonparties, including [the non-party seeking to compel arbitration]." 75 F.4th at 983 (quoting *Burnett v. Nat'l Ass'n of Realtors*, 615 F. Supp. 3d 948, 958 (W.D. Mo. 2022). Accordingly, "the [c]ourt—not an arbitrator—must address whether [Health Choice Now] can enforce the [arbitration agreement]." *Id.* (quoting *Burnett*, 615 F. Supp. 3d at 959).

The analysis is somewhat different under the May 2025 Terms and Conditions because that document expressly includes "subsidiaries, affiliates, and their advertisers, marketing partners, and clients" (among others) within the scope of the arbitration provision and states that arbitration is

15

required for "any dispute related to any emails, text messages or calls you may receive from us or from any third party in conjunction with your interactions with our Website or with us, regardless of whether such dispute is with us or with the third party." (ECF 52-3, p. 8.) This is not the "narrow, party-specific language" at issue in *Burnett*.

All the same, the arbitration provision in the May 2025 Terms and Conditions still must show a "clear and unmistakable agreement" to submit disputes between Carter and Health Choice Now regarding arbitrability to an arbitrator. *Sacharow*, 689 N.E.2d at 887. It does not meet this standard. As explained above, there is nothing in the contract to communicate to Carter that he was entering an agreement to arbitrate disputes with Health Choice Now, as that entity is not mentioned directly and the only indirect reference requires the reader to divine that "an Internet property of topcreditcardfinder" (which is how "Company" is defined) is a reference to a cognizable legal entity that has subsidiaries and affiliates, one of which is Health Choice Now. Even Health Choice Now does not seem to be claiming that "topcreditcardfinder" is a cognizable legal entity. Instead, Zitter simply asserts that C4R owns and operates the website go.topcreditcardfinder.com. (ECF 52-1, ¶ 9.) No reasonable person in Carter's position would understand that he was agreeing with an unnamed affiliate of an unnamed entity to arbitrate the issue of arbitrability. *See Revitch*, 977 F.3d at 717–18; *Wexler*, 211 F. Supp. 3d at 504.

The fact that Carter's purported prior interactions with C4R websites involved contracts expressly identifying C4R as the contractual counterparty reinforces the problems with the May 2025 Terms and Conditions. The premise of cases enforcing clickwrap and hybridwrap agreements is that consumers have the ability to review the applicable terms and conditions to understand what they are agreeing to and with whom. *See, e.g.*, *Foster*, 15 F.4th at 864 ("[T]he user 'is deemed to have notice of all facts that reasonable inquiry would disclose,' including the terms themselves." (quoting *1000 Va. Ltd. P'ship v. Vertecs Corp.*, 146 P.3d 423, 431 (Wash. 2006))). Here, according to Zitter's Declaration, Carter was informed on thirty-seven prior occasions that he was entering a contract with a party specifically identified as C4R. No reasonable person would conclude, on visit number thirty-eight, that his agreement with "an Internet property of topcreditcardfinder" is somehow a reference to that same entity. *See Wexler*, 211 F. Supp. 3d at 504. Instead, Health Choice Now's position relies on the sort of "implication or subtlety" that the New York Court of Appeals has held is insufficient to bind a party to an arbitration provision. *See Waldron*, 461 N.E.2d at 274.

16

Speaking of "implication or subtlety," Carter's ostensible agreement to the May 2025 Terms and Conditions arose out of his interaction with the Top Credit Card Finder website six or seven months *after* the phone calls he received from Health Choice Now or Alvarado that underlie this dispute. But the May 2025 Term and Conditions merely require him to arbitrate disputes involving communications that he "may receive" (future tense) from the "Company" or any subsidiary, affiliate, or marketing partner. Thus, Health Choice Now is not merely asking the Court to conclude that Carter was agreeing to arbitrate disputes with an unnamed entity, but also that he was doing so on a retroactive basis despite only forward-looking language in the arbitration provision itself. In these circumstances, the alleged agreement to arbitrate the issue of arbitrability with Health Choice Now is anything but "clear and unmistakable." *See In re Massena Cent. Sch. Dist. (Massena Confederated Sch. Emps.' Ass'n, NYSUT, AFL-CIO)*, 918 N.Y.S.2d 228, 231–32 (2011) (holding that arbitrator lacked authority to decide threshold question of arbitrability). Indeed, it is wholly non-existent. Thus, the issue of arbitrability is for the Court to decide, not an arbitrator.

## III.    CONCLUSION.

Because this dispute does not fall within the scope of any arbitration agreement Carter allegedly entered, the Court DENIES Health Choice Now's Motion to Compel Arbitration. (ECF 52.)

IT IS SO ORDERED.

Dated: July 1, 2025

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

17