**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ROBERT HOSSFELD,** individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> *v.* <br><br> **EVERQUOTE, INC. and FARMERS GROUP, INC.** <br><br> *Defendants.* | Case No. 1:26-cv-11440-RGS |

## <u>PLAINTIFF'S OPPOSITION TO FARMERS' MOTION TO DISMISS</u> [Dkt 41]

Alexander H. Burke, *pro hac vice*
**BURKE LAW OFFICES, LLC**
909 Davis Street, Suite 500
Evanston, IL 60201
(312) 729-5288
ABurke@BurkeLawLLC.com

Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

*Counsel for the Plaintiff*

Farmers' motion depends on a corporate-form narrowing that has little to do with the Amended Complaint's actual theory of liability. Plaintiff does not seek to hold Farmers Group, Inc. ("Farmers") liable merely because some related Farmers entity underwrites insurance, or because an independent agent somewhere used the Farmers name. The Amended Complaint alleges that Farmers Group, Inc. itself created, operated, approved, controlled, and benefited from the telemarketing pipeline that generated the calls and text messages at issue.

That pipeline was straightforward. Farmers operated the Agency Growth Store, a lead-generation platform through which Farmers agents purchased leads from vendors Farmers pre-approved for TCPA compliance, including EverQuote. AC ¶¶ 20–22, 61–62. Farmers negotiated the vendor relationships, approved the consent disclosures, used Jornaya/Guardian to police consent parameters, data-mapped EverQuote leads into its own CRM, shared DNC data, and encouraged agents to use EverQuote leads to develop Farmers business. AC ¶¶ 21–22, 100–104, 113(i). EverQuote then called Plaintiff using caller ID that said "Farmers Agent," told him the call would be transferred to the Holmes Farmers agency, and transmitted his information to that agency. AC ¶¶ 24–29, 37. The Holmes agency then called Plaintiff as "JD with Farmers Insurance" and sent him a link to sell him Farmers goods and services. AC ¶¶ 34–41. Farmers controlled the entire telemarketing universe within which the calls to Plaintiff were made.

Farmers asks the Court to ignore that alleged system and instead isolate formal corporate details: Farmers Group, Inc. is not itself an insurance company; it is not the named underwriting principal in the Agent Appointment Agreement; and it did not physically dial Plaintiff's phone. But those points do not answer the pleaded agency and ratification theories. The question at this stage is not whether Farmers can ultimately prove that the telemarketing system belonged to someone else. The question is whether Plaintiff plausibly alleges that Farmers authorized,

controlled, approved, and benefited from the EverQuote/Farmers-agent lead-generation system that produced the challenged calls. The Amended Complaint does exactly that.

Farmers' own manifestations—"Farmers Agent" caller ID, "Farmers Insurance" identification, use of a Farmers.com agency page, and a system designed to sell Farmers-branded insurance—also plausibly plead apparent authority. AC ¶¶ 25, 38, 40, 123. And Farmers' alleged continued acceptance of the benefits of the system after receiving complaints that agents and vendors were calling numbers on the National Do Not Call Registry and Farmers' internal Do Not Call list plausibly pleads ratification. AC ¶¶ 124–129.

At bottom, Farmers' motion asks the Court to accept Farmers' version of the corporate structure, draw inferences in Farmers' favor, and decide agency against Plaintiff before discovery. Rule 12 does not permit that. Taking the Amended Complaint's allegations as true, Farmers did not merely exist near the challenged telemarketing. It built and operated the marketing system, approved the vendor and consent process, directed how Farmers agents and vendors used the system, and accepted the benefits when that system marketed Farmers-branded insurance to Plaintiff. The motion should be denied.

## STANDARD FOR REVIEW

At Rule 12, the Court must accept the Amended Complaint's well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiff's favor. See *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12, 17 (1st Cir. 2011); *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52–53 (1st Cir. 2013). The plausibility inquiry is not a license to choose among competing factual versions or credit the defendant's preferred inferences. *Ocasio-Hernandez*, 640 F.3d at 17. A complaint survives where the well-pleaded facts, taken together, make liability plausible, even if the defendant can imagine an innocent explanation or intends to contest the facts in discovery. *Id.* at 12–13; *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 30

(1st Cir. 2010). A complaint alleging TCPA vicarious liability does not require the usual level of particularity. *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 325 (D. Mass. 2020).

## FACTS

Farmers Group, Inc. is not a passive parent company; it offers and sells insurance nationwide through its exchanges, subsidiaries, and agents; acts as attorney-in-fact for the Farmers exchanges; and operates and controls the marketing systems, lead programs, and agent platforms used to generate Farmers business. AC ¶¶ 17–19. One of those systems is Farmers' Agency Growth Store, a web-based service through which Farmers agents purchase marketing leads from vendors Farmers has pre-approved for TCPA compliance, including EverQuote. AC ¶ 20. Farmers negotiates and executes agreements with the entities that make the Agency Growth Store possible, including EverQuote, Verisk/Jornaya, LeadCloud, and others, and specifically authorizes and encourages its agents to EverQuote Agency Growth Store leads. AC ¶¶ 21-22.

EverQuote operates an online insurance lead-aggregation marketplace. It obtains marketing leads from websites that claim to identify consumers interested in insurance, then resells those leads to insurers, insurance agents, and telemarketers. AC ¶ 15. EverQuote also conducts "warm transfers," in which it calls a consumer and contemporaneously transmits the consumer's information to its customer. AC ¶ 16.

Plaintiff's residential telephone number has been on the National Do Not Call Registry since 2015 and was also on Farmers' internal Do Not Call list. AC ¶ 4. Before the calls at issue, Plaintiff had requested not to receive future telemarketing calls during telemarketing calls promoting Farmers insurance. AC ¶ 14. Farmers and EverQuote had actual knowledge that Plaintiff's number was on Farmers' do-not-call list, and Farmers agents had access to DNC Registry and Farmers internal do-not-call data. AC ¶¶ 15–16.

3

Nevertheless, on March 4, 2026, Plaintiff received a telephone solicitation to his residential telephone number that showed caller ID "Farmers Agent," at Farmers' insistence. AC ¶¶ 24-25. EverQuote placed the call for the purpose of developing business for Farmers, told Plaintiff he had requested an automobile insurance quote, and stated that the call would be transferred to the Holmes agency, a Farmers agency in Lubbock, Texas. AC ¶¶ 27–28. Plaintiff told EverQuote he had not requested an insurance quote. AC ¶ 29. Shortly after Plaintiff notified it that he had not requested insurance information, EverQuote sent Plaintiff a text concerning his "requested auto coverage application" and providing a link. AC ¶ 30. The link directed Plaintiff to an EverQuote webpage displaying an advertisement for Progressive insurance. AC ¶ 32. At the time EverQuote sent that text, the ultimate insurance-company beneficiary had not yet been identified, and Farmers was one of the eligible beneficiaries. AC ¶ 33.

Later that same day, Plaintiff received another Farmers telephone solicitation, this time from the Alexander Holmes Farmers agency. AC ¶¶ 34–36. EverQuote had transmitted Plaintiff's lead information to the Farmers agency. AC ¶ 37. During the call, the caller identified himself as "JD with Farmers Insurance," and when Plaintiff asked how the caller obtained his information, the caller answered: EverQuote. AC ¶¶ 38-39. The caller then sent Plaintiff a text message with the Holmes agency's URL on Farmers.com to increase the likelihood of selling Farmers goods and services. AC ¶ 40. Plaintiff told the caller he had never agreed to be contacted and demanded that the telemarketing calls stop. AC ¶ 41. EverQuote then sent Plaintiff another follow-up text message the next day, to try to develop business for Farmers and potentially other insurers. AC ¶¶ 43-44. Plaintiff later received additional insurance telemarketing calls on March 9, March 10, and March 11, because EverQuote resold his lead even though it knew he had not opted in and had requested DNC. AC ¶¶ 46–56.

4

These events were not isolated. Farmers and EverQuote allegedly maintain policies and procedures that permit telemarketing calls to numbers on Farmers' or EverQuote's internal do-not-call lists if they believe there has been an opt-in. AC ¶ 60. Farmers' Agency Growth Store allegedly allows agents to buy discounted leads from vendors Farmers pre-approves for TCPA compliance. AC ¶ 61. Farmers engages third-party compliance company Jornaya to review consent language used on EverQuote's websites, and knowingly and formally approved the consent language and disclosures for the lead that resulted in the calls to Plaintiff. AC ¶ 62.[1]

EverQuote lead data used in connection with Farmers allegedly originates from websites using substantively identical consent disclosures that Farmers approved. AC ¶¶ 100–101. Farmers and its agents track EverQuote leads, certain contacts, and telemarketing calls through an in-house CRM data-mapped with EverQuote. AC ¶ 102. EverQuote and Farmers use Jornaya's Guardian product to try to ensure that leads provided through the Agency Growth Store fall within consent parameters set by EverQuote and/or Farmers. AC ¶ 103. Jornaya allegedly tracks consent events so EverQuote and Farmers can try to prove consent if later confronted with a TCPA lawsuit. AC ¶ 104.

Farmers allegedly designed and implemented a business model that delegates telemarketing and telemarketing compliance to its agents while retaining strict control, including the ability to discipline and terminate agents for failure to follow Farmers policies and guidance. AC ¶ 106. Farmers insists on controlling, and maintaining the ability to control, the day-to-day operations of agents, their telemarketing vendors, and others who conduct telemarketing on Farmers' behalf. AC ¶ 107. Farmers agents and EverQuote *followed* Farmers' telemarketing rules, policies, and guidance, and doing so *caused* the TCPA violations alleged herein. AC ¶ 108.

---

[1] Farmers and EverQuote maintain the technological and practical ability to stop calling and remove a lead from their sales systems immediately after a do-not-call request. AC ¶ 64.

Farmers' standardized Agent Appointment Agreement ("AAA") affords Farmers substantial rights to control the telemarketing at issue – even though Farmers is not a signatory thereto. AC ¶ 110. Farmers set the telemarketing policies and guidance the AAA requires agents to follow, and as the managerial and implementation entity for the exchanges enjoys the power and benefits over agents afforded by the Agent Appointment Agreement and Farmers policies and guidance. AC ¶ 111. Although the exchanges are the nominal principals listed in the Agent Appointment Agreement, Farmers created centralized systems, policies, and rules that dictate agent behavior as to telemarketing. AC ¶ 112. Among other things, Farmers requires agents to solicit Farmers insurance, requires Farmers agents and telemarketing vendors to state that calls are made on behalf of Farmers, requires agents and vendors to try to sell Farmers products first, requires pre-approval for marketing materials using the Farmers name, retains the right to modify telemarketing instructions at any time, permits third-party telemarketers to generate business only subject to Farmers' rules, shares DNC data, negotiates favorable EverQuote pricing, mandates the manner and content of telemarketing scripts, provides or requires telemarketing training, and may discipline or terminate agents for conduct Farmers believes is detrimental to its business. AC ¶ 113.

Farmers also knew its agents routinely obtained leads from vendors such as EverQuote and called those leads to sell Farmers insurance products. AC ¶ 121. Farmers authorized that practice, required compliance with its telemarketing policies, and retained authority to discipline or terminate agents who violated those policies. AC ¶ 121. Plaintiff and class members reasonably believed Farmers authorized the calls because Farmers required use of the Farmers trade name, gave agents access to proprietary customer, product, and pricing information, authorized agents to bind Defendants through telemarketing-derived sales, and retained the revenue and marketing benefits from successful calls. AC ¶ 123. Farmers benefited not only

6

from completed sales, but also from marketing exposure, sales opportunities, lead information, and consumer contacts. AC ¶¶ 125–127. In Plaintiff's case, the system functioned exactly as intended: Plaintiff's information was generated or transmitted as an insurance lead, Plaintiff was contacted by telephone and text message, and Farmers-branded insurance products and services were marketed to him. AC ¶ 128. By continuing the conduct despite notice that agents and vendors were calling persons on the National Do Not Call Registry or Farmers' internal Do Not Call list, Farmers ratified the conduct alleged in the Amended Complaint. AC ¶ 129.

## ARGUMENT

**A.   Farmers' Motion Improperly Asks the Court to Reject the Amended Complaint's Well-Pleaded Allegations and Draw Inferences in Farmers' Favor.**

Farmers' motion asks that the Court do more than test the sufficiency of the pleading; it asks the Court to accept Farmers' competing factual characterization of its corporate structure, regulatory status, and relationship to the telemarketing system, and then to use that characterization to defeat the operational-control allegations Plaintiff actually pleads. Those arguments are not proper on a Rule 12 motion. *Ocasio-Hernandez*, 640 F.3d at 17.

The Amended Complaint alleges that Farmers operated and controlled the marketing systems, lead programs, and agent platforms used to generate Farmers business; operated the Agency Growth Store; negotiated and executed agreements with EverQuote and other entities that made the system possible; approved lead-generation disclosures for TCPA compliance; maintained CRM and consent-tracking integrations with EverQuote and Jornaya; shared DNC data; and encouraged Farmers agents to buy EverQuote leads to develop Farmers business. AC ¶¶ 19–22, 61–62, 100–104, 113(i). Those allegations – which Farmers' motion ignores – must be accepted as true.

7

Farmers instead asks the Court to treat a declaration from its counsel and selected regulatory screenshots as dispositive. But Rule 12 generally confines the Court to the complaint, documents attached to it, documents sufficiently referred to in it, documents central to the claim, undisputedly authentic documents, and official public records. *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993); *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 16–17 (1st Cir. 1998). Even when a court may consider such materials, it may not use them to resolve factual disputes, weigh evidence, or draw inferences against the plaintiff. *See Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013); *Ocasio-Hernandez*, 640 F.3d at 17.

Farmers' materials do not negate Plaintiff's allegations in any event. At most, they purport to show that Farmers Group, Inc. is not itself listed as a Texas insurance company and was not the formal appointing insurer for Alexander Holmes. That is not the AC's pleaded theory. Plaintiff alleges that Farmers Group, Inc. created, managed, approved, and benefited from the lead-generation and telemarketing system that connected EverQuote, Farmers agents, and consumers. AC ¶¶ 19–22, 105–113, 121–129. Whether Farmers was the underwriting insurer, or whether Holmes was formally appointed to sell insurance for Farmers Group, Inc. or an exchange or subsidiary, does not resolve whether Farmers controlled, authorized, facilitated, or ratified the telemarketing conduct alleged in the Amended Complaint.

Nor may Farmers use its exhibits to draw favorable factual inferences. For example, Farmers asks the Court to infer that because FGI is not the nominal party to the Agent Appointment Agreement, FGI lacked control over the Holmes agency's telemarketing. But the Amended Complaint alleges the opposite: that Farmers, as the managerial and implementation entity for the exchanges, enjoys the power and benefits over agents afforded by the Agent Appointment Agreement and Farmers policies and guidance, and that Farmers created centralized systems, policies, and rules that dictate agent behavior as to telemarketing. AC ¶¶

111–112. At Rule 12, Farmers is not entitled to substitute its preferred inference for Plaintiff's well-pleaded one. *See Ocasio-Hernandez*, 640 F.3d at 17; *Rodríguez-Reyes*, 711 F.3d at 53.

The same is true of Farmers' effort to rely on regulatory screenshots. Public records may show that a particular entity appears, or does not appear, in a particular regulatory search. They do not negate the AC's well-pleaded allegations that FGI: created the Agency Growth Store, negotiated the deal with EverQuote to sell leads to agents, approved EverQuote's consent disclosures, set the telemarketing policies, shared DNC data, controlled use of Farmers branding, and who accepted the benefits of the resulting telemarketing. AC ¶¶ 61–66, 100–113, 121–129. Those are the facts that matter to Plaintiff's agency and ratification theories, and the Amended Complaint pleads them in detail.

Farmers' argument therefore depends on a premature factual narrowing. Properly viewed through the Rule 12 lens, the Amended Complaint plausibly alleges that Farmers Group, Inc. created and operated the telemarketing pipeline at issue; approved the lead-generation and consent process; exercised control over Farmers agents and EverQuote as to telemarketing and telemarketing compliance; and continued to accept the benefits of that system after receiving complaints that it generated unlawful calls. AC ¶¶ 105–129. That is enough to proceed to discovery.

### B. Farmers May Be Held Directly Liable Because it Designed and Implemented a System Virtually *Guaranteed* to Generate Violations, the Calls Were Made "On Behalf Of" Farmers and Because Farmers Delegated Telemarketing Compliance to Its Common-Law Agents.

Farmers argues that it cannot be directly liable because EverQuote and the Holmes Agency physically placed the challenged calls and text messages. That argument is – again – too narrow. A party who engages a third-party telemarketer may be held liable under federal common law agency principles for a TCPA violation. *Rosenberg v. LoanDepot.com LLC*, 435 F.

Supp. 3d 308, 325 (D. Mass. 2020). The Restatement imposes accountability and "direct

liability" when a principal authorizes others to perform tortious acts:

> A principal's own fault may subject the principal to liability to a third party harmed by an agent's conduct. Often termed "direct liability," such liability stems either from the principal's" relationship with an agent whose conduct harms a third party or from the agent's failure to perform a duty owed by the principal to the third party.
>
> A principal is subject to liability under § 7.04 when an agent acts with actual authority in committing a tort, that is, when the agent reasonably believes, based on a manifestation of the principal, that the principal wishes the agent so to act.
>
> A principal is subject to liability under § 7.05 on the basis of the principal's negligence in selecting, supervising, or otherwise controlling or failing to control the agent.

Rest. (3d) Agency §7.03, *cmt b* (paragraph breaks supplied). The AC sufficiently alleges so-

called "direct liability" pursuant to § 7.04, because the alleged violations were the direct and

foreseeable result of EverQuote and the Holmes agency following Farmers' corporate

telemarketing policies. AC ¶ 108. Those policies – which the AC alleges EverQuote and Holmes

agency were required to follow – created a reasonable belief on the part of Holmes and

EverQuote that Farmers wanted it to act in a manner that violated the TCPA. AC ¶¶ 111. The AC

alleges that Farmers' telephone-contact guidance instructed agents to apply an incorrect consent

standard for Do Not Call Registry compliance, and allowed calls to numbers on Farmers'

internal Do Not Call list based on a supposed "consent" exception Plaintiff alleges no longer

exists. AC ¶¶ 118–120.[2]

---

[2] Although the TCPA's internal do not call regulations originally contained a consent exception but abrogated that exception in 2003. The key lies in the TCPA's definitions of "telephone solicitation" and "telemarketing," both defined terms. "Telephone solicitation" includes a consent exception, 47 C.F.R. §§ 64.1200(f)(15)(i), whereas "telemarketing" does not. 64.1200(f)(13) (2026). Before 2003, the TCPA's internal do not call provisions regulated "telephone solicitations," 47 C.F.R. § 64.1200(e) (2001), the definition of which included a consent exception. 47 C.F.R. § 64.1200(f)(3)(i) (2001). In 2003 the FCC replaced the old regulation's scope from "telephone solicitation" to "telemarketing," thus eliminating any reference to consent. *In re TCPA*, 2003 Order, 18 FCC Rcd 14014, 14070, ¶96 (2003). That regulation is in effect today. 47 C.F.R. § 64.1200(d) (2026).

The internal do not call regulation prohibits <u>all</u> telemarketing calls unless the seller has proper procedures in place for (among other things) maintaining a complete internal do not call list, and ensuring that such list is honored. 47 C.F.R. §§ 64.1200(d) & 64.1200(d)(4). Because Farmers prescribed the policies governing telemarketing and required agents and vendors acting on its behalf to follow them, it is liable under ordinary agency principles when conduct within that authority violates the TCPA.  See Rest. (3d) Agency § 7.04 (2006); *id. cmt. b* ("[T]he agent is the instrumentality through which the principal achieves the principal's objective."); *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 325–26 (D. Mass. 2020).

Additionally, Plaintiff's Do Not Call claims arise under 47 U.S.C. § 227(c), which authorizes a private action by a person who receives more than one call within twelve months "by or on behalf of the same entity" in violation of the FCC's residential-privacy regulations. 47 U.S.C. § 227(c)(5). The FCC's rules likewise recognize liability for the entity "on whose behalf" telemarketing is conducted. See 47 C.F.R. § 64.1200(d)(4). And the rules define a "seller" as the person or entity "on whose behalf a telephone call or message is initiated" to encourage the purchase of goods or services. 47 C.F.R. § 64.1200(f)(11).

That language matters here. Farmers' motion treats direct liability as though it exists only when the defendant's own equipment physically dials the phone. But Congress and the FCC used broader language. 47 U.S.C. § 227(c)(5); 47 C.F.R §64.1200(d)(4). A call made "on behalf of" the entity whose goods and services are being marketed is not legally irrelevant merely because an agent, vendor, or lead generator placed it. The Amended Complaint alleges that EverQuote and the Holmes Agency contacted Plaintiff to market Farmers-branded insurance through Farmers agents, using a Farmers-approved lead system, Farmers-approved consent disclosures, Farmers telemarketing policies, Farmers branding, Farmers DNC data, and Farmers agent platforms. AC ¶¶ 19–22, 61–66, 100–104, 113, 121, 126–128. Those allegations plausibly plead

11

calls made "on behalf of" Farmers. *See Wood v. Farmers Grp. Inc.*, 2023 WL 2628086, at *2 (C.D. Cal. Feb. 7, 2023).

Not only did Farmers design and implement the policies that endorsed and encouraged the actions and omissions that caused Plaintiff's injuries, it orchestrates the entire system that created such. AC ¶¶ 19–22, 61–62, 100–104, 113(i). These allegations describe the entity that designed and operated the telemarketing pipeline, not a bystander who merely learned after the fact that someone else made calls.

Farmers argues that it cannot be held liable because it delegated TCPA compliance to its agents, but this argument reinforces rather than destroys Farmers' liability. Farmers sets the telemarketing policies and guidance its agents must follow, retains the right to modify those rules at any time, requires agents and vendors to use Farmers branding, mandates the manner and content of telemarketing scripts, shares DNC data, approves lead vendors and disclosures, requires telemarketing training, and may discipline or terminate agents who fail to follow its policies. AC ¶¶ 107–113, 121. Having delegated TCPA compliance duties to common-law agents acting within the scope of that delegation and providing mandatory policies and practices that do not conform to the TCPA, Farmers cannot evade liability by saying it's all Farmers' agents' fault. After all, a principal cannot delegate performance of a legal duty to an agent and thereby eliminate the principal's own responsibility for conduct undertaken within the delegated authority. See Rest. (3d) Agency §§ 7.03 *cmt. b*, 7.04 & *cmt. b* (2006). Where, as alleged here, Farmers supplied the governing compliance rules and authorized agents to implement them in Farmers telemarketing, the agents were "the instrumentalit[ies] through which the principal achieve[d] the principal's objective." *Id.* § 7.04 *cmt. b*.

At a minimum, those allegations plausibly establish that the Holmes Agency acted as Farmers' common-law agent for telemarketing and telemarketing compliance. Farmers

12

authorized its agents to obtain third-party leads, required them to follow Farmers' telemarketing policies – which Farmers could change anytime it wishes – , controlled the content and branding of their solicitations, gave them access to Farmers systems and information, and retained the right to discipline or terminate them for noncompliance. AC ¶¶ 105–113, 121. The Holmes Agency's call was within that delegated role: it called a lead EverQuote transmitted through the Farmers lead-generation process, identified itself as Farmers Insurance, and sent Plaintiff a Farmers.com link to sell Farmers goods and services. AC ¶¶ 36–40. Farmers is liable for compliance failures committed by its common-law agents while performing the very telemarketing functions Farmers authorized them to perform.

Farmers' "physical caller" rule would let sellers avoid the Do Not Call rules by outsourcing the button-press to place the call while retaining control over the campaign, the vendor, the scripts, the branding, the compliance rules, and the benefits. That is not what § 227(c)(5)'s "by or on behalf of" language permits. Plaintiff alleges that Farmers created and operated the EverQuote/Farmers-agent telemarketing pipeline, delegated telemarketing and compliance responsibilities to common-law agents, supplied the (illegal) rules under which they acted, and benefited when the system marketed Farmers-branded insurance to Plaintiff. AC ¶¶ 105–129. That is enough to plead direct liability under the Internal Do Not Call provisions.

### C. The Amended Complaint Plausibly Pleads that EverQuote Acted as Farmers' Agent.

Farmers also argues that it cannot be held liable for EverQuote's calls, because EverQuote was merely a lead seller in an online marketplace. That argument ignores the relationship the Amended Complaint actually alleges. This is not an instance where EverQuote generated generic insurance leads and happened to sell one to a Farmers agent. Again, Farmers orchestrated the entire system: it selected and approved EverQuote, integrated EverQuote into

13

Farmers' Agency Growth Store, imposed TCPA compliance gates on EverQuote lead generation, approved EverQuote's consent language, tracked EverQuote leads through Farmers systems, and used EverQuote to connect consumers to Farmers agents for the purpose of marketing its insurance. AC ¶¶ 20–22, 61–62, 100–104.

Agency is "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Rest. (3d) Agency § 1.01 (2006). The agency need not encompass every aspect of the parties' relationship; "[a]spects of an overall relationship may constitute agency and entail its legal consequences while other aspects do not." *Id.* § 1.01 *cmt. b*. Nor must the principal control every detail of performance. A principal's right of control varies with the relationship, and an agent may exist even though the principal does not control "the full range of the agent's activities" or the agent's use of time and judgment. *Id.* § 1.01 *cmt. c*.

What distinguishes agency is the principal's right to give interim instructions concerning the entrusted work. *Id.* § 1.01 *cmt. f(1)*.[3] Actual authority exists when, at the time of acting, the agent reasonably believes from the principal's manifestations that the principal wishes the agent to act. Rest. (3d) Agency § 2.01 (2006). Its scope includes actions expressly or impliedly designated by the principal and actions necessary or incidental to accomplishing the principal's objectives. *Id.* § 2.02(1).

EverQuote's role in Plaintiff's calls illustrates the point. Farmers' Agency Growth Store encourages Farmers agents to purchase leads from vendors Farmers pre-approved for TCPA compliance, including EverQuote. AC ¶¶ 20, 61. Farmers controls the relationship between its

---

[3]     "Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling." Rest. (3d) Agency § 1.02.

agents and EverQuote, because it negotiated and executed agreements with the entities that make that system possible, including EverQuote, Verisk/Jornaya, LeadCloud, and others, AC ¶ 21, and it authorizes and encourages its agents to purchase EverQuote leads. AC ¶ 22. There is no reason why EverQuote cannot remain an independent lead marketplace, generally, and at the same time act as Farmers' agent for the discrete function of calling, qualifying, and routing leads into the Farmers channel. Rest. (3d) Agency § 1.01 *cmt. b*. ("Aspects of an overall relationship may constitute agency and entail its legal consequences while other aspects do not.")

Farmers set the policies that caused the violations alleged, requires that those engaged in telemarketing on its behalf adhere to those policies and maintains absolute control over its telemarketers' actions by reserving the right to change its policies whenever it wants. AC ¶ 117. That is not a bare buyer-seller relationship. It is a Farmers designed and curated lead-generation channel designed to move consumers from EverQuote to Farmers agents. *See Rosenberg*, 435 F. Supp. 3d at 325–26 (defendant authorized third parties to solicit customers, provided access to its systems, and benefited from the solicitations); *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 776–78 (N.D. Ill. 2014) (allegations supported inference that telemarketer acted with actual or apparent authority); *United States v. Dish Network, LLC*, 954 F.3d 970 (7th Cir. 2020) (contract authorizing seller "absolute discretion" to change its telemarketing policies gave seller "complete control" over telemarketers' performance); *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 583–87 (S.D. Ohio 2016) (allegations concerning authority, control, branding, and benefits sufficient to plead vicarious TCPA liability); *Cunningham v. Kondaur Cap. Corp.*, No. 3:14-cv-1574, 2014 WL 8335868, at *6–8 (M.D. Tenn. Nov. 19, 2014) *see also Wood v. Farmers Grp., Inc.*, No. 2:21-cv-08960, 2023 WL 2628086, at *2–3 (C.D. Cal. Feb. 7, 2023).

The compliance architecture Farmers designed and implemented further supports agency. Farmers engages third-party compliance company Jornaya to review the consent language on

15

websites from which EverQuote and other lead generators source leads, and Farmers approved the consent language and disclosures for the EverQuote lead that produced Plaintiff's calls. AC ¶ 62; 103. Jornaya purports to track consent events so EverQuote and Farmers can attempt to prove consent if confronted with a TCPA lawsuit. AC ¶ 104. Farmers participated in defining, approving, and policing the rules under which EverQuote generated and supplied leads for Farmers telemarketing. *See In re DISH Network*, 28 FCC Rcd. at 6592–93 ¶¶ 46, 52 (relevant evidence includes whether the seller authorized use of its trade name, provided access to information and systems normally within the seller's exclusive control, or knew of TCPA violations and failed to terminate the relationship); *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450–52 (9th Cir. 2018) (control over the "manner and means" of telemarketing is central to agency analysis); *Krakauer v. DISH Network, LLC*, 925 F.3d 643, 660–62 (4th Cir. 2019) (agency supported by authorization to market seller's services, use seller information and systems, and seller's ability to control or terminate telemarketing); *Rosenberg*, 435 F. Supp. 3d at 325–26.

Farmers' own data systems also tie EverQuote to Farmers' telemarketing operation. Farmers and its agents track EverQuote leads, telephone contacts, and telemarketing calls through an in-house CRM that is data-mapped with EverQuote. AC ¶ 102. Farmers and EverQuote also allegedly maintain the practical and technological ability to stop calling and remove a lead from their sales systems immediately after being notified that a lead is invalid or that a consumer makes a do-not-call request. AC ¶ 64. Those well-pleaded allegations are inconsistent with Farmers' attempt to portray EverQuote as an independent marketplace seller whose conduct was outside Farmers' control.

The calls themselves, too, confirm EverQuote's alleged function within the Farmers system. EverQuote called Plaintiff using caller ID that stated "Farmers Agent," at Farmers'

16

insistence. AC ¶ 25. EverQuote transmitted Plaintiff's lead information to the Holmes agency as part of a lead-generation process Farmers designed to connect consumers with Farmers agents. AC ¶ 37. The Holmes agency then called Plaintiff to sell Farmers goods and services, identified itself as "Farmers Insurance," and sent Plaintiff a Farmers.com agency link. AC ¶¶ 36–40. EverQuote thus did exactly what the alleged Farmers system was designed to do: connect a consumer lead to a Farmers agent to market Farmers insurance.

These allegations plausibly plead actual authority. Farmers allegedly approved EverQuote as a lead vendor, approved the disclosures EverQuote used to generate leads, set or participated in setting the consent parameters through Jornaya/Guardian, integrated EverQuote leads into Farmers systems, encouraged agents to buy EverQuote leads, and used EverQuote to connect consumers to Farmers agents. AC ¶¶ 20–22, 61–62, 100–104. At the pleading stage, those allegations support the inference that EverQuote acted subject to Farmers' control, or at least subject to Farmers' control over the specific telemarketing and TCPA-compliance functions at issue. Rest. (3d) Agency §§ 1.01, 2.01–2.02 (2006); *Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 150–51 (1st Cir. 2004) (whether an insurance intermediary acted for an insurer was a fact-dependent question, and the jury could find agency where the intermediary acted at least partly on the insurer's behalf in securing business); *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 742–43, 729 N.E.2d 1113, 1119 (2000) (agency turns on consent to act on another's behalf and the principal's right of control); *Rosenberg*, 435 F. Supp. 3d at 325–26.

Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Rest. (3d) Agency § 2.03 (2006). Farmers' argument incorrectly assumes apparent authority requires a personalized statement from the principal to the plaintiff. It does not. A manifestation may be

17

made through conduct and may be directed to the public or a class of persons rather than to a specifically identified individual. Rest. (3d) Agency §§ 1.03 *cmt. b*, 2.03 *cmt. c*. Additionally, a principal may manifest authority by placing an actor in a position or system from which third parties reasonably infer authority, including through established channels of communication, branding, or organizational practices. *Id.* § 1.03 *cmts. b–c*.

Plaintiff received a call displaying "Farmers Agent" on caller ID, was told the call would be transferred to a Farmers agency, and then received the follow-up call from a Farmers agency that identified itself as Farmers Insurance and sent a Farmers.com link. AC ¶¶ 25, 27–28, 36–40. Those were not private manifestations by EverQuote alone. The Amended Complaint alleges that these manifestations were the result of policies *Farmers imposed upon* EverQuote and the Holmes agency: it required use of Farmers' trade name during telemarketing calls, controlled Farmers branding, and required agents and vendors making calls on its behalf to state that the call was being made on behalf of Farmers. AC ¶¶ 113(b), 113(e), 123(a). Those allegations support the inference that Plaintiff reasonably understood EverQuote's call as authorized by Farmers, and that such understanding traces directly to Farmers' policy requiring that it be identified as the beneficiary of the calls.

The Amended Complaint also plausibly alleges ratification. Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Rest. (3d) Agency § 4.01(1) (2006). Ratification occurs through either "manifesting assent that the act shall affect the person's legal relations" or "conduct that justifies a reasonable assumption that the person so consents." *Id.* § 4.01(2). Ratification requires knowledge of material facts or a reckless assumption of risk, which may be inferred from the circumstances. *Id.* § 4.06 & *cmts. b, d*. Farmers knew its agents and their vendors were telemarketing on its behalf, received numerous complaints that the conduct violated the TCPA,

18

and nevertheless continued to accept the benefits of the system. AC ¶ 124. Farmers benefited from EverQuote-generated telemarketing through marketing exposure, sales opportunities, lead information, and consumer contacts. AC ¶¶ 125–127. In Plaintiff's case, the system Farmers created worked as intended: Plaintiff's information was treated as an insurance lead, Plaintiff was contacted by phone and text, he was transferred to a Farmers agent and Farmers-branded insurance products and services were marketed to him. AC ¶ 128. Farmers' continued acceptance of those benefits despite notice of unlawful calling plausibly pleads ratification. AC ¶ 129. A principal may not accept the economic benefits of an act while rejecting its accompanying legal consequences. Rest. (3d) Agency § 4.07 *cmt. b*; *see also Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073–75 (9th Cir. 2019) (ratification may arise through knowing acceptance of benefits); *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014–16 (9th Cir. 2018) (discussing knowledge and acceptance-of-benefits requirements); *Krakauer*, 925 F.3d at 659–62; *In re DISH Network*, 28 FCC Rcd. at 6593 ¶ 52. Unlike cases involving anonymous marketers who did not purport to act for the defendant, EverQuote displayed "Farmers Agent," identified the Holmes Farmers agency as the intended transfer recipient, and transmitted Plaintiff's lead into the Farmers sales channel. AC ¶¶ 25, 27–28, 37. The alleged conduct was therefore undertaken, or at minimum purportedly undertaken, on Farmers' behalf and was capable of ratification. *See Henderson*, 918 F.3d at 1074–75; *Kristensen*, 879 F.3d at 1014.

Farmers' marketplace-seller characterization therefore cannot support dismissal. The Amended Complaint alleges that EverQuote was an approved, integrated, compliance-gated component of the telemarketing pipeline Farmers created and curated. Farmers may dispute those allegations later. But at Rule 12, Plaintiff has plausibly alleged that EverQuote acted as Farmers' agent in generating, calling, transmitting, and routing leads to Farmers agents for Farmers-branded insurance sales.

19

**E. The Texas Act Claim Survives Because Farmers' Challenge Is Derivative of Its TCPA Arguments.**

Farmers does not identify any independent reason to dismiss Plaintiff's Texas Telephone Solicitation Act claim. Instead, Farmers treats that claim as derivative of Plaintiff's TCPA claims, arguing only that the Texas Act claim fails if no TCPA violation is plausibly alleged. Because Farmers' attack on the Texas Act claim rises or falls with its TCPA arguments, and because the TCPA claims are plausibly pleaded, the Texas Act claim should survive as well.

## CONCLUSION

The motion to dismiss should therefore be denied. At minimum, if the Court concludes that any theory requires additional detail, Plaintiff respectfully requests leave to amend.

Dated: July 16, 2026                                             Respectfully submitted,

                                                                /s/Alexander H. Burke

Alexander H. Burke, *pro hac vice*
**BURKE LAW OFFICES, LLC**
909 Davis Street, Suite 500
Evanston, IL 60201
(312) 729-5288
ABurke@BurkeLawLLC.com

Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

*Counsel for the Plaintiff*

20